SIERRA CLUB et al., Plaintiffs,

v.

Robert F. FROEHLKE, Secretary of the
Army, et al., Defendants,

Trinity River Authority of Texas et al.,
Defendants by Intervention.

Civ. A. No. 71–H–983.

United States District Court,
S. D. Texas,
Houston Division.

Feb. 16, 1973.

Robert H. Singleton, Lawrence D. Thompson, Houston, Tex., James W. Moorman, San Francisco, Cal., for plaintiffs.

Anthony J. P. Farris, U. S. Atty., Jack Shepherd, Chief Asst. U. S. Atty., Charles B. Wolfe, Asst. U. S. Atty., Houston, Tex., for defendants.

Martin Harris, Barry Bishop, Clark, Thomas, Harris, Denius & Winters, Austin, Tex., for Trinity River Authority of Texas.

William A. Olson, City Atty., Edward A. Cazares, First Asst. City Atty., Joseph G. Rollins, Senior Asst. City Atty., Houston, Tex., for City of Houston and Coastal Industrial Water Authority of Texas.

S. G. Johndroe, Jr., City Atty., City of Fort Worth, Tex., for Fort Worth, Tex.

N. Alex Bickley, Carroll R. Graham, Peter R. Thompson, Dallas, Tex., for City of Dallas, Texas.

## MEMORANDUM AND ORDER

CARL O. BUE, Jr., District Judge.

### A.

### 1.

### INTRODUCTION

The complexity of this case and the substantial record [1] submitted for review

---

1. The record in this case consists of thirteen book-boxes containing, by this Court's rough computation, some 246 items. These items range in length from a few pages

have caused this Court great concern. The geographical magnitude of the projects and the financial investment involved are very substantial. The Court has closely studied the entire record, paying particular attention to the various studies and congressional hearings. These include three studies pertaining to what this Court shall identify as the Trinity Project, described in detail hereafter, which were published in 1941,[2] 1965,[3] and most recently in 1968.[4] Sev-

to several thousand, such as in the Senate and House Hearings on public work projects. Because of the complexity of this case, and the need to refer occasionally to facts in more than one context, much of the source material has been placed in footnotes rather than in the text. For this reason footnotes will frequently consist of two parts. The first shall be a formal citation; the second, placed in brackets, will be the location of the described document or statement in one of the items located in one of the numbered boxes of records. For example, DEPARTMENT OF THE ARMY, CORPS OF ENGINEERS, TRINITY RIVER AND TRIBUTARIES, TEXAS, H.Doc.No.403, 77th Cong., 1st Sess. (1941) [Box 1, Item 5].

2. DEPARTMENT OF THE ARMY, CORPS OF ENGINEERS, TRINITY RIVER AND TRIBUTARIES, TEXAS, H.DOC.NO.403, 77th Cong., 1st Sess. (1941). This one volume study contains the basic District Engineer's report, several reports and reviews by higher levels within the Corps, and the Secretary of War's letter of transmittal of the study to Congress. In order to simplify subsequent references to one or another of these reports or comments, the following section notations are used:

§ 1—Letter of Transmittal from Henry L. Stimson, Secretary of War, to the Speaker of the House of Representatives, Oct. 1, 1941 [hereinafter cited as H. DOC.No.403 § 1 (1941)] [Box 1, Item 5, § 1].

§ 2—Report of Maj. Gen. J. L. Schley, Chief of Engineers, to the Secretary of War, Sept. 4, 1941 [hereinafter cited as H.DOC.No. 403 § 2 (1941)] [Box 1, Item 5, § 2].

§ 3—Report of the Board of Engineers for Rivers and Harbors, by Brig. Gen. Thomas M. Robins, Senior Member, Corps of Engineers, to the Chief of Engineers, Aug. 11, 1941 [hereinafter cited as H.DOC.No.403 § 3 (1941)] [Box 1, Item 5, § 3].

§ 4—Report of Col. F. S. Besson, Galveston District Engineer, Nov. 15, 1939. Subject: Survey of the Trinity River and Tributaries, Texas, for flood control and allied purposes, and for navigation [hereinafter cited as H.DOC.NO.403 §

4 (1941)] [Box 1, Item 5, § 4]. This is the basic, highly detailed report covering all aspects of the proposed project. § 5—Report of Col. R. G. Powell, Gulf of Mexico Division Engineer, New Orleans, Louisiana, Jan. 15, 1941, to the Chief of Engineers [hereinafter cited as H.DOC.NO.403 § 5 (1941)] [Box 1, Item 5, § 5].

3. DEPARTMENT OF THE ARMY, CORPS OF ENGINEERS, TRINITY RIVER AND TRIBUTARIES, TEXAS, H.DOC.NO.276 (1965). Volume one of this five volume study contains the basic District Engineer's report, several reports and reviews by higher levels within the Corps, letters with comments from other interested persons and agencies, and the Secretary of Army's letter of transmittal of the study to Congress. The remaining four volumes contain appendices embodying detailed studies on one or another specific topic, the conclusions of which are referred to in the main report. In order to simplify subsequent references to one or another of the reports or comments in volume one, the following section notations are used:

§ 1—Letter of Transmittal from Stanley R. Resor, Secretary of the Army, to the Speaker of the House of Representatives, Aug. 17, 1965 [hereinafter cited as H.DOC.NO.276 § 1 (1965)] [Box 1, Item 9, Vol. I, § 1].

§ 2—Comments of the Bureau of the Budget, Charles L. Schultze, Director, to the Secretary of the Army, Aug. 11, 1965 [hereinafter cited as H.DOC.NO. 276 § 2 (1965)] [Box 1, Item 9, Vol. I, § 2].

§ 2a—Section contains numerous letters of comment and endorsement from various state and federal agencies and officials. Where referred to, they will be identified in the footnote [hereinafter cited as H.DOC.NO.276 § 2a (1965)] [Box 1, Item 9, Vol. I, § 2a].

§ 3—Report of Lt. Gen. W. K. Wilson, Jr., Chief of Engineers, to the Secretary of the Army, Nov. 29, 1963 [hereinafter cited as H.DOC.NO.276 § 3 (1965)] [Box 1, Item 9, Vol. 1 § 3].

§ 4—Report of the Board of Engineers for Rivers and Horbors, by Maj. Gen. R. G. MacDonnell, Chairman, to the

4. See note 4 on page 1300.

eral relate specifically to what this Court will identify as the Wallisville

Chief of Engineers, Mar. 14, 1963 [hereinafter cited as H.DOC.NO.276 § 4 (1965)] [Box 1, Item 9, Vol. I, § 4].

§ 5—Report of Col. R. P. West, Fort Worth District Engineer, June 30, 1962. Subject: Comprehensive Survey Report on Trinity River and Tributaries, Texas [hereinafter cited as H.DOC.NO.276 § 5 (1965)] [Box 1, Item 9, Vol. I, § 5]. This is the basic, highly detailed report covering all aspects of the proposed project.

§ 6—Endorsement of Brig. Gen. C. H. Dunn, Southwestern Division Engineer, Dallas, Texas, Sept. 19, 1962 [hereinafter cited as H.DOC.NO.276 § 6 (1965)] [Box 1, Item 9, Vol. I, § 6].

Where reference is made to material located in one of the appendices to this report, reference will be made as follows:

App. I—Project Formulation, Vol. II, pages 1–102 [hereinafter cited as H.DOC.NO.276 App. I (1965)] [Box 1, Item 9, Vol. II, App. I].

App. II—Hydrology, Hydraulic Design, and Water Resources, Vol. III [hereinafter cited as H.DOC.NO.276 App. II (1965)] [Box 1, Item 9, Vol. III, App. II].

App. III—Navigation and Navigation Economics, Vol. II, pages 103–239 [hereinafter cited as H.DOC.NO.276 App. III (1965)] [Box 1, Item 9, Vol. II, App. III].

App. IV—Flood Control Economics, Vol. II, pages 241–272 [hereinafter cited as H.DOC.NO.276 App. IV (1965)] [Box 1, Item 9, Vol. II, App. IV].

App. V—Recreation and Fish and Wildlife, Vol. V, pages 1–116 [hereinafter cited as H.DOC.NO.276 App. V (1965)] [Box 1, Item 9, Vol. V, App. V].

App. VI—Cost Estimates, Geology, and Design Information, Vol. IV [hereinafter cited as H.DOC.NO.276 App. VI (1965)] [Box 1, Item 9, Vol. IV, App. VI].

App. VII—Economic Base Study, Vol. V, pages 117–216 [hereinafter cited as H.DOC.NO.276 App. VII (1965)] [Box 1, Item 9, Vol. V, App. VII].

App. VIII—Comments of other Agencies, Vol. V, pages 217–256 [hereinafter cited as H.DOC.NO.276 App. VIII (1965)] [Box 1, Item 9, Vol. V, App. VIII].

App. IX—Resolutions, Public Hearings, Prior Reports, Vol. V, pages 257–267 [hereinafter cited as H.DOC.NO.276 App. IX (1965)] [Box 1, Item 9, Vol. V, App. IX].

Project, including one published in 1961,[5] the general design memorandum [6]

4. DEPARTMENT OF THE ARMY, CORPS OF ENGINEERS, TRINITY RIVER AND TRIBUTARIES, TEXAS, H.DOC.NO.364 (1968). This one volume study contains the basic District Engineer's report, several reports and reviews by higher levels within the Corps, and the Secretary of the Army's letter of transmittal of the study to Congress. In order to simplify subsequent references to one or another of these reports or comments, the following section notations are used:

§ 1—Letter of Transmittal from Stanley R. Resor, Secretary of the Army, to the Speaker of the House of Representatives, July 15, 1968 [hereinafter cited as H.DOC.NO.364 § 1 (1968)] [Box 3, Item 43, § 1].

§ 2—Comments of the Bureau of the Budget, Charles J. Zwick, Director, to the Secretary of the Army, July 15, 1968 [hereinafter cited as H.DOC.NO.364 § 2 (1968)] [Box 3, Item 43, § 2].

§ 3—Report of Maj. Gen. F. J. Clarke, Acting Chief of Engineers, to the Secretary of the Army, June 28, 1968 [hereinafter cited as H.DOC.NO.364 § 3 (1968)] [Box 3, Item 43, § 3].

§ 4—Report of Col. Franklin B. Moon, Galveston District Engineer, May 29, 1968. Subject: Trinity River, Texas, Comprehensive Improvement Project—Reevaluation of Navigation Economics [hereinafter cited as H.DOC.NO.364 § 4 (1968)] [Box 3, Item 43, § 3]. This is the basic, highly detailed report covering all aspects of the economic reevaluation.

§ 5—Endorsement of Maj. Gen. C. C. Haug, Southwestern Division Engineer, Dallas, Texas, June 14, 1968 [hereinafter cited as H.DOC.NO.364 § 5 (1968)] [Box 3, Item 43, § 5].

Where reference is made to material located in one of the two appendices contained in this volume, it will be made as follows:

App. I—Engineering, pages 45–116 [hereinafter cited as H.DOC.NO.364 App. I (1968)] [Box 3, Item 43, App. I].

App. II—Navigation Economics, pages 117–628 [hereinafter cited as H.DOC. NO.364 App. II (1968)] [Box 3, Item 43, App. II].

5. DEPARTMENT OF THE ARMY, CORPS OF ENGINEERS, WALLIS-VILLE RESERVOIR, TRINITY RIV-

6. See note 6 on page 1301.

ER, TEXAS, H.DOC.NO.215, 87th Cong., 1st Sess. (1961). This one volume study contains the basic District Engineer's report, several reports and reviews by higher levels within the Corps, letters and comments from other interested persons and agencies, and the Secretary of Army's letter of transmittal of the study to Congress. In order to simplify subsequent references to one or another of the reports or comments in this volume, the following section notations are used:

§ 1—Letter of Transmittal from Elvis J. Stahr, Jr., Secretary of the Army, to the Speaker of the House of Representatives, July 14, 1961 [hereinafter cited as H.DOC.NO.215 § 1 (Wallisville 1961)] [Box 1, Item 8, § 1].

§ 2—Comments of the Bureau of the Budget, Carl H. Schwartz, Jr., Chief, Resources and Civil Works Division, to the Secretary of the Army, July 5, 1961 [hereinafter cited as H.DOC.NO. 215 § 2 (Wallisville 1961)] [Box 1, Item 8, § 2].

§ 2a—Section contains numerous letters of comment and endorsement from various state and federal agencies and officials. Where referred to they will be identified in the footnote [hereinafter cited as H.DOC.NO.215 § 2a (Wallisville 1961)] [Box 1, Item 8, § 2a].

§ 3—Report of Maj. Gen. Keith R. Barney, Acting Chief of Engineers, to the Secretary of the Army, Apr. 18, 1961 [hereinafter cited as H.DOC.NO. 215 § 3 (Wallisville 1961)] [Box 1, Item 8, § 3].

§ 4—Report of the Board of Engineers for Rivers and Harbors, by Maj. Gen. W. K. Wilson, Jr., Chairman, to the Chief of Engineers, May 6, 1960 [hereinafter cited as H.DOC.NO.215 § 4 (Wallisville 1961)] [Box 1, Item 8, § 4].

§ 5—Report of Col. E. A. Hansen, Galveston District Engineer, Apr. 6, 1960. Subject: Interim Review of reports on the Trinity River and Tributaries, Texas, (Wallisville Reservoir) [hereinafter cited as H.DOC.NO.215 § 5 (Wallisville 1961)] [Box 1, Item 8, § 5].

§ 6—Endorsement of Brig. Gen. Wm. Whipple, Southwestern Division Engineer, Dallas, Texas, Apr. 6, 1960 [hereinafter cited as H.DOC.NO.215 § 6 (Wallisville 1961)] [Box 1, Item 8, § 6].

Although four appendices were originally prepared with the District Engineer's report (Hydrology and Hydraulics, Engineering Data, Economics, Statement of Local Interests), only Appendix IV was printed with this volume. Where refer-ence is made to this appendix, it will be made as follows:

App. IV—Statement of Local Interests [hereinafter cited as H.DOC.NO.215 App. IV (Wallisville 1961)] [Box 1, Item 8, App. IV].

6. DEPARTMENT OF THE ARMY, CORPS OF ENGINEERS, WALLISVILLE RESERVOIR, DESIGN MEMORANDUM NO. 1 (GENERAL IN FEATURE DETAIL) (rev. ed., Aug. 1965). Vol. one of this three volume study contains the basic District Engineer's report, several appendices, and numerous letters containing comments regarding various features of the project. The remaining two volumes contain additional appendices. The first 103 pages of volume one, containing the letters, were not numbered consecutively at the time of printing the volume; thus the Court has taken the liberty of adding numbers for purposes of review. The main report, beginning at the 104th page of the volume, and each of the subsequent appendices have consecutively numbered pages which will be used hereinafter for references. In order to simplify subsequent reference to the material in this volume, the following section notations are used:

§ 1—Section contains numerous memos, letters of comment, endorsements, and replies by various levels of the Corps communicating with one another regarding the main report. Where reference is made to one of the documents in this section, it will be fully described in the footnote if necessary to a fuller understanding. All documents in this section, however, shall generally be referred to hereinafter as 1 WALLISVILLE GEN. DESIGN MEMO NO. 1 § 1 (1965) [Box 2, Item 25, § 1].

§ 2—This section consists of the main report of the District Engineer [hereinafter cited as 1 WALLISVILLE GEN.DESIGN MEMO NO. 1 § 2 (1965) [Box 2, Item 25, § 2].

Where reference is made to material located in one of the appendices to this report, reference will be made as follows:

App. A—Hydrology and Hydraulics, Vol. 1 [hereinafter cited as 1 WALLISVILLE GEN.DESIGN MEMO NO. 1 App. A (1965)] [Box 2, Item 25, App. A].

App. B—Geology and Soils, Vol. 1 [hereinafter cited as 1 WALLISVILLE GEN.DESIGN MEMO NO. 1 App. B (1965)] [Box 2, Item 25, App. B].

App. C—Costs, Project Evaluation, and Cost Allocations, Vol. 1 [hereinafter cited as 1 WALLISVILLE GEN.DESIGN MEMO NO. 1 App. C (1965)] [Box 2, Item 25, App. C].

and recreational study [7] published in 1965, and a supplement published in 1969.[8] Of central importance will be the environmental impact statement for the Wallisville Project, dated December, 1971.[9] The congressional hearings to

App. D—Exhibits, Vol. 1 [hereinafter cited as 1 WALLISVILLE GEN. DESIGN MEMO NO. 1, App. D (1965)] [Box 2, Item 25, App. D].
App. E—Electrical, Water and Sewage, and Corrosion Control, Vol. 1 [hereinafter cited as 1 WALLISVILLE GEN. DESIGN MEMO NO. 1, App. E (1965)] [Box 2, Item 25, App. E].
App. F—Navigation Lock, Vol. 2 [hereinafter cited as 2 WALLISVILLE GEN. DESIGN MEMO NO. 1, App. F (1965)] [Box 2, Item 26, App. F].
The third volume, containing data pertaining to the diversion control structure, was deleted in July, 1965, following engineering changes.

7. DEPARTMENT OF THE ARMY, CORPS OF ENGINEERS, WALLISVILLE RESERVOIR, DESIGN MEMORANDUM NO. 2A (June, 1965). This one volume study presents a preliminary plan surrounding the recreational features of the project [hereinafter cited as WALLISVILLE DESIGN MEMO NO. 2A (Recreation 1965)] [Box 2, Item 29].

8. DEPARTMENT OF THE ARMY, CORPS OF ENGINEERS, WALLISVILLE RESERVOIR, DESIGN MEMORANDUM NO. 1 (General in Feature Detail) SUPP. NO. 1 (February 1969). This supplement updates the Design Memorandum No. 1 by incorporating revisions resulting from more detailed planning and supplemental field data [hereinafter cited as WALLISVILLE DESIGN MEMO NO. 1, SUPP. NO. 1 (1969)] [Box 2, Item 28].

9. DEPARTMENT OF THE ARMY, CORPS OF ENGINEERS, ENVIRONMENTAL IMPACT STATEMENT, WALLISVILLE LAKE, TRINITY RIVER, TEXAS (Dec. 13, 1971) [hereinafter cited as WALLISVILLE EIS]. [Box 5, Item 102].

10. The extensive, multi-volume Congressional hearings relating to public works appropriations for fiscal year 1966 were submitted to the Court in Xerox form, excerpting those pages pertaining to the Trinity or Wallisville Projects, their components or related projects. This

which this Court has paid closest attention include those relating to appropriations for public works projects for the fiscal years 1966,[10] 1967,[11] 1968,[12] 1969,[13] 1970,[14] 1971,[15] 1972,[16] and 1973.[17]

Court for reference purposes, has identified these hearings as follows:
§ 1—Hearings on H.R. 9220 Before the Subcomm. of the Senate Comm. on Appropriations (Public Works Appropriations for Fiscal Year 1966), 89th Cong., 1st Sess., pt. 1 (1965) [hereinafter cited as 1966 Senate Subcomm. Hearings § 1] [Box 4, Item 81, § 1].
§ 2—Hearings on H.R. 9220 Before the Subcomm. of the Senate Comm. on Appropriations (Public Works Appropriations for Fiscal Year 1966), 89th Cong., 1st Sess., pt. 2 (1965) [hereinafter cited as 1966 Senate Subcomm. Hearings § 2] [Box 4, Item 81, § 2].
§ 3—Hearings on H.R. 9220 Before the Subcomm. of the House Comm. on Appropriations (Public Works Appropriations for Fiscal Year 1966), 89th Cong., 1st Sess., pt. 4 (1965) [hereinafter cited as 1966 House Subcomm. Hearings § 3] [Box 4, Item 81, § 3].

11. The extensive, multi-volume Congressional hearings relating to public works appropriations for fiscal year 1967 were submitted to the Court in Xerox form, excerpting those pages pertaining to the Trinity or Wallisville Projects, their components or related projects. This Court for reference purposes has identified these hearings as follows:
§ 1—Hearings on H.R. 17787 Before sional hearings relating to public works appropriations for fiscal year 1967 were submitted to the Court in Xerox form, excerpting those pages pertaining to the Trinity or Wallisville Projects, their components or related projects. This Court for reference purposes has identified these hearings as follows:
§ 1—Hearings on H.R. 17787 Before the Subcomm. of the Senate Comm. on Appropriations (Public Works Appropriations for Fiscal Year 1967), 89th Cong., 2d Sess., pt. 1 (1966) [hereinafter cited as 1967 Senate Subcomm. Hearings § 1] [Box 4, Item 82, § 1].
§ 2—Hearings on H.R. 17787 Before the Subcomm. of the Senate Comm. on Appropriations (Public Works Appropriations for Fiscal Year 1967), 89th Cong., 2d Sess., pt. 2 (1966) [herein-

after cited as 1967 Senate Subcomm. Hearings § 2] [Box 4, Item 82, § 2]. § 3—Hearings on H.R. 17787 Before the Subcomm. of the House Comm. on Appropriations (Public Works Appropriations for Fiscal Year 1967), 89th Cong., 2d Sess., pt. 1 (1966) [hereinafter cited as 1967 House Subcomm. Hearings § 3] [Box 4, Item 82, § 3]. § 4—Hearings on H.R. 17787 Before the Subcomm. of the House Comm. on Appropriations (Public Works Appropriations for Fiscal Year 1967), 89th Cong., 2d Sess., pt. 3 (1966) [hereinafter cited as 1967 House Subcomm. Hearings § 4] [Box 4, Item 82, § 4].

12. The extensive, multi-volume Congressional hearings relating to public works appropriations for fiscal year 1968 were submitted to the Court in Xerox form, excerpting those pages pertaining to the Trinity or Wallisville Projects, their components or related projects. This Court for reference purposes has identified these hearings as follows:

§ 1—Hearings on H.R. 11641 Before the Subcomm. of the Senate Comm. on Appropriations (Public Works and Atomic Energy Commission Appropriations for Fiscal Year 1968), 90th Cong., 1st Sess., pt. 1 (1967) [hereinafter cited as 1968 Senate Subcomm. Hearings § 1] [Box 4, Item 83, § 1]. § 2—Hearings on H.R. 11641 Before the Subcomm. of the Senate Comm. on Appropriations (Public Works and Atomic Energy Commission Appropriations for Fiscal Year 1968), 90th Cong., 1st Sess., (non-departmental witnesses) (1967) [hereinafter cited as 1968 Senate Subcomm. Hearings § 2] [Box 4, Item 83, § 2]. § 3—Hearings on H.R. 11641 Before the Subcomm. of the House Comm. on Appropriations (Public Works Appropriations for Fiscal Year 1968), 90th Cong., 1st Sess., pt. 1 (1967) [hereinafter cited as 1968 House Subcomm. Hearings § 3] [Box 4, Item 83, § 3]. § 4—Hearings on H.R. 11641 Before the Subcomm. of the House Comm. on Appropriations (Public Works Appropriations for Fiscal Year 1968), 90th Cong., 1st Sess., pt. 3 (1967) [hereinafter cited as 1968 House Subcomm. Hearings § 4] [Box 4, Item 83, § 4].

13. The extensive, multi-volume Congressional hearings relating to public works appropriations for fiscal year 1969 were submitted to the Court in Xerox form, excerpting those pages pertaining to the Trinity or Wallisville Projects, their components or related projects. This Court for reference purposes has identified these hearings as follows:

§ 1—Hearings on H.R. 17903 Before the Subcomm. of the Senate Comm. on Appropriations (Public Works for Water and Power Resources Development and Atomic Energy Commission Appropriations for Fiscal Year 1969), 90th Cong., 2d Sess., pt. 1 (1968) [hereinafter cited as 1969 Senate Subcomm. Hearings § 1] [Box 4, Item 84, § 1]. § 2—Hearings on H.R. 17903 Before the Subcomm. of the Senate Comm. on Appropriations (Public Works for Water and Power Resources Development and Atomic Energy Commission Appropriations for Fiscal Year 1969), 90th Cong., 2d Sess., pt. 2 (1968) [hereinafter cited as 1969 Senate Subcomm. Hearings § 2] [Box 4, Item 84, § 2]. § 3—Hearings on H.R. 17903 Before the Subcomm. of the House Comm. on Appropriations (Public Works Appropriations for Water and Power Resources Development and the Atomic Energy Commission for Fiscal Year 1969), 90th Cong., 2d. Sess., pt. 1 (1968) [hereinafter cited as 1969 House Subcomm. Hearings § 3] [Box 4, Item 84, § 3].

14. The extensive, multi-volume Congressional hearings relating to public works appropriations for fiscal year 1970 were submitted to the Court in Xerox form, excerpting those pages pertaining to the Trinity or Wallisville Projects, their components or related projects. This Court for reference purposes has identified those hearings as follows:

§ 1—Hearings on H.R. 19877 Before the Subcomm. on Rivers and Harbors and the Subcomm. on Flood Control of the House Comm. on Public Works (Omnibus River and Harbor and Flood Control Act of Fiscal Year 1970), 91st Cong., 2d Sess., (Hearings of September 30 through October 13) (1970) [hereinafter cited as 1970 House Subcomm. Hearings § 1] [Box 4, Item 85, § 1]. § 2—Hearings on H.R. 14159 Before the Subcomm. of the Senate Comm. on Appropriations (Public Works for Water, Pollution Control, and Power Development and Atomic Energy Commission Appropriations for Fiscal Year 1970), 91st Cong., 1st Sess., pt. 1 (1969) [hereinafter cited as 1970 Senate Subcomm. Hearings § 2] [Box 4, Item 85, § 2]. § 3—Hearings on H.R. 14159 Before the Subcomm. of the Senate Comm. on Appropriations (Public Works for Water, Pollution Control, and Power

Development and Atomic Energy Commission Appropriations for Fiscal Year 1970), 91st Cong., 1st Sess., pt. 5 (1969) [hereinafter cited as 1970 Senate Subcomm. Hearings § 3] [Box 4, Item 85, § 3].

§ 4—Hearings on H.R. 14159 Before the Subcomm. of the Senate Comm. on Appropriations (Public Works for Water, Pollution Control, and Power Development and Atomic Energy Commission Appropriations for Fiscal Year 1970), 91st Cong., 1st Sess., pt. 6 (1969) [hereinafter cited as 1970 Senate Subcomm. Hearings § 4] [Box 4, Item 85, § 4].

§ 5—Hearings on H.R. 14159 Before the Subcomm. of the Senate Comm. on Appropriations (Public Works for Water, Pollution Control, and Power Development and Atomic Energy Commission Appropriations for Fiscal Year 1970), 91st Cong., 1st Sess., pt. 7 (1969) [hereinafter cited as 1970 Senate Subcomm. Hearings § 5] [Box 4, Item 85, § 5].

§ 6—Hearings on H.R. 14159 Before the Subcomm. of the House Comm. on Appropriations (Public Works Appropriations for Water and Power Resources Development and the Atomic Energy Commission for Fiscal Year 1970), 91st Cong., 1st Sess., pt. 1 (1969) [hereinafter cited as 1970 House Subcomm. Hearings § 6] [Box 4, Item 85, § 6].

§ 7—Hearings on H.R. 14159 Before the Subcomm. of the House Comm. on Appropriations (Public Works Appropriations for Water and Power Resources Development and the Atomic Energy Commission for Fiscal Year 1970), 91st Cong., 1st Sess., pt. 5 (1969) [hereinafter cited as 1970 House Subcomm. Hearings § 7] [Box 4, Item 85, § 7].

15. The extensive, multi-volume Congressional hearings relating to public works appropriations for fiscal year 1971 were submitted to the Court in Xerox form, excerpting those pages pertaining to the Trinity or Wallisville Projects, their components or related projects. This Court for reference purposes has identified these hearings as follows:

§ 1—Hearings on H.R. 18127 Before the Senate Comm. on Appropriations (Public Works for Water, Pollution Control, and Power Development and Atomic Energy Commission Appropriations for Fiscal Year 1971), 91st Cong., 2d Sess., pt. 4, Vol. 1 (1970) [hereinafter cited as 1971 Senate Comm.

Hearings § 1] [Box 4, Item 86, § 1].

§ 2—Hearings on H.R. 18127 Before the Subcomm. of the Senate Comm. on Appropriations (Public Works for Water, Pollution Control, and Power Development and Atomic Energy Commission Appropriations for Fiscal Year 1971), 91st Cong., 2d Sess., 47–073 (1970) [hereinafter cited as 1971 Senate Subcomm. Hearings § 2] [Box 4, Item 86, § 2].

§ 3—Hearings on H.R. 18127 Before the Subcomm. of the Senate Comm. on Appropriations (Public Works for Water, Pollution Control, and Power Development and Atomic Energy Commission Appropriations for Fiscal Year 1971), 91st Cong., 2d Sess., 41–379 (1970) [hereinafter cited as 1971 Senate Subcomm. Hearings § 3] [Box 4, Item 86, § 3].

§ 4—Hearings on H.R. 18127 Before the Subcomm. of the House Comm. on Appropriations (Public Works for Water, Pollution Control, and Power Development and Atomic Energy Commission Appropriation Bill for Fiscal Year 1971), 91st Cong., 2d Sess., pt. 1 (1970) [hereinafter cited as 1971 House Subcomm. Hearings § 4] [Box 4, Item 86, § 4].

§ 5—Hearings on H.R. 18127 Before the Subcomm. of the House Comm. on Appropriations (Public Works for Water, Pollution Control, and Power Development and Atomic Energy Commission Appropriation Bill for Fiscal Year 1971), 91st Cong., 2d Sess., pt. 2 (1970) [hereinafter cited as 1971 House Subcomm. Hearings § 5] [Box 4, Item 86, § 5].

§ 6—Hearings on H.R. 18127 Before the Subcomm. of the House Comm. on Appropriations (Public Works for Water, Pollution Control, and Power Development and Atomic Energy Commission Appropriation Bill for Fiscal Year 1971), 91st Cong., 2d Sess., pt. 5 (1970) [hereinafter cited as 1971 House Subcomm. Hearings § 6] [Box 4, Item 86, § 6].

16. The extensive, multi-volume Congressional hearings relating to public works appropriations for fiscal year 1972 were submitted to the Court in Xerox form, excerpting those pages pertaining to the Trinity or Wallisville Projects, their components or related projects. This Court for reference purposes has identified these hearings as follows:

§ 1—Hearings on H.R. 10090 Before the Subcomm. of the Senate Comm. on Appropriations (Public Works for Water and Power Development and Atomic Energy Commission Appropria-

tions for Fiscal Year 1972), 92d Cong., 1st Sess., pt. 2 (1971) [hereinafter cited as 1972 Senate Subcomm. Hearings § 1] [Box 4, Item 87, § 1].

§ 2—Hearings on H.R. 10090 Before the Subcomm. of the Senate Comm. on Appropriations (Public Works for Water and Power Development and Atomic Energy Commission Appropriations for Fiscal Year 1972), 92d Cong., 1st Sess., pt. 4, Vol. 2 (1971) [hereinafter cited as 1972 Senate Subcomm. Hearings § 2] [Box 4, Item 87, § 2].

§ 3—Hearings on H.R. 10090 Before the Subcomm. of the Senate Comm. on Appropriations (Public Works for Water and Power Development and Atomic Energy Commission Appropriations for Fiscal Year 1972), 92d Cong., 1st Sess., pt. 4, Vol. 1 (1971) [hereinafter cited as 1972 Senate Subcomm. Hearings § 3] [Box 4, Item 87, § 3].

§ 4—Hearings on H.R. 10090 Before the Subcomm. of the Senate Comm. on Appropriations (Public Works for Water and Power Development and Atomic Energy Commission Appropriations for Fiscal Year 1972), 92d Cong., 1st Sess., pt. 5 (1971) [hereinafter cited as 1972 Senate Subcomm. Hearings § 4] [Box 4, Item 87, § 4].

§ 5—Hearings on H.R. 10090 Before the Subcomm. of the House Comm. on Appropriations (Public Works for Water and Power Development and Atomic Energy Commission Appropriation Bill for Fiscal Year 1972), 92d Cong., 1st Sess., pt. 2 (1971) [hereinafter cited as 1972 House Subcomm. Hearings § 5] [Box 4, Item 87, § 5].

§ 6—Hearings on H.R. 10090 Before the Subcomm. of the House Comm. on Appropriations (Public Works for Water and Power Development and Atomic Energy Commission Appropriation Bill for Fiscal Year 1972), 92d Cong., 1st Sess., pt. 5 (1971) [hereinafter cited as 1972 House Subcomm. Hearings § 6] [Box 4, Item 87, § 6].

17. The extensive, multi-volume Congressional hearings relating to public works appropriations for fiscal year 1973 were submitted to the Court in Xerox form, excerpting those pages pertaining to the Trinity or Wallisville Projects, their components or related projects. This Court for reference purposes has identified these hearings as follows:

§ 1—Hearings on H.R. 15586 Before the Senate Comm. on Appropriations (Public Works for Water, Pollution Control, and Power Development and Atomic Energy Commission Appropriations for Fiscal Year 1973), 92d Cong., 2d Sess., pt. 1, Vol. 1 (1972) [hereinafter cited as 1973 Senate Comm. Hearings § 1] [Box 7, Item 144, § 1].

§ 2—Hearings on H.R. 15586 Before the Senate Comm. on Appropriations (Public Works for Water, Pollution Control, and Power Development and Atomic Energy Commission Appropriations for Fiscal Year 1973), 92d Cong., 2d Sess., pt. 1. Vol. 2 (1972) [hereinafter cited as 1973 Senate Comm. Hearings § 2] [Box 7, Item 144, § 2].

§ 3—Hearings on H.R. 15586 Before the Senate Comm. on Appropriations (Public Works for Water, Pollution Control, and Power Development and Atomic Energy Commission Appropriations for Fiscal Year 1973), 92d Cong., 2d Sess., pt. 4, Vol. 1 (1972) [hereinafter cited as 1973 Senate Comm. Hearings § 3] [Box 7, Item 144, § 3].

§ 3a—Hearings on H.R. 15586 Before the Senate Comm. on Appropriations (Public Works for Water, Pollution Control, and Power Development and Atomic Energy Commission Appropriations for Fiscal Year 1973, 92d Cong., 2d Sess., pt. 5 (1972) [hereinafter cited as 1973 Senate Comm. Hearings § 3a] [Box 7, Item 144, § 3a].

§ 4—Hearings on H.R. 15586 Before the Subcomm. of the House Comm. on Appropriations (Public Works for Water and Power Development and Atomic Energy Commission Appropriation Bill for Fiscal Year 1973), 92d Cong., 2d Sess., pt. 1 [hereinafter cited as 1973 House Subcomm. Hearings § 4] [Box 7, Item 144, § 4].

§ 5—Hearings on H.R. 15586 Before the Subcomm. of the House Comm. on Appropriations (Public Works for Water and Power Development and Atomic Energy Commission Appropriation Bill for Fiscal Year 1973), 92d Cong., 2d Sess., pt. 2 [hereinafter cited as 1973 House Subcomm. Hearings § 5] [Box 7, Item 144, § 5].

§ 6—Hearings on H.R. 15586 Before the Senate Comm. on Appropriations (Public Works for Water, Pollution Control, and Power Development and Atomic Energy Commission Appropriations for Fiscal Year 1973), 92d Cong., 2d Sess., pt. 4, Vol. 2 (1972) [hereinafter cited as 1973 Senate Comm. Hearings § 6] [Box 7, Item 144, § 6].

§ 7—Hearings on H.R. 15586 Before the Subcomm. of the House Comm. on Appropriations (Public Works for Water and Power Development and Atomic Energy Commission Appropriation Bill for Fiscal Year 1973), 92d Cong., 2d Sess., pt. 5 [hereinafter cited as 1973 House Subcomm. Hearings § 7] [Box 7, Item 144, § 1].

## 2.

### THE PARTIES AND ISSUES

#### a.

##### *Description of Parties*

This case is brought as a class action by five organizations and two individuals on behalf of themselves and a class who have enjoyed or otherwise derived benefit from the Trinity River, Trinity Bay, and surrounding areas in their natural state and who wish to preserve and enhance such areas in their natural state and beauty. Four of the organizations include the Sierra Club, the Houston Audubon Society, the Houston Sportsmens Club and the Environmental Protection Fund. In general, each alleges a membership in Texas who use and enjoy the waters of the Trinity River, Trinity Bay, and surrounding areas. Collectively, they exist for purposes of promoting conservation and proper management of land, water and wildlife resources. The fifth organization, the Texas Shrimp Association, is composed of members primarily engaged in commercial shrimping in areas of the Trinity River, Trinity Bay, and related localities. The organization exists for the purpose, among others, of preserving the shrimp nursery grounds in their natural state. The two named individuals, Charles L. Peting and Eugene A. Dutton, live in or near the affected areas where they have hunted, trapped, fished and shrimped in the Trinity River and Trinity Bay areas, and they wish to preserve these areas in their natural state. The complaint, taken as a whole, alleges that the failure of the defendants to abide by the applicable law has caused irreparable harm and damage to plaintiffs who have no adequate remedy at law.

Named as defendants in the complaint are Robert F. Froehlke, Secretary of the Army, Lt. Gen. Frederick J. Clark, Chief of Engineers of the Army Corps of Engineers, and Col. Nolan C. Rhodes, District Engineer of the Army Corps of Engineers. All defendants, collectively referred to as the Corps by this Court, are sued in their official capacities. For purposes of this decision, the Court requested, and the Corps supplied, a simplified chain-of-command for the Corps of Engineers. This is included in the footnotes.[18] Another party appear-

18. See note 18 on page 1307.

## SIMPLIFIED CHAIN OF COMMAND

### Secretary of the Army

The Secretary of the Army is the head of the Department of the Army. Subject to the direction, authority, and control of the President as Commander in Chief and of the Secretary of Defense. He is responsible for the conduct of all affairs of the Department of the Army including the Civil Works Program of the Corps of Engineers. In this capacity he *reviews studies made under direction of the Chief of Engineers pursuant to Congressional request and submits the finished product* to Congress as a "favorable" or "unfavorable" report depending upon whether the project involved is recommended for accomplishment or is considered unjustified, uneconomical or infeasible.

### UNDER SECRETARY OF THE ARMY

As deputy and principal civilian assistant, acts with full authority of the Secretary in the general management of the Department.

### OFFICE OF CIVIL FUNCTIONS
#### Department of the Army

Responsible for the civil functions of the Department of the Army, including the Civil Works Programs of the Corps Engineers, and miscellaneous civil functions as assigned.

### CHIEF OF ENGINEERS

Under the direction and supervision of the Secretary of the Army, the Chief of Engineers has responsibility for planning, programing, budgeting and engineering, construction operations and maintenance and real estate, necessary for the improvement of rivers, harbors, and waterways for navigation, flood control, and related purposes; administration of laws for the protection and preservation of navigable waters and other duties, including directing and supervising the preparation of reports on proposed navigation, flood control or related projects as requested by Congress and the planning, designing, constructing, operating, and maintaining of projects authorized by Congress.

### BOARD OF ENGINEERS FOR RIVERS AND HARBORS

Conducts independent reviews of surveys and special reports as requested by Act of Congress or resolution of Congressional Committees, or as directed by the Chief of Engineers. concerning proposed works for development of water resources of the United States and makes recommendations in compliance with study directives. Reviews and approves plans for major modification or reconstruction of existing navigation improvements. See U.S.C. 541.

### DIRECTORATE OF CIVIL WORKS
#### Office Chief of Engineers

Responsible for those functions assigned to the Chief of Engineers relating to civil works, as distinguished from military activities, and pertaining to the Planning, design, construction, operation and maintenance and real estate necessary for the development of the nation's water resources and the improvement of rivers, harbors and waterways for navigation, flood control, hydro-electric power and related purposes, including shore protection.

### DIVISION ENGINEER, SOUTHWESTERN DIVISION

U. S. Army Engineer Divisions are supervisory offices having jurisdiction over specified geographical or program areas. The Southwestern Division encompasses all of Oklahoma, most of Texas and New Mexico and a part of Kansas, Colorado, Arkansas and Louisiana.

### DISTRICT ENGINEER, GALVESTON DISTRICT
#### (Wallisville Lake)

U. S. Army Engineer Districts are the principal operational offices of the Corps of Engineers for the design and construction of civil and military facilities for the U. S. Army, the U. S. Air Force and other governmental agencies. The Galveston District handles only civil works matters; prepares engineer studies and develops the design for facilities; operates and maintains flood control and river and harbor (navigation) facilities and installations. The Galveston District is charged with supervision and management of the work on the Wallisville Lake Project.

### DISTRICT ENGINEER, FT. WORTH DISTRICT
#### (Trinity River & Tributaries)

The general functions of this District are the same as those described for the Galveston District, opposite, except that the Fort Worth District handles both Military and Civil Works matters. The Fort Worth District is charged with the design and construction of the Trinity River and Tributaries Project as authorized by Congress.

SIMPLIFIED CHAIN OF COMMAND

[Box-7, Item 142]

ing as a defendant, by intervention, is the Trinity River Authority of Texas (hereinafter referred to as the TRA). The TRA is a governmental agency of the State of Texas which was created as a conservation and reclamation district pursuant to statute.[19] The duty of the TRA is to prepare a master plan for the maximum development of the soil and water resources of the entire Trinity River watershed, including plans for the complete utilization, for all economically beneficial purposes, of the water resources of the watershed. The TRA is empowered to engage in water supply, flood control, pollution control, sewerage transportation and treatment, navigation, soil conservation and other related activities. Both the Wallisville and Trinity River Navigation Projects are located within the territory over which the TRA has authority. The record indicates that the TRA has been active in promoting and coordinating planning and construction activities related to both of these projects as well as several others. The City of Houston, Texas, defendant by intervention, is a municipal corporation concerned with the conveyance, transportation and distribution of water for and on behalf of the City. Much of its water sources presently come from the Trinity River, and it has contracted with the federal government to store and impound water in the reservoir being created by the Wallisville Project. The Coastal Industrial Water Authority of Texas, which intervened jointly with the City of Houston, is a governmental agency of the State of Texas created as a conservation and reclamation district and authorized to sell, transport and deliver water to customers. Additional defendants are the Cities of Dallas and Fort Worth, Texas, both of which are being allowed to intervene as defendants by this opinion,[20] as

they have substantial interests in flood control and navigational aspects of the Trinity Projects.

b.

### Description of Projects

The controversy in this case focuses upon a comprehensive development program of the Trinity River Basin which includes provisions for navigation, flood control, water conservation and recreation.[21] This is being accomplished in part by the State of Texas and in part by the Corps of Engineers, both working together. Part of this development program is the Trinity Project which provides for a multiple purpose channel 12 x 200 feet in dimensions extending about 363 miles from the Houston Ship Channel in Galveston Bay, near the Gulf of Mexico, to Fort Worth, Texas. The channel serves both navigation and flood control purposes and will consist of sixteen navigation dams and twenty navigation locks to overcome a total lift of 496 feet. The channel will follow an existing navigation channel to Liberty, Texas, and pass through the pools of Wallisville, Livingston and Tennessee Colony reservoirs. The existing Dallas floodway will be enlarged, and part of the Trinity River and tributary channels in the vicinity of Dallas will be realigned for flood control. This project also entails other flood control features, construction of about 98 miles of 84 inch pipeline from Tennessee Colony Lake to Benbrook Lake, and alterations to existing bridges and utilities to provide navigation clearances. Future plans include a widening of the channel to 250 feet and the adding of duplicate locks with pumping facilities to recirculate water. Provisions are also made for water quality control, recreation and redevelopment.[22] The latest projected appropri-

---

19. Tex.Rev.Civ.Stat. art. 8280–188 (1959), *as amended* (Supp.1971).

20. *See* pages 1336 to 1337 *infra* and accompanying text.

21. A map depicting the comprehensive plan of development for the Trinity River Basin is located at Appendix A *infra*.

22. *See* 1973 Senate Comm. Hearings § 2, *supra* note 17, at 1407; H.Doc. No. 364 § 3, *supra* note 4, at 1–3.

ation estimate for the total Trinity project to completion is $1,356,000,000.[23] The magnitude of this project may be seen by considering that the total civil works budget for the Corps of Engineers in the entire country for fiscal year 1973 is $1,844,591,000.[24] According to the record, with the exception of Wallisville, no construction work has begun on any of the specified components of the Trinity Project, although engineering and environmental studies and evaluations are underway.

The focal point of this litigation is the Wallisville Project. Located at the mouth of the Trinity River, this project consists of a low dam 39,000 feet in length, a navigation lock compatible with the dimensions indicated for the Trinity Project's navigation features and ancillary facilities needed for operation of the lock. The structural facilities will occupy approximately 80 acres of land, while the reservoir contained behind the dam will, at its initial maximum operating level of four feet, cover approximately 19,700 acres. This project also entails enlarging an existing 6 foot deep by 100 foot wide navigation channel from the reservoir to Liberty, Texas, a distance of approximately twelve miles, as well as developing recreational facilities.[25] The total estimated appropriation cost of the Wallisville Project is $28,800,000. As of December 31, 1972, construction on the dam and lock is represented to be approximately 87 percent complete with the overall project development being approximately 72 percent complete.

The project territory for the Trinity Project includes wooded lands, pasture and crop lands with the majority of the area being characterized as agricultural.[26] The Wallisville Project will submerge substantial amounts of woodands and marshands which provide natural settings for a variety of wildlife, waterfowl and fish, some of which are referred to as rare and endangered species.

The plaintiffs, in their complaint, point out that the defendant Army Corps of Engineers intends to cut out 184 of the natural crooks and bends and convert the Trinity River into a generally straight barge canal 370 miles long, 12 feet deep and 250 feet wide with additional footage on either side. The plaintiffs continue by alleging the following:

Plaintiffs would show that the construction of the Trinity Project will destroy thousands of acres of bottomland and hundreds of thousands of trees between Fort Worth-Dallas and the Gulf of Mexico. Numerous game, fish and other wildlife will lose their habitat and perish. Industrial and population growth will be thereby encouraged in over-developed areas with resulting pollution and urban problems. Construction of the projected barge canal across Texas will concentrate heavy industry along its banks which, when considered with the trafficking of barges and boats up and down the canal, shall reduce the free-flowing Trinity River to a series of placid pools with polluted and stagnant water.

Plaintiffs also state that the Wallisville Project will cause substantial harm to the saltwater commercial fishing industry in that the reservoir will convert to a freshwater condition substantial acres of saltwater marshlands that are breed-

23. 1973 Senate Comm. Hearings § 2, *supra* note 17, at 1407.

24. Public Works for Water and Power Development and Atomic Energy Commission Appropriation Act of 1973, Pub. L. No. 92–405, 86 Stat. 621, U.S.C.Cong. & Admin.News, p. 713 (1972). *See also,* H.Rep. No. 92–1310, 92d Cong., 2d Sess. 6–28 (1972) (Conference Report) [Box 8, Item 158a].

25. *See* WALLISVILLE EIS, *supra* note 9, at 2–3; 1972 Senate Subcomm. Hearings § 1, *supra* note 16, at 1664.

26. *See* Department of the Army, Corps of Engineers, Trinity River Project, Texas, Tennessee Colony Lake Design Memorandum No. TC–2, Site Selection and Project Formulation, I–2 (1971) [hereinafter cited as Tenn. Colony Lake Memo] [Box FW, Item ii]; H.Doc. No. 364 App. I, *supra* note 4, at 54.

ing areas of commercial species. Agencies generally concurring with the plaintiffs' position regarding environmental aspects of the Wallisville Project include the Environmental Protection Agency (EPA),[27] the Bureau of Sport Fisheries and Wildlife, U. S. Department of the Interior,[28] the National Marine Fisheries Service,[29] and the Texas Department of Parks and Wildlife.[30] The environmental impact of the Trinity Project has not yet been adequately measured; thus the various positions with respect to specific environmental impacts are not as fully developed in this record as they are with respect to the Wallisville Project.

Perhaps a document appearing in the record best expresses the position of the Corps with respect to water resource projects and their related environmental problems. It provides in part:

It has long been the policy of the Corps to coordinate its water resource projects with all local, state, and Federal agencies concerned with recreational and fish and wildlife resources located in each project area. Since the passage of the National Environmental Policy Act of 1969 (Public Law No. 91–190), the Corps has been required to issue a formal statement of the impact of any Corps project on the natural environment. The Environmental Impact Statement for the Trinity River study is presently scheduled for completion in 1972. Until the environmental survey is made by qualified personnel and an impact statement prepared and reviewed by all of the local, state, and Federal agencies involved in evaluating the

relative need and value of these resources, a complete assessment of the project's impact on the environment cannot be made. A full assessment of the relative value of land and water resources in terms of a positive and negative effect of the project on the natural environment and the ecological balance within the project area will be included in the statement. (Some persons) subscribe to the often expressed belief that all Corps projects, per se, destroy most environmental values, including land, water, and fish and wildlife resources. A project of this size and scope will open large recreation areas to the general public for such activities as: boating, canoeing, sailing, hiking, fishing, scenic driving, etc.

With the Federal Government's participation in this project, large areas of land will come under the Federal control in the form of operation and maintenance easements. This control will afford the Federal Government the opportunity to manage development and public use along the waterway in a manner consistent with the intent of Congress in Public Law No. 91–190. Recreational type activities such as those previously mentioned would be encouraged in the controlled areas and facilities to accommodate public access and use will be provided. Thus, the land use potential of the area with respect to preserving and enhancing environmental qualities will be maximized. While the project plan calls for widening, deepening, and straightening the Trinity River, it also contemplates leaving the River

27. Letter of Kenton Kirkpatrick, Director, Office of Planning, to Galveston District Engineer, Mar. 1, 1971. WALLISVILLE EIS, *supra* note 9, at A–16 to A–19.

28. Letter of Robert F. Stevens, Acting Regional Director, to Galveston District Engineer, Nov. 6, 1970. WALLISVILLE EIS, *supra* note 9, at A–1. Previous letters may be found at E1–1, E3–1, E4–1.

29. Comments, accompanying letter of James R. Hibbs, for Sidney R. Galler, Deputy Assistant Secretary for Environmental Affairs, U.S. Department of Commerce, to Office of Chief Engineer, June 7, 1971. WALLISVILLE EIS, *supra* note 9, at A–4.

30. Letter of J. R. Singleton, Executive Director, to Division of Planning Coordination, Office of the Governor of Texas, Nov. 13, 1970. WALLISVILLE EIS, *supra* note 9, at A–32.

cutoffs and oxbows in their natural state, which will provide undisturbed spawning, nursery, and foraging areas for the preservation of the species of fish and wildlife native to the river and adjoining land areas. . . .

Should the Federal investment in this project be eliminated, there is no assurance that any private or Federal funds will be expended to preserve the natural setting of the Trinity River. On the contrary, land owners may find it profitable to sell their land to private interests who may develop the land with little or no consideration to the preservation of the natural environment or to the ecological balance of the area, strictly to maximize their return from the land. It might be added that the Federal Government is the prime sponsor of wildlife preserves and national forest areas, which provide significant contributions toward the preservation of our natural environment.[31]

#### c.

#### Description of Issues

The plaintiffs seek a declaration that the defendants are proceeding in violation of law in that they have exceeded their authority by not complying with the requirements of the National Environmental Policy Act of 1969 (NEPA) 42 U.S.C.A. § 4321 et seq., which became effective January 1, 1970. The plaintiffs contend that the Wallisville Project is, in reality, a part of the Trinity Project, although separately funded by Congress, and that the Corps has begun construction at Wallisville without first preparing an impact statement as to the Trinity. In the alternative, the plaintiffs contend that the environmental impact statement already prepared for the Wallisville Project is nevertheless deficient

under NEPA's requirements for a full disclosure. The Corps responds that the projects are separate, although compatible, that an impact statement now in preparation for the Trinity Project will be completed prior to the initiation of construction on that project, and that the Wallisville Project impact statement is legally sufficient. The Corps has also raised ancillary issues pertaining to legal standing to sue, subject matter jurisdiction and personal jurisdiction.

The case is before this Court on plaintiffs' motion for summary judgment seeking to enjoin the named defendants from constructing or causing the construction of the entire Trinity Project of which Wallisville is a part unless and until they comply with the National Environmental Policy Act. Alternatively, the plaintiffs seek similar injunctive relief with respect to the Wallisville Project alone until the standards of NEPA are met. In December, 1972, the defendant Corps of Engineers also filed a motion for summary judgment, alleging that there is substantial evidence in the record reflecting that the named officials have in all respects complied with the provisions of NEPA.

#### B.

#### HISTORY AND GENERAL BACKGROUND

#### 1.

#### THE TRINITY RIVER BASIN PROJECTS

A comparison of the recited purposes and descriptions of the Trinity and Wallisville Projects, as stated by the Corps of Engineers, would appear to raise questions as to the Corps' contention that the projects should be regarded as separate and distinct, at least for envi-

---

31. Army Corps of Engineers, Response to Testimony by Donald Mitchell Smith Before the Public Works Sub-Committee of Appropriations, Committees of the U.S. House of Representatives and U.S. Senate on the Subject of the Trinity River and Tributaries, Texas Project, 6–7 [Box 6, Item 129, at 9–10] [hereinafter cited as Corps Response to Donald Smith]. While the report in the record is undated, Mr. Smith first testified before Congress in 1971. 1972 Senate Subcomm. Hearings § 2, *supra* note 16, at 1446.

ronmental purposes. In the 1968 study, the Corps of Engineers reported to Congress that the Trinity Project envisaged several aspects, the navigation features of which included the lock and reservoir of Wallisville.[32] The environmental impact statement reports the primary function of the Wallisville Project as being a bar to saltwater intrusion accompanying enlargement of the navigation channel to Liberty, Texas, and as serving as the first lock and dam in the Trinity system, when constructed.[33] Because of the genuine difficulties encountered in assessing this problem and the environmental implications raised by the National Environmental Policy Act, this Court has felt compelled to probe behind the outward appearances of these projects to determine as equitably as possible from this extensive record what the facts are and thus what legal consequences flow from such a determination. For this reason, an inquiry into the history and evolution of these projects is beneficial.

Navigation of the Trinity River is known to have first received federal assistance at about the time of the Civil War, ultimately extending up some 300 miles with limited success. In 1902 a major federal project was undertaken, anticipating a four foot channel with 37 locks and dams for utilization of water in the upper reaches of the river for continuous navigation. Between 1902 and 1916 various Congressional acts au-

thorized the individual construction of various locks and dams as part of the overall project; nevertheless, the project was abandoned by Congress in 1922, except for the reach from the mouth of the Trinity to Liberty, Texas, because it was too difficult to maintain open river navigation. Even the Liberty channel was later suspended in 1930, for lack of commerce. Local interests thereafter pressured Congress to reopen the Liberty channel which resulted in a limited allocation of funds in 1940.

In 1941 the Army Corps of Engineers published the first major study of the Trinity River Basin, analyzing the needs for flood control, navigation, water conservation, and allied purposes.[34] This plan, similar to the 1902 concept, contemplated a 9 foot deep by 150 foot wide channel, 26 locks, sufficient dams and reservoirs to store the water necessary for navigation, plus modification of 43 bridges and 22 pipelines to permit navigation. By straightening the river channel through cutoffs, the route would be reduced approximately 110 miles.[35] Because the navigation aspects were found to be economically unjustified, the Corps recommended approval of the plan as a whole, postponing construction beyond Liberty until additional justification arose.[36]

In 1944 and again in 1945 the House Committee on Rivers and Harbors sought to have a restudy made,[37] but it was unable to gain sufficient congres-

32. H.Doc. No. 364 § 3 (1968), *supra* note 4, at 2.

33. WALLISVILLE EIS, *supra* note 9, at 1–2.

34. H.Doc. No. 403 (1941), *supra* note 2.

35. Sources of the foregoing history include the following: WALLISVILLE EIS, *supra* note 9, at 3–4; H.Doc. No. 276 § 5 (1965), *supra* note 3, at 37–39; Department of the Army, Corps of Engineers, Plan of Survey, Navigation Study–Trinity River, Texas, 5–10 (1958) [hereinafter cited as Corps Plan of Survey] [Box FW, Item u, at V–7 to V–13].

36. H.Doc. No. 403 (1941), *supra* note 2, § 3 at 8, § 2 at 6, § 1 at IX.

37. Resolved by the Committee on Rivers & Harbors of the House of Representatives, United States, That the Board of Engineers for Rivers and Harbors created under Section 3 of the River and Harbor Act, approved June 13, 1902 [32 Stat. 373], be, and is hereby requested to review the reports on the Trinity River and Tributaries, Texas, contained in House Document Numbered 403, Seventy-seventh Congress, First Session, with a view to determining whether any modification should be made in the recommendations therein at this time with respect to work for navigation and local flood protection along the main stem and major tributaries of the Trinity River.

sional support. In 1956 a major drought caused extensive saltwater intrusion and damage to rice crops, causing local interests to construct a temporary dam on the river.[38] Being at sea level in its lower reaches, the Trinity and its constructed navigation channels allow saltwater at times to penetrate upstream despite the natural flow of the river. Periodic influences such as high tides, seasonal changes, low river flow and droughts increase the likelihood of intrusion.[39] This situation apparently spurred the adoption of a restudy resolution by the Senate Committee on Public Works in 1958,[40] which Congress acted upon favorably.[41] Under this Congressional authorization, which directed the Secretary of the Army to cause a survey of the "Trinity River, Texas", the Corps authorized an interim report survey focusing upon "the saltwater aspect of the authorized navigation project for the preservation of the quality of water available for irrigation." [42]

The then new Corps of Engineers' Southwest Division Engineer, Brigadier General William Whipple, was quoted in 1958 as stating that the study of the Trinity River, as a whole, would be given top priority. Discussing the past history of efforts to make the river navigable, he stated that a 1945 attempt to open a channel from Galveston Bay to Liberty was a mistake. It had been found that canalizing the river caused saltwater to intrude inland, thereby disrupting irrigation among the rice growers. While some of the historic problems were attributable to lack of interest, lack of funds, and the two World Wars, General Whipple also attributed much of it to bad planning. His recommendation was a comprehensive study of the entire Trinity River Basin with a view towards development over the next 40 to 50 years.[43]

The studies of the saltwater intrusion problem revealed that much of it was directly attributable to navigation efforts. It had been greatly increased, for example, when a navigation channel to Houston, Texas, removed the natural barriers restricting the inward flow of seawater.[44] It was so identified by local resi-

---

Above resolution adopted March 1, 1944, and again February 28, 1945. Quoted in H.Doc. No. 215 § 5 (Wallisville 1961), *supra* note 5, at 20.

38. *See* 1970 Senate Subcomm. Hearings § 4, *supra* note 14, at 6235; H.Doc. No. 215 § 5 (Wallisville 1961), *supra* note 5, at 28.

39. *See, e. g.,* H.Doc. No. 215 § 5 (Wallisville 1961), *supra* note 5, at 24–25, 28, 36. The Corps reported that hurricanes hit the Texas coast on the average of once every 1.7 years and will inundate the Wallisville reservoir with tides as high as fifteen feet above sea level. 1 WALLISVILLE GEN. DESIGN MEMO NO. 1 § 2 (1965), *supra* note 6, ¶ 17–03 at 17. The saltwater intrusion accompanying these tides would be removed by flushing out the reservoir, through the navigation locks with fresh river water. *Id.,* § 1 at 43, 48.

40. Resolution of Jan. 20, 1958, quoted in H.Doc. No. 215 § 5 (Wallisville 1961), *supra* note 5, at 21. The language was virtually identical to that of prior Congressional resolutions. *See* note 37 *supra.*

41. River and Harbor Act of 1958, Pub.L. 85–500, § 112, 72 Stat. 297, 304, U.S.C. Cong. & Admin.News, 85th Cong., 2d Sess., 349 (1958) [Box 1, Item 4, at 297, 304]. The pertinent text is also quoted in H.Doc. No. 215 § 5 (Wallisville 1961), *supra* note 5, at 21.

42. H.Doc. No. 215 § 5 (Wallisville 1961), *supra* note 5, at 21. *See also* The Liberty Vindicator, Aug. 28, 1958 [Box FW, Item q, at U–279].

43. *See* Fort Worth Star Telegram, Aug. 22, 1958, at 8 [Box FW, Item q, at U–281]; Houston Post, Aug. 24, 1958 [Box FW, Item q, at U–282].

44. "Without question, saltwater intrusion into the lower river has been aggravated by federal nevigation improvements constructed in Galveston and Trinity Bays and in the lower Trinity River since 1870." Report of Col. John E. Unverferth, Galveston District Engineer, May 9, 1966. Subject: Trinity River and Tributaries, Texas—Wallisville Reservoir, Design Memorandum No. 1 [General in feature detail]. 1 WALLISVILLE GEN. DESIGN MEMO NO. 1 § 1 (1965), *supra* note 6, at 45.

dents who registered many complaints.[45] The Corps reported to Congress that the Anahuac Channel, a navigation channel located in Trinity Bay, "was not extended into the Trinity River because of saltwater intrusion problems." [46] In various letters to Texas Congressmen, the Corps described the "origin" of the Wallisville Project as stemming from the need for salinity control necessitated by the navigation project associated with the Trinity Project.[47] The Environmental Protection Agency, to which an early draft of the Wallisville impact statement was submitted, reported in 1971:

> The statement that the alleviation of the saltwater intrusion problem will permit the extension of the authorized navigational improvements upstream should be elaborated. It should be made clear that the prevention of saltwater intrusion up the Trinity River by construction of the lock and dam would permit the extension of navigation channel upstream without a concurrent increase of salt intrusion. This project is the key part of the total development of the Trinity River Basin, especially the navigational aspects.[48]

As stated previously, the Wallisville impact statement notes that the primary function of the Wallisville Project is a saltwater barrier to aid navigation.[49]

While the saltwater studies were underway, local entities were interested in possibly developing water storage capabilities in conjunction with this barrier.[50] In September, 1959, the City of Houston and the Trinity River Authority executed an agreement regarding water usage to be obtained from the Wallisville Project. It was agreed that their usage would be "in a manner which will not constitute a deterrent to navigation." The State of Texas water permit which was issued included a similar restriction. It provided that water usage was to be:

> Subordinate to the present and future use and reuse for navigation purposes of the return flows from the metropolitan areas of Dallas and Fort Worth in their natural flowing state and by impoundment in pools created by locks and appurtenances within the river and navigation channels; and further, such return flows shall be permitted to pass through the (Wallisville) reservoir authorized herein to the extent necessary to provide navigation below said reservoir and the rights hereby acquired shall be subordinate to such uses.[51]

45. H.Doc. No. 215 (Wallisville 1961), *supra* note 5, § 5 at 30–34, App. IV. The Corps reported that the intrusion was in part due to natural causes. *Id.*, § 5, at 36. A "judgment estimate" made in 1966 by the Corps attributed 75 percent of the saltwater intrusion to natural causes and 25 percent to navigational features. 1 WALLISVILLE GEN. DESIGN MEMO No. 1 § 1, *supra* note 6, at 45.

46. H.Doc. No. 276 § 5 (1965), *supra* note 3, at 104.

47. *See, e. g.,* Letters to: Senator John Tower, Aug. 24, 1970 [Box 6, Item 126, at 26], and also March 13, 1971 [Box 6, Item 127, at 54]; Congressman George Bush, Aug. 24, 1970 [Box 6, Item 126 at 17]; Congressman Bob Casey, Aug.

10, 1970 [Box 6, Item 126, at 34]; and Congressman Bob Eckhardt, Aug. 10, 1970 [Box 10, Item 126, at 41].

48. WALLISVILLE EIS, *supra* note 9, at A–17.

49. *See* note 33 *supra* and accompanying text. Some of the barrier effect has been attributed to the Livingston Reservoir by the Corps. At a conference held on Feb. 23, 1966, a judgment decision allocated the claimed salinity control benefits equally between the two reservoirs. 1 WALLISVILLE GEN. DESIGN MEMO NO. 1 § 1 (1965), *supra* note 6, at 83.

50. H.Doc. No. 215 (Wallisville 1961), *supra* note 5, § 4 at 12, § 5 at 38.

51. *See,* Agreement between the City of Houston, Texas, and the Trinity River

Following completion of the studies, the Corps recommended to Congress in 1961 that a saltwater barrier reservoir be constructed near the mouth of the Trinity River. It was anticipated that the findings of the studies would be incorporated in the pending comprehensive review of reports being undertaken on the Trinity River and tributaries, and that the project would also serve a function in an integrated water supply plan.[52] Congress approved the Corps' recommendation.[53] A location at river mile 3.9 was selected because of "site limitations" and because it was apparently viewed as the most suitable location for meeting the water resource needs of the area.[54]

Although the record is not clear, it appears that numerous projects were funded separately for budgetary reasons, administrative manageability or because of some "urgent" local problem. Nevertheless, these various projects, including Wallisville, Aubrey and Lakeview Lakes, existing navigation channels, and the high-level bridges, were included and considered as being part of the Trinity River comprehensive development program.[55]

In March, 1963, the restudy of the Trinity River and tributaries was completed. Following its review process through the Corps' chain-of-command, the Board of Engineers recommended that the development plans be coordinated with the Wallisville Project and that the navigational features be conditionally approved, subject to later studies indicating economic justification. The Chief of Engineers concurred, recommending that navigation construction be deferred until further economic studies warranted requesting the funds from Congress.[56] Congress conditionally ap-

Authority of Texas, Sept. 10, 1959 [Box FW, Item q, at U–309]; Permit to appropriate public waters of the State of Texas, No. 1970, granted jointly to the City of Houston and Trinity River Authority of Texas, Oct. 11, 1960 [Box FW, Item q, at U–297].

The record is not clear, but the question arises as to whether this subordination of water usage to navigation is in conflict with federal law. 33 U.S.C.A. § 701–1(b).

52. H.Doc. No. 215 § 5 (Wallisville 1961), *supra* note 5, at 63, 64.

53. Rivers and Harbors Act of 1962, Pub.L. No. 87–874, § 101, 76 Stat. 1173, 1175, U.S.C. Cong. & Admin.News, 87th Cong., 2d Sess., 1376 (1962) [Box 1, Item 10]. The common introduction of the Act, and the part pertinent to the Wallisville Project, reads as follows:

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled.

Sec. 101. That the following works of improvement of rivers and harbors and other waterways for navigation, flood control, and other purposes are hereby adopted and authorized to be prosecuted under the direction of the Secretary of the Army and supervision of the Chief of Engineers, in accordance with the plans and subject to the conditions recommended by the Chief of Engineers

in the respective reports hereinafter designated:

. . . . .

Trinity River, Wallisville Reservoir, Texas: House Document Numbered 215, Eighty-seventh Congress, at an estimated cost of $9,162,000: *Provided,* That nothing in this Act shall be construed as authorizing the acquisition of additional lands for establishment of a national wildlife refuge at the reservoir; . . .

54. H.Doc. No. 215 (Wallisville 1961), *supra* note 5, § 4 at 12, § 5 at 38.

55. *See, e. g.,* H.Doc. No. 276 § 5 (1965), *supra* note 3, at 105, 103–06; Letter from Maj. Gen. William F. Cassidy, Director of Civil Works to U. S. Senator John Tower (Texas), Feb. 5, 1962, 2 [Box FW, Item x, at C–175]; H.Doc. No. 215 (Wallisville 1961), *supra* note 5, § 5 at 30–32, 69, § 6 at 71, § 4 at 16, § 1 at v; 1973 Senate Comm. Hearings § 2, *supra* note 17, at 1459; Statements of Col. K. S. Kristoferson, Fort Worth District Engineer, Transcript of public meeting for Tennessee Colony Lake, April 20, 1971, at 10 [Box FW, Item jj, at FF–22], public meeting for Aubrey Lake, April 30, 1971, at 9 [Box FW, Item hh, at EE–19].

56. *See* H.Doc. No. 276 (1965), *supra* note 3, § 4 at 28–33, § 3 at 2.

proved the Trinity Project in 1965 in the following language:

> The following works of improvement of rivers and harbors and other waterways for navigation, flood control, and other purposes are hereby adopted and authorized to be prosecuted under the direction of the Secretary of the Army and supervision of the Chief of Engineers, in accordance with the plans and subject to the conditions recommended by the Chief of Engineers in the respective reports hereinafter designated. . . .

> . . . . . . .

> Trinity River and tributaries, Texas: House Document Numbered 276, Eighty-Ninth Congress, including navigation, except that the recommendations of the Board of Engineers for Rivers and Harbors, dated March 14, 1963, shall apply, and there is hereby authorized $83,000,000 for initiation and partial accomplishment of the project. Prior to expenditure of any funds for construction of those features designed exclusively for navigation, the Chief of Engineers shall submit to the Congress a reevaluation based upon current criteria.[57]

In 1967 and 1968 the only apparent activity in the Trinity Basin, with the exception of continued study and planning of the various projects, related to the modification of the high-level bridges. In both years Congress appropriated funds, as requested by the Corps, but with the limitation that such funding "is in no way to be interpreted as approval of the planning and construction of the navigation portion of the project."[58] The Corps concluded a reevaluation study of the economics for the navigation aspects and submitted it to Congress in 1968.[59] The District Engineer's report stated that the navigation features were "well justified".[60] The Southwest Division Engineer, in a one sentence endorsement, concurred in that conclusion;[61] the acting Chief of Engineers, relying on the District Engineer's statistics, concurred;[62] the Bureau of the Budget stated briefly that it had "no objection" to the transmission of the report to Congress,[63] and the Secretary of the Army transmitted the report to the Speaker of the House of Representatives on July 15, 1968, without commenting upon the merits of the report.[64]

A close examination of the Senate and House Reports, conference reports, and public hearings indicates that since the submission of the 1968 reevaluation study there has been no Congressional approval of the study's findings, nor approval of construction on the navigation channel.

57. Rivers & Harbors Act of 1965, Pub.L. No. 89–298, § 301, 79 Stat. 1089, 1091, U.S.C.Cong. & Admin.News, 89th Cong., 1st Sess., 1074 (1965) [Box 2, Item 24, at 1089, 1091].

58. The words of limitation are found in the Committee or Conference Reports which accompany the appropriation bills. H.R.Rep. No. 505, 90th Cong., 1st Sess., at 49–50 (1967) (to accompany the Atomic Energy Commission Appropriation Bill of 1968, H.R. 11641) [Box 4, Item 74, at 49–50]; H.R.Rep. 1788 (Conf.Report), 90th Cong., 2d Sess., at 29 (1968) (To accompany the Public Works for Water and Power Resources Development and Atomic Energy Commission Appropriation Bill of 1969, H.R. 17903) [Box 4, Item 76, at 291]. The language of the bills themselves, which are extremely general in terms, contain no such words of limitation. Act of Nov. 20, 1967, Pub.L. 90–147, Tit. I, 81 Stat. 471, U.S.C.Cong. & Admin.News, 90th Cong., 1st Sess., pp. 503–506 (1967); Act of Aug. 12, 1968, Pub.L. 90–479, Tit. I, 82 Stat. 705, U.S.C.Cong. & Admin.News, 90th Cong., 2d Sess., pp. 813–816 (1968).

59. See note 4 supra.

60. H.Doc. No. 364 § 4 (1968), supra note 4, at 39.

61. Id. § 5 at 43.

62. Id. § 3 at 1–6.

63. Id. § 2 at vi.

64. Id. § 1 at v.

## 2.

## A CHRONOLOGY OF ENVIRONMENTALLY-RELATED EVENTS

The Corps of Engineers' attention was first drawn to a possible adverse environmental effect of the Wallisville saltwater barrier project in 1960, ten years before the advent of NEPA, when the Fish & Wildlife Service, U. S. Department of the Interior, stated that marine (saltwater) commercial fishing might be affected. Based upon a fifty year period of analysis of fresh water fishery and wildlife aspects of the dam, the service reported:

> It is evident that there will be some loss of nursery areas for marine fish and shellfish, but until the Bureau of Commercial Fisheries has been able to conduct the necessary investigations and adequate assessments, the project effects on the marine fisheries cannot be made.
>
> . . . . . .
>
> The amount of nutrients and fresh water that will enter the bay areas will be reduced considerably and will have an adverse and cumulative effect on marine fisheries. Until such time as studies have been made, the effects of the projects on marine fisheries will remain unknown.[65]

The report noted that there would be substantial benefits to sport and commercial fresh water fishing, as contrasted with the saltwater marine fishing. There would be elimination of some upland game and fur animal habitat, but this was thought to be insignificant. The report indicated that potential benefits could be obtained for waterfowl and hunting if a National Wildlife Refuge was included. Natural habitats in other areas of the Texas Coast were reportedly being rapidly engulfed by increasing industrial and urban expansion.

There was apparently substantial local public opposition to the wildlife refuge, as it would necessarily require acquisition of additional, privately-owned land.[66] At the time of recommending construction of the Wallisville Project to Congress, the Corps also recommended that the wildlife refuge should be considered favorably, but that the necessary water rights should be acquired by someone other than the Corps. The Corps also pointed out that the refuge was regarded as being a severable economic component which could be included or excluded without affecting the justification for the reservoir project itself.[67] As to the reported effect of the Wallisville Project upon marine commercial fishing, the 1961 report was silent, noting only that "[t]he Acting Regional Director states that the Bureau of Commercial Fisheries advises that no investigation has been made of the marine commercial fishers relative to the Wallisville reservoir, however, it is proposed to make adequate study of this phase of the reservoir project when funds become available." [68] In 1963 the Assistant Secretary for the U. S. Department of the Interior communicated with the Corps regarding the claimed damage to commercial fishing. He wrote:

> The Fish and Wildlife Service advises that significant losses to the marine commerical fishery would result in the absence of the fresh water discharges recommended in its report. Freshwater inflows for the maintenance of fishery resources is as much a water requirement as that for navigation, industrial supply, etc., and should be

---

65. Letter of John C. Gatlin, Regional Director, Southwest Region 2, Bureau of Sport Fisheries and Wildlife, United States Department of the Interior, to the Galveston District Engineer, Mar. 29, 1960, pages 1, 7. WALLISVILLE EIS, *supra* note 9, at E1–1, 1–7.

66. Report of Southwest Division Engineer on Public Hearing on Wallisville Reservoir and Wildlife Refuge, to Chief of Engineers, Feb. 17, 1961 [Box FW, Item z, at W–43].

67. H.Doc. No. 215 § 3 (Wallisville 1961), *supra* note 5, at 4, 6.

68. *Id.* § 5 at 60–61.

provided for in the comprehensive planning for the development of all river basins. The Department therefore urges that every effort be made to provide for mean monthly fresh-water discharges into Trinity Bay as recommended by the Fish and Wildlife Service.[69]

The issue of the project's effects upon marine fishing led the Corps to employ Dr. Gordon Gunter, a marine biologist from Mississippi. His report, filed in 1966, stated that the reservoir would have a minor effect only. In his opinion, the amount of fresh water diverted by the reservoir from its normal flow into Trinity Bay would be minimal, as the majority of the water diverted would be attributable to a state funded reservoir, located upstream at Lake Livingston, with which Wallisville was to be jointly operated.[70] Aside from the brevity of his reports, Dr. Gunter's covering letter placed much of his analysis in question:

> Enclosed is my report on the Wallisville Reservoir. I am sorry that I could not get it to you right away. However, I ran into a buzz saw of things that had to be done when I got back home and I did not get the statistical data I wanted right away.
>
> Even so, none of this can be used with any surety, and the really important thing is that Galveston Bay produced a great many oysters last year. The Bay is quite rich in nutrients.[71]

Prior to receiving this report, the Corps reportedly placed much reliance on the opinion of the Fish and Wildlife Service that the project would produce substantial fresh water benefits.[72] The then Division Engineer, Brig. Gen. W. T. Bradley, reported that a 1966 conference with the U. S. Fish and Wildlife Service had led him to believe that the Service had made a judgment evaluation of the impact on the commercial fishing industry which was based substantially upon a lack of basic data. As to the Gunter report, he stated "it appears from his analysis that a scientific evaluation of the project's impact upon wildlife might well result in only a small fraction of that resulting from the approximation made by the Fish and Wildlife Service."[73] The report of the conference which was attended by representatives of the Corps from both the District and Division levels, the Bureau of Sports Fisheries and Wildlife, and the Bureau of Commercial Fisheries, indicated that an estimate of the commercial loss could be placed at slightly more than $562,000 annually. The report concluded by stating "based upon available data and the assumptions made, the estimates appeared to be reasonable."[74] Nevertheless, to this date the Corps has attributed no financial loss to commercial fishing. The Corps' present position is as follows:

> The possibility that such a loss might occur was considered. Available techniques and data, however, did not produce results indicating that

69. Letter from Assistant Secretary of the Interior, to Chief of Engineers, Sept. 27, 1963. H.Doc. No. 276 § 2a (1965), *supra* note 3, at Lvi. This letter is not attached to the Wallisville Environmental Impact Statement.

70. G. Gunter, A Report on the Probable Damages to Estuarine Fishery Resources of the Galveston Bay System by Construction of the Wallisville Reservoir Near the Mouth of the Trinity River (June 17, 1966). WALLISVILLE EIS, *supra* note 9, at E5 to E5–7.

71. Letter of Gordon Gunter to Galveston District Engineer, June 17, 1966 [Box 5, Item 105]. The covering letter is not

included with the Wallisville environmental impact statement.

72. *See* note 65 *supra* and accompanying text.

73. 1 WALLISVILLE GEN. DESIGN MEMO No. 1 § 1 (1965), *supra* note 6, at 54.

74. Summary of Discussions, Subject: Effects of Construction of Wallisville Reservoir on Fish and Wildlife Resources, 3 (June 3, 1966) [Box 5, Item 115, at 3] [hereinafter cited as 1966 Conference Report]; also found at 1 WALLISVILLE GEN. DESIGN MEMO No. 1 § 1 (1965), *supra* note 6, at 92.

such a loss would, in fact, occur. Accordingly, no cost for this item was taken into account in the economic analysis of the project.[75]

The report of the 1966 conference also noted that it was recognized by all parties that "the construction of Wallisville is a certainty whether it is done by the Corps of Engineers or by the Trinity River Authorities." [76]

Although there was continuing controversy over this issue for several years, it reached its zenith in 1970. In February of that year, Dr. R. T. Baldauf published a report conducted by Texas A&M University on behalf of the Department of the Interior and with the cooperation of the Fish and Wildlife Service. Covering more than a two year study period, the report found that the Wallisville reservoir would destroy approximately 12,500 acres of nursery grounds upon which various commercial marine species depended by converting those acres from saltwater to freshwater.[77] To resolve the obvious inconsistencies contained in the two reports, the Corps engaged a firm known as Environment Consultants, Inc., of Dallas, Texas, to evaluate both reports. This firm concluded that the Gunter report "lacked any substance and would not hold water under close scrutiny" because it was "overly simplistic." [78] The report of Environment Consultants, Inc. stated that Dr. Gunter had misused or juggled figures regarding water diversion and, as such, his findings were "not sensible." In summary, it stated that "the entire report should be dismissed as having no validity." [79] As for the Baldauf report, Environment Consultants, Inc. found that the placement of sampling stations could have been better, but that the data overall, was a "tribute to their good field technique." [80] By comparison, the criticism of the Baldauf report was slight.[81]

Only shortly before the Baldauf report was published, the National Environmental Policy Act of 1969 became effective. Copies of the Act were disseminated throughout the Army Corps of Engineers on March 3, 1970.[82] In May, 1970, the first interim guidelines regarding statements on proposed federal actions affecting the environment were issued by the Council on Environmental Quality.[83] In July, 1970, the Galveston Division of the Corps established an Environmental Resources Section of the Project Planning Branch. The staff included civil engineers with backgrounds in water resource planning, hydraulics and hydrology and agronomy. Later, they were joined by a landscape archi-

75. Army Corps of Engineers, Answer to Interrogatory No. 40(n).

76. 1966 Conference Report, *supra* note 74, at 3.

77. Baldauf, A Study of Selected Chemical and Biological Conditions of the Lower Trinity River and the Upper Trinity Bay (Feb. 1970) (Texas A&M Water Resources Institute). WALLISVILLE EIS, *supra* note 9, Exhibit 7.

78. Covering letter from David Louis Steed, Ph.D, Environment Consultants, Inc., to Galveston District Engineers, Nov. 5, 1971. WALLISVILLE EIS, *supra* note 9, at E9–2.

79. WALLISVILLE EIS, *supra* note 9, at E9–13, 9–15 (Report).

80. *Id.* at E9–7.

81. The Baldauf Report was criticized by Environment Consultants, Inc. for not having more fully utilized the wealth of data amassed by the study. It was also questioned concerning its conclusion that locating the dam upstream would have reduced the direct destructive effect upon the prime nursery areas. The Baldauf Report had not fully considered the possibilities of indirect destruction from such changes as salinity, flow patterns and vegetative cover.

82. It was disseminated by circular EC 1165-2-83 (ENGCW–RL). Files, Wallisville Lake, Texas—History of Preparation of Environmental Statement 1, Oct. 18, 1971 (record of Corps). [hereinafter cited as Corps' Environmental History] [Box 5, Item 101].

83. CEQ Interim Guidelines, 35 Fed.Reg. 7390-93 (1970).

tect, a biologist, and an officer with chemical engineering background.[84] In early August, 1970, the Department of Defense issued an interim set of guidelines on the preparation of environmental statements.[85] They were very general guidelines aimed at all branches of the Department of the Defense dealing with environmental areas. In that same month, the office of the chief engineer advised all Districts that environmental statements should be prepared for projects under construction where unresolved conflicts existed. Because of the controversy surrounding the Wallisville reservoir, the decision was made that same month to prepare an environmental statement.[86] The first preliminary draft of a statement, also prepared in August, was submitted to Southwest Division (SWD) for comment by the District Engineers. There it was generally revised and augmented by the Environmental Resources Branch, Southwest Planning Division, and then returned to the Galveston Division for review.[87] This had no sooner been done when new Corps instructions were promulgated on September 25, 1970, giving more detailed guidance on the preparation and coordination of environmental statements. The need for coordination with other federal agencies was emphasized.[88]

After further revision to meet the new specifications, the preliminary draft was submitted for comment to various federal and state agencies in October, 1970, by the District Engineer.[89] In November, 1970, the Army Corps of Engineers disseminated a set of environmental guidelines for civil works programs.[90] The preliminary draft was again modified, based upon comments received, and drafts were submitted through channels on January 18, 1971, a copy of which was subsequently transmitted to the Council on Environmental Quality.[91] On January 28, 1971, new guidelines for the preparation for impact statements were published by the Council on Environmental Quality.[92] Apparently in response to these new guidelines and other comments received, the draft was revised again by the District Engineer in February of 1971 and was believed to be a final statement. In late March, however, the district was advised by SWD that major revisions were required in accordance with comments provided by the staff of the Southwest Division. During April and May, 1971, the statement was revised and submitted to the District Counsel for review.[93] His response was:

The attached statements meet the requirements of Section 102(2)(C) of the National Environmental Policy Act of 1969 (Public Law 91–190).[94]

In April, 1971, further modifications to the Environmental Guidelines were issued by the Council on Environmental

84. Corps' Environmental History, *supra* note 82, at 4.

85. DEPARTMENT OF DEFENSE, INTERIM GUIDELINES ON ENVIRONMENTAL STATEMENTS, Envir.L.Rep. —Stat. & Admin. 46021–22 (Aug. 8, 1970) [Box 5, Item 90]. [Hereinafter cited as DOD GUIDELINES]

86. Corps' Environmental History, *supra* note 82, at 4.

87. *Id.* at 4, 5.

88. These instructions were disseminated by circular EC 1120-2-56. Corps' Environmental History, *supra* note 82, at 5.

89. *Id.* at Incl. 8.

90. DEPARTMENT OF THE ARMY, CORPS OF ENGINEERS, ENVIRONMENTAL GUIDELINES FOR THE CIVIL WORKS PROGRAM OF THE CORPS OF ENGINEERS, INSTITUTE FOR WATER RESOURCES REPORT 70–5, ER 1165–2–500 Appendix A (Nov. 30, 1970) [Box 5, Item 92]. [Hereinafter cited as 1970 CORPS GUIDELINES].

91. Corps' Environmental History, *supra* note 82, at 6.

92. CEQ Guidelines, 36 Fed.Reg. 1398–1402 (1971).

93. Corps' Environmental History, *supra* note 82, at 9.

94. *Id.* at Incl. 22 (June 14, 1971).

Quality.[95] These are the latest guidelines issued by the CEQ.

At about this time, however, the Corps received a letter dated June 7, 1971, from the Assistant Secretary of Commerce transmitting critical comments supplied by the National Marine Fisheries Service. The NMFS comments, based upon the February, 1971, draft, were critical of the Corps' environmental decisions relying upon Dr. Gunter's report. The comments stated:

> Among the biologists who have investigated this area, only *one* has concluded that the environmental effects of the project on the estuary would be minimal . . . the Corps of Engineer's consultant.[96]

The strongly worded report criticized other Corps environmental decisions regarding the Wallisville Project, such as the refusal to reconsider relocating the dam upstream where, reportedly, the harm would be reduced. It also criticized the Corps' summaries of the various consultant reports as given in the environmental statement because, although technically correct, the summaries conveyed "an erroneous impression that the consultant's (Gunter) report which reports some biological observations of one month, was equally (as) thorough as the Texas A&M team's report which reported on a sampling program *conducted for more than two years*." [97] The NMFS report also called attention to Dr. Gunter's covering letter noted previously. Meanwhile, the Corps' first set of proposed regulations on the preparation and coordination of impact statements was issued in June of 1971.[98]

Concern over the growing and expressed opposition to the Wallisville Project at such a late stage in the planning phase led to a conference in Galveston on June 25, 1971, of representatives from the Galveston District and Southwest Division of the Corps, the Trinity River Authority, the City of Houston, and the Chambers-Liberty Counties Navigation District. It was felt that the Corps had only three courses of action: (1) to stop the project until more comprehensive environmental studies were made and the statement detailed, (2) to slow down construction pending further studies, or (3) to continue working as rapidly as possible, but also to work on strengthening the environmental impact statement.[99] The last course of action was selected because it was not believed that the second option would produce new data within a "reasonable time frame", because the benefits were thought to be needed immediately and partially because it was feared that *stoppage might cloud the status of the future Trinity River Navigation Project*.[100] The acting chief of the Southwest Division Engineering recommended that the District Engineer not compromise the Corps' position with Dr. Gunter; instead, he should insert a statement in the environmental impact statement that ways would be found to mitigate the loss of the marshlands, and he should accept the position that the mitigation losses would be paid for by someone. No concern was to be paid to the benefit-cost ratio.[101]

Modifications were made once more in the environmental impact statement which was again submitted to the District Counsel who, as before, found that it met the requirements of the law.[102] At this point the record stops. The fi-

95. CEQ Guidelines, 36 Fed.Reg. 7724–29 (1971).

96. WALLISVILLE EIS, *supra* note 9, at A–6.

97. WALLISVILLE EIS, *supra* note 9, at A–12.

98. Proposed Corps Regs., 36 Fed.Reg. 11309–18 (1971).

99. Corps' Environmental History, *supra* note 82, Incl. 25, at 4.

100. *Id.* at 4–5.

101. Covering letter of R. L. Buffington, June 29, 1971. Corps' Environmental History, *supra* note 82, Incl. 25.

102. CERTIFICATION SHEET, WALLISVILLE EIS, *supra* note 9 (inside front cover).

nal impact statement, dated December 13, 1971, does not reflect the channels through which it was submitted for approval by or within the Corps, whether it was submitted to any other federal agencies, or whether any comments thereto were received. Furthermore, it cannot be determined from the impact statement itself or from the record before this Court whether such statement was reviewed and approved by the Secretary of the Army and whether, in turn, the Secretary transmitted the statement to Congress for review. The record only reflects that a copy was received by the Council on Environmental Quality in late January of 1972.[103]

## C.

## THE ROLE OF THE WALLISVILLE PROJECT FOR NEPA PURPOSES

■■ The history of the comprehensive development plans for the Trinity Basin reveals that the Wallisville Project, although funded separately, was and is, in fact, an important and essential component. Thus an injunction as to further construction on any aspect of the Trinity Project could be justified pending completion of a satisfactory impact statement and full review as required by law. This Court carefully considered the issue of retroactivity and those cases which have held, more or less categorically, that NEPA is not to be applied retroactively.[104] However, NEPA does not contain the traditional "grandfather clause" with which Congress has exempted ongoing projects from laws it intends to be applied prospectively only.[105] Those cases of the Court of Appeals for the Fifth Circuit which discuss or involve factual situations related to the issue of retroactivity or environmental considerations have also been carefully noted.[106] A majority of the better reasoned cases have generally held NEPA applicable to ongoing projects, using a variety of tests.[107]

103. 37 Fed.Reg. 3005 (1972) [Box 5, Item 104].

104. See, e. g., Pennsylvania Environmental Council, Inc. v. Bartlett, 315 F.Supp. 238 (M.D.Pa.1970), aff'd 454 F.2d 613 (3rd Cir. 1971) ; Investment Syndicates, Inc. v. Richmond, 318 F.Supp. 1038 (D.Or. 1970).

105. This has been held to indicate a strong legislative intent to apply Section 102 to federal actions initiated prior to January 1, 1970. Environmental Defense Fund v. Tennessee Valley Authority, 339 F.Supp. 806, 811 (E.D.Tenn.1972) ; Nolop v. Volpe, 333 F.Supp. 1364, 1367 (D.S.D.1971).

106. Zabel v. Tabb, 430 F.2d 199, 213 (5th Cir. 1970), cert. denied, 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971) ; Texas Committee on Natural Resources v. United States, 430 F.2d 1315 (5th Cir. 1970), vacating 1 E.R. 1303 (W.D.Tex. 1970) ; Named Individual Members of San Antonio Conservation Society v. Texas Highway Department, 446 F.2d 1013, 1025 (5th Cir. 1971), cert. denied, 403 U.S. 932, 91 S.Ct. 2257, 29 L.Ed.2d 711; Clark v. Volpe, 461 F.2d 1266 (5th Cir. 1972), affirming 342 F.Supp. 1324 (E.D.La.1972) ; Ragland v. Mueller, 460 F.2d 1196 (5th Cir. 1972).

107. See, e. g., Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323, 1329–1330 (4th Cir. 1972), cert. denied, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261; Greene County Planning Board v. Federal Power Commission, 455 F.2d 412, 425 (2nd Cir. 1972), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90; Lathan v. Volpe, 455 F.2d 1111, 1116, 1121 (9th Cir. 1971) ; Scenic Hudson Preservation Conference v. Federal Power Commission, 453 F.2d 463, 481 (2nd Cir. 1971), cert. denied, 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972) ; Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1120, 1120 n. 25 (1971) ; Named Individual Members of San Antonio Conservation Society v. Texas Highway Department, 446 F.2d 1013, 1025 (5th Cir. 1971), cert. denied, 403 U.S. 932, 91 S.Ct. 2257, 29 L.Ed.2d 711; Zabel v. Tabb, 430 F.2d 199, 213 (5th Cir. 1970), cert. denied, 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971) ; Environmental Defense Fund, Inc. v. Corps of Engineers of U. S. Army, 348 F.Supp. 916 (N.D.Miss.1972) ; Thompson v. Fugate, 347 F.Supp. 120, 124 (E.D.Va.1972) ; Natural Resources Defense Council v. Grant, 341 F.Supp. 356, 364–365 (E.D. N.C.1972) ; Morningside-Lenox Park Association v. Volpe, 334 F.Supp. 132, 144

The guidelines of the Council on Environmental Quality (CEQ) would favor applying NEPA in full except in instances in which it is not practicable to reassess the basic course of action. When this is the case, the guidelines state that "further incremental major actions" should be "shaped so as to minimize adverse environmental consequences." [108] As a rule of thumb to employ during this transition period when numerous federal projects initiated prior to NEPA are still underway, this Court is persuaded that a presumption in favor of NEPA's application is proper, particularly where substantial action is yet to be taken, absent equally persuasive countervailing factors.

■■ The present projected total cost of the Wallisville Project is approximately $28,800,000. While this is a substantial figure, it is only about two percent of the total present projected cost of the Trinity Project. Despite the extent of completion of the Wallisville Project, this Court cannot ignore its relationship to the Trinity Project which has now reached a coherent stage of development that is distinctive and comprehensive. *See* Citizens for Clean Air v. Corps of Engineers of U. S. Army, 349 F.Supp. 696, 708 (S.D.N.Y.1972). The guidelines of the CEQ advise the agencies to bear in mind the effect a complex of projects may cumulatively produce and direct that the lead agency should prepare an environmental statement, if it is reasonable to anticipate a cumulatively significant impact.[109] The majority of decisions involving agen-

cy attempts to divide projects or development programs into artificial "segments" for determining the scope of environmental impacts have opposed such action on the grounds that this would frustrate the vitality of NEPA by allowing piecemeal decisions.[110] The Fifth Circuit Court of Appeals has also held this approach to be unreasonable. Named Individual Members of San Antonio Conservation Society v. Texas Highway Department, 446 F.2d 1013, 1023 (5th Cir. 1971), cert. denied, 403 U.S. 932, 91 S.Ct. 2257, 29 L.Ed.2d 711. Thus, this Court concurs in and adopts the position that impact statements are required for ongoing federal projects initiated prior to January 1, 1970, the effective date of NEPA, which are likely to extend significantly into the future. Environmental Defense Fund v. Tennessee Valley Authority, 339 F.Supp. 806, 811 (E.D.Tenn.1972). This is obviously a balancing test based on practical considerations. In its totality, the development of the Trinity River Basin has not reached that stage of progress where the cost of alteration or abandonment would definitely outweigh whatever benefits might accrue therefrom. Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323, 1331 (4th Cir. 1972), cert. denied, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261.

■■ This Court believes that equitable considerations must also be taken into consideration. First, as the record reflects, the Corps of Engineers has invested a substantial amount of time, effort and technical expertise on the Wal-

(N.D.Ga.1971); Environmental Defense Fund v. Corps of Engineers of U. S. Army, 325 F.Supp. 728, 742–743 (E.D. Ark.1971).

108. CEQ Guideline § 11, 36 Fed.Reg. 7727 (1971).

109. CEQ Guideline § 5(b), 36 Fed.Reg. 7724–25 (1971). *See also* Proposed EPA Reg. § 6.7(c), 36 Fed.Reg. 880 (1972). This Court has been advised that all proposed EPA regulations have become effective.

110. *See, e. g.,* Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C.

5, 458 F.2d 827, 835 (1972); Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323, 1329 (4th Cir. 1972); Greene County Planning Board v. Federal Power Commission, 455 F.2d 412 (2nd Cir. 1972), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90; Indian Lookout Alliance v. Volpe, 345 F.Supp. 1167, 1172 (S.D.Iowa 1972); Thompson v. Fugate, 347 F.Supp. 120, 123–124 (E.D.Va. 1972); Committee to Stop Route 7 v. Volpe, 346 F.Supp. 731, 740 (D.Conn. 1972); Morningside-Lenox Park Association v. Volpe, 334 F.Supp. 132 (N.D.Ga. 1971).

lisville Project. Until the Baldauf report stressing the resulting estuarine damage was published in February, 1970, there is every reason to conclude that the Corps exercised a good faith judgment in determining whether or not to proceed. The Corps believed that opponents to the project, who admittedly had no reliable evidence or facts upon which to base a conclusion, were in error. Until 1970 the Corps was under no legal obligation to obtain that evidence upon which an accurate judgment could be based. Similarly, during the first year under NEPA, virtually no one understood what action was really expected under the new law. Guidelines were not issued until the middle and latter part of the year, and they were extremely vague. Only as the case law applying NEPA commenced to develop and fill in gaps could the Corps have known what was required. Similarly, the report of Environment Consultants, Inc., which concluded that the Baldauf report was substantially more accurate than the Gunter report, was not completed until November 5, 1971. At this point construction on Wallisville had already begun. Although the record does suggest that the Corps may have been hasty in awarding the first contract, it does not appear that it was doing so in the deliberate effort to evade the law.[111] Similarly, since the Wallisville Project was funded separately and developed independently of the Trinity Project, it was not patently unreasonable for the Corps to presume that an impact statement as to Wallisville only would be sufficient.

This Court also has been concerned with the multiple purpose nature of the Wallisville Project. Its five authorized purposes include salinity control, navigation, water conservation, recreation and fish and wildlife enhancement.[112] For the most part, the latter three purposes are substantially "local" in nature, particularly that related to water conservation. This purpose was added to the salt-water barrier purpose shortly after the plan for building a barrier was accepted.[113] This purpose developed as the project developed and appears to be one of the more significant features requiring scrutiny by this Court.

In instances in which the multiple purposes of a local nature were determined to be particularly substantial, such a determination would equitably favor a resolution of the case under NEPA on a local basis. In other words, if only one of several project purposes was related to the master project and it was relatively insignificant when compared to the purposes serving local needs, equity would not favor granting an injunction as to the local project pending completion of an environmental impact statement as to the larger, minimally associated project. There is presently a paucity of case law in this area. The only reported case which this Court has found bearing upon multiple purpose issues is Committee to Stop Route 7 v. Volpe, 346 F.Supp. 731, 734 (D.Conn. 1972). In that case it was determined that if a highway segment which had a utility of its own was constructed, it would narrow the range of locality alternatives of the major route. Accordingly, its construction was enjoined. *Id.* at 740. That particular problem is not present here because all navigation, existing and proposed, will use the waters of the Trinity River, if at all. Keeping in mind the basic purpose of NEPA to avoid piecemeal environmental evaluations, a practical test to determine at what point a multiple purpose project becomes sufficiently associated with a major project so as to be controlled by it basically turns on the nature and extent of the nexus between the two projects. If in any given relationship the nexus between a major project and a smaller, multiple purpose project is exceedingly thin and attenuated, it would appear to

111. *See* WALLISVILLE EIS, *supra* note 9, at 100–01.

112. *Id.* at 1.

113. *See* note 50 *supra* and accompanying text.

be unreasonable and impracticable to enjoin what is substantially a local project. Similarly, if the major project is not yet sufficiently distinct or comprehensive, the nexus might be insufficient as well.

In the present case the Trinity Project is sufficiently distinct, but an evaluation of the nexus poses difficulty. According to Corps benefit-cost figures for the Wallisville Project in fiscal year 1972, the latest in the record, 41.3 percent of the total benefits are attributed to navigation and 25.4 percent to salinity control.[114] Thus on the surface it appears that over 65 percent of the total project benefits are attributable to a role compatible with the Trinity Project. In light of the existing navigation to Liberty, Texas, however, and the barrier impact on saltwater accompanying navigational uses, the above percentages do not necessarily reflect an accurate nexus between the two projects. Unfortunately, the present record does not provide a basis for a more informed judgment. However, it is not necessary at this point for the Court to make such a determination because, as the following will demonstrate, the record raises questions as to the true significance of certain of the claimed purposes of the project.

1.

## WATER CONSERVATION AND SUPPLY

The record is replete with references and statistics regarding the role and value of the Wallisville Project in conserving river water for industrial and municipal purposes.[115] This Court accepts the proposition that if the project was operated jointly with the state built Lake Livingston reservoir, for which it was designed, a substantial increase in the amount of water captured would occur.[116] As counsel for the Corps points out, the public need for water is also an essential environmental element.[117]

There are some detracting factors in the record, however, which are not sufficiently clarified in the present Wallisville impact statement as prepared by the Corps. For example, it can be misconstrued, since it suggests that conservation may be needed for drinking water.[118] The appended comments from the City of Houston also suggests this

---

114. Tabulation by Fiscal Years Showing Federal Cost Estimate, B/C Ratio, Interest Rate, Benefit, Capability [Box 5, Item 88]. [Hereinafter cited as *Corps' B/C Tabulations*].

115. *See, e. g.*, WALLISVILLE EIS, *supra* note 9, at 1, 6, 8–9; 1 WALLISVILLE GEN. DESIGN MEMO NO. 1 App. C (1965), *supra* note 6, at 26–27; H.DOC. NO.215 (Wallisville 1961), *supra* note 5, § 4 at 11, § 5 at 26, 36–37, § 6 at 111–36 (U. S. Public Health Service, Municipal and Industrial Water Requirements, Wallisville Reservoir [1960]).

116. WALLISVILLE EIS, *supra* note 9, at 5–7, 9, 20; 1 WALLISVILLE GEN. DESIGN MEMO NO. 1 App. C (1965), *supra* note 6, at 26–27.

117. Defendants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment at 9.

118. Referring to a study prepared by the U. S. Geological Survey, the impact statement notes that the chemical quality of Trinity River water is suitable for domestic purposes, including drinking water,

as well as for industrial and irrigation purposes. Noting that the Upper Trinity contains water of poor organic quality, due to sewage and industrial discharges, it is evidently diluted with natural runoff in the Trinity Basin and is suitable for most municipal and other purposes. Referring specifically to water stored in Wallisville Lake, the impact statement notes that adverse discharges, such as upstream sewage effluents, will be regulated under permits and that "these discharges will not adversely affect the quality of water stored in Wallisville Lake to any significant degree." WALLISVILLE EIS, *supra* note 9, at 17–19.

The City of Houston referred to water supply as follows:

The City of Houston has already commenced the preparation of plans to use Trinity River water within its domestic water supply system and it is estimated that at least 100 MGD will be so utilized in five years.

Letter from E. B. Tate, Director, Houston Department of Public Works, to Col. Nolan E. Rhodes, Galveston District Corps of Engineers, July 23, 1971, at 2.

possible use. However, comments dated July 7, 1971, from the Southwest Planning Division of the Army Corps of Engineers, made in connection with a draft copy of the impact statement, noted:

> The misunderstandings that reservoir water will be used as drinking water have been clarified in the environmental statement as previously noted.[119]

Contrary to this representation, the Court can only conclude that the environmental statement is anything but clear. Furthermore, chemical treatment of water in order to rid it of vegetation may also render the water unsuitable for drinking purposes.[120]

The record also places in question the actual volume of water available for supply over the life of the project and the benefits attributed to this supply. When the Wallisville Project is placed in "system operation", the normal water level will apparently fluctuate between one and four feet with an average level of 2.3 feet above sea level. Yet the impact statement almost invariably uses the four foot level whenever reservoir volume is considered.[121] The impact statement makes two references to an operationally lower level, both of which are lost in the text. The first declares:

> After twenty-five years, the water level may frequently be drawn down to an elevation of one foot above mean sea level whenever necessary for development and use of the water yield from the lake.[122]

The other reference states:

> Later, the local sponsors, under their contractual agreement with the Government, may utilize the full Wallisville yield down to the minimum operating level of one foot above mean sea level, which is required for control of the salinity intrusion.[123]

Furthermore, a letter in the record dated February 8, 1961, from the then Galveston District Engineer reported that if the Livingston and Wallisville Reservoirs were operated in a manner calculated to yield the maximum water from the combined reservoirs, Wallisville would be empty of storage conservation water approximately 63 percent of the time and that large portions of the reservoir area would be mud flats. He continued by stating, "[a]s a water conservation storage reservoir, the four foot Wallisville reservoir is considered to be without merit." [124] There appears to be little discussion or analysis of potential growth of water plants which reportedly has cut the volume of most lakes and reservoirs in Texas by one-half.[125] Sediment collection in the reservoir, depos-

---

WALLISVILLE EIS, *supra* note 9, at A–54. [Hereinafter cited as *Houston Letter*].

119. Corps' Environmental History, *supra* note 82, at Incl. 26, No. 32, at 5.

120. Letter of Texas Department of Parks and Wildlife to Office of the Governor of Texas, Nov. 13, 1970. WALLISVILLE EIS, *supra* note 9, at A–33. *But see* Corps' response. *Id.* at 72–73. Identification of chemicals to be used would facilitate the following of opinions upon actual effect.

121. *Id.* at i, 1, 2, 6 and 21a.

122. *Id.* at 24.

123. *Id.* at 6.

124. Letter of Col. Harold C. Brown, District Engineer, to Southwestern Division Engineer, Dallas, Texas, February 8, 1961, at 5 [Box 2, Item 23]. [Hereinafter cited as *Brown Letter*].

125. The record reflects that at a recent public meeting conducted by the Corps regarding site selection for Aubrey Lake reservoir, a Dr. J. K. G. Silvy spoke about this problem. Representing the Water Research Laboratories of North Texas State University, based upon a stated forty years of experience studying Texas reservoirs, he made the following statement:

> This is a statement by North Texas State University and the Utility Board of the City of Denton. We wish to take this opportunity to present some ideas based on findings from the Water Research Laboratories of the University that have been studying Texas reservoirs for a period of almost forty years.
> During the past seventy years . . . the construction of reservoirs has not

ited by the river, is lightly discussed in the impact statement as being "variable and unpredictable." [126] Yet the record reflects that the Corps predicted in 1965 the reservoir volume would be diminished by twenty percent at the end of fifty years.[127] No discussion is given to the effect of the proposed addition of a duplicate set of locks and the reusing of the river water for navigation purposes associated with the Trinity Project,[128] to which the water rights of the City of Houston and the Trinity River Authority are presumed to be subordinated.[129]

Also, the effect of water evaporation appears to be inadequately considered, particularly where the record indicates that it may be very substantial.[130]

 An important element in an analysis such as this one is the degree of need, present or projected, for one or more uses of water. The impact statement does not discuss the fact that off-river freshwater storage reservoirs for rice irrigation nearly equal the water storage capacity of the Wallisville reservoir after deducting that quantity re-

---

taken into consideration the ecology of the region that was to be inundated, the number of streams feeding into the reservoir, except for volume and flow, the changes likely in the socio-economic areas, the recreational use, and, most of all, quality and preservation of water for areas that are semi-arid. . . .

Thus, the Corps of Engineers is urged to weigh the expense and advantage of a deep, compact surface reservoir instead of the usual sprawling type. As a matter of fact, it seem incredible that thousands of acres of land are purchased which are rarely exposed to enough water to be of any importance either from the standpoint of flood control, conservation pool, municipal supply, or other uses for which water may be ultimately consumed. Many biological problems are created by the shallow areas which characterize most lakes and reservoirs in Texas. Shallow water results in rapid eutrophication or aging, if you like to put it that way, reduction in water quality, increased evaporation, and inferior and maybe dangerous recreational supply areas.

. . . It is further urged, in acquiring dam-site land, that the cost of digging or finding a deeper base can be compared with the cost of purchasing large tracts of flat land. We have learned that in this region, for example, every year there is more evaporation than rainfall. . . . And the most critical water loss would be evaporation from the large-surfaced lakes, not from consumption. Any water plan that spans less than fifty years is perhaps very short sighted.

It is now time to use the information that is available from an ecological standpoint to build a reservoir that eutrophication would not take in fifty years as it has in all reservoirs in this

part of the country. To be sure, old reservoirs may have the same area, but they do not have the same volume.

We urge the Corps of Engineers to choose a dam site that will give the maximum depth and to use its funds for excavating as deep as possible rather than procuring expensive land. It is likely that such a reservoir may have a total useful age of fifty years. Otherwise, it is our prediction based on limnological data that a reservoir constructed like Garza-Little Elm may have a useful life of little more than 25 years. While the surface is still there, the volume is not available. . . .

The response of Col. Kristoferson of the Corps of Engineers was as follows:

That's a good statement, Dr. Silvy, but, boy, you sure made it more difficult, I'll tell you, to meet all those requirements.

Record of public meeting held at Denton, Texas, by Col. R. S. Kristoferson, Fort Worth District Engineer, April 30, 1971, 60–64 [Box FW, Item HH, at EE–70 to EE–74].

126. WALLISVILLE EIS, *supra* note 9, at 25.

127. 1 WALLISVILLE GEN. DESIGN MEMO NO. 1 (1965), *supra* note 6, § 1 at 66, App. A at 9. Siltation also has other effects. *Id.,* App. E at 2.

128. *See* note 22 *supra* and accompanying text.

129. *See* note 51 *supra* and accompanying text.

130. *See* WALLISVILLE EIS, *supra* note 9, at 11; 1 WALLISVILLE GEN. DESIGN MEMO NO. 1 § 2 (1965), *supra* note 6, at 10; H.Doc.No.215 § 5 (Wallisville 1961), *supra* note 5, at 27; *Brown Letter, supra* note 124, at 5. *See also* note 125 *supra.*

served for navigation purposes.[131] Furthermore, it appears that the "need" for rice farmers for proposed crop expansion uses may not necessarily exist in light of their recent opposition to proposals of the Federal Government for expanding regulated production.[132] As to the total need of the community for water supply, it is worth noting that at no time since fiscal year 1967 have the total estimated benefits attributable to the water supply purposes of the Wallisville Project ever exceeded 3.7 percent of the total claimed project benefits.[133] This would suggest that water need plays a very low role in the project's motivating forces.

 It is quite possible, if not probable, that the water needs of this area are substantial and that they will increase dramatically in the future. Nevertheless, the record casts considerable doubt on whether the Wallisville Project was intended to meet those needs, regardless of the understanding of local interests. Furthermore, there is some

question as to whether it can meet those needs, even if it were intended to do so. The impact statement's analysis of these factors appears to be superficial. Assuming that the Corps has not, in fact, made an error in judgment, the impact statement needs clarification and amplification so that a decision-maker may be apprised of the nature and extent of the claimed water needs, the availability of such water from the project sources and the uses to which it will be put. The Court is simply unable to conclude from the impact statement that a full disclosure of these facts has been made as required under NEPA.

One additional matter is worthy of note. The impact statement does not reconcile the fact that, as reported by Corps officials, system operation of Wallisville with the Lake Livingston reservoir would produce only an additional $38,000 of additional claimed annual water supply benefits, while eliminating $291,000 of claimed annual recreation benefits.[134]

---

131. The volume of Wallisville reservoir is 45,600 acre-feet. WALLISVILLE EIS, *supra* note 9, at 1. Of this, 10,000 acre-feet is allocated solely to navigation. 1 WALLISVILLE GEN. DESIGN MEMO NO. 1 § 2 (1965), *supra* note 6, at 17, thus leaving approximately 35,600 acre-feet for use as a salinity barrier as well as water supply purposes. The record reflects that two water suppliers of rice irrigation water have off-river storage reservoirs with combined capacity of about 35,400 acre-feet. 1 WALLISVILLE GEN. DESIGN MEMO NO. 1 § 1 (1965), *supra* note 6, at 43.
The Wallisville impact statement makes only the following comment regarding these supplies:
> Lake Anahuac was formerly an estuarine arm of Trinity Bay, known as Turtle Bay, but was converted by non-federal interests to a fresh water storage pool many years ago.
WALLISVILLE EIS, *supra* note 9, at 7.

132. According to recent newspaper reports, Texas rice farmers are opposing an acreage increase being considered by the federal government on the grounds that it would require additional expense while only depressing the market price. Houston Post, Nov. 28, 1972, at A13, col. 1.

133. *Corps' B/C Tabulations, supra* note 114.

134. The Wallisville Project should be operated as an independent unit at present and not as an element of a system since the independent plan of operation provides the greatest excess of benefits over costs. The reimbursable costs for this project should be derived from a cost allocation study based on an independent plan of operation. The system operation is not an economically feasible plan since the report indicates that we must forego $291,000 of recreation benefits annually to obtain $38,000 of additional water supply benefits. However, should future conditions indicate that the system plan is justified, the pertinent economic and non-economic factors which justify the plan will be submitted to this office for approval prior to modifying the operation of the project.
Memo from Wendell E. Johnson (by Homer B. Willis), Chief Engineering Division, Civil Works, Army Corps of Engineers, to Southwest Division Engineer, July 22, 1966. 1 WALLISVILLE GEN. DESIGN MEMO NO. 1 § 1, *supra* note 6, at 57. *See also* App. C at 27.

## 2.

### SALTWATER BARRIER EFFECT

Reportedly, the saltwater barrier would permit the withdrawal of 880 million gallons per day from the Trinity River without contamination.[135] The impact statement reports that Wallisville Lake, operating in conjunction with Livingston reservoir, will prevent average annual crop damages in excess of $800,000,[136] a figure somewhat higher than the $500,000 claimed in 1965.[137] The use of this figure in this context is not entirely appropriate, since it does not indicate that only about half that amount is attributable to the Wallisville Project.[138] The record is not clear as to the emphasis which should be given to a saltwater barrier. Although the Corps attributes 25.4 percent of the total project benefits to this purpose,[139] the record reflects that local interests did not seek saltwater protection until navigation expansion programs began.[140] There apparently has been no demand for such a barrier, unrelated to navigation, since 1950.[141] The record does not provide a basis for allocating this purpose between existing and proposed navigation.

## 3.

### FACILITATING EXISTING NAVIGATION

The record does reflect that there is some commerce on the existing navigation channel to Liberty,[142] and that early plans for the Wallisville Project included navigation locks sufficient to meet existing traffic.[143] The record is not clear as to whether anticipated channel enlargement plans, associated with the Wallisville Project, are sought to be justified on the basis of meeting existing navigation needs.[144] Although the present lock size is greater than that needed for existing commerce,[145] that factor alone is not sufficient justification for finding the required "nexus" with the Trinity Project.

## 4.

### RECREATION

The Wallisville Project anticipates providing four public park areas with related facilities.[146] Substantial annual benefits up to 38 percent have been attributed to recreation,[147] the present figure being approximately 18 percent.[148] Aside from the recreation eval-

---

135. *Houston Letter, supra* note 118, at A–54.

136. WALLISVILLE EIS, *supra* note 9, at 20.

137. 1 WALLISVILLE GEN. DESIGN MEMO NO. 1 (1965), *supra* note 6, § 1 at 44, App. C at 26.

138. The barrier effect has been estimated by the Corps as being equally divided between Wallisville and Livingston reservoirs. *See* note 49 *supra*. The latest benefit-cost figures, which are not included, in the impact statement, attributed, $356,000 benefits to Wallisville. *Corps' B/C Tabulations, supra* note 114.

139. *Corps' B/C Tabulations, supra* note 114.

140. *See* notes 43–47 *supra* and accompanying text.

141. WALLISVILLE EIS, *supra* note 9, at 89.

142. *See, e. g.,* H.DOC.NO.215 § 4 (Wallisville 1961), *supra* note 5, at 11.

143. *Id.,* § 3, at 1–2; 1 WALLISVILLE GEN. DESIGN MEMO NO. 1 § 1 (1965), *supra* note 6, at 22.

144. *See* note 25 *supra* and accompanying text; 1 WALLISVILLE GEN. DESIGN MEMO NO. 1 § 1 (1965), *supra* note 6, at 46–47.

145. H.DOC.NO.215 (Wallisville 1961), *supra* note 5, § 3 at 1–2, § 4 at 15.

146. WALLISVILLE EIS, *supra* note 9, at 2; WALLISVILLE DESIGN MEMO NO. 2A (Recreation 1965), *supra* note 7, at 5–6, 10–11.

147. H.DOC.NO.215 § 5 (Wallisville 1961), *supra* note 5, at 50 (Table 5).

148. Benefits of $257,000 are claimed. *Corps' B/C Tabulations, supra* note 114.

uation problems discussed hereafter in the benefit-cost section of this opinion, the impact statement does not meet, discuss or evaluate in any detail the various reports questioning the validity of the claimed recreation benefits. As has been mentioned in the discussion of water conservation, it has been reported by a past Corps official that joint operation of Lake Livingston and Wallisville reservoirs would deplete it of conservation water (on which water recreation would occur) approximately 63 percent of the time, leaving large portions of the reservoir in mudflats.[149] This same joint operation results in the loss of $291,000 worth of recreational benefits in order to obtain a minimal amount of increased water supply benefits.[150] In 1965 the Corps reported that the shallow water depth of the project would be the principal deterrent to recreational use of the reservoir waters themselves.[151] While the impact statement does state that recreation value is of short term duration and may terminate after 25 years,[152] the record is unclear as to whether this was taken into account in evaluating claimed benefits. More importantly, this does not correlate with the fact that recreation benefits, as claimed, were not made on the basis of existing recreation needs,

but on projected needs in the year 2010, a point in time beyond which present recreation benefits ostensibly will terminate.[153] Early Corps' instructions suggest that recreation "needs" are to be evaluated.[154] Nevertheless, the current project evaluations do not appear to have done so; nor have they taken into account, as requested by the Bureau of Outdoor Recreation, U. S. Department of the Interior, the "need" for natural recreation environment.[155]

### 5.

### FISH AND WILDLIFE

The presently claimed fish and wildlife benefits for Wallisville are $157,000 annually,[156] in contrast with the originally estimated $109,300,[157] although the impact statement does not indicate the basis utilized in arriving at these benefits. One brief reference in the impact statement recites that "many thousands of acres of rice fields", the cultivation of which is permitted by fresh water from the Trinity, furnishes suitable homes to waterfowl.[158] This representation may or may not be in conflict with a 1962 report of the Bureau of Sport Fisheries and Wildlife noting that intensive management of a water area, not

---

149. *See* note 124 *supra* and accompanying text.

150. *See* note 134 *supra* and accompanying text.

151. WALLISVILLE DESIGN MEMO NO. 2A (Recreation 1965), *supra* note 7, at 3.

152. WALLISVILLE EIS, *supra* note 9, at 52.

153. H.DOC.NO.215 § 5 (Wallisville 1961), *supra* note 5 at 43. The record suggests that present recreational facilities are adequate to meet present needs. *See* WALLISVILLE DESIGN MEMO NO. 2A (Recreation 1965), *supra* note 7, at 4 (Table 2).

154. Statements should discuss significant relationships between the proposal and other developments (existing and authorized). For example, a statement on a project which would convert a free-

flowing section of a stream to a reservoir should contain information on the amount of flowing and flat water available in the area.
Investigation, Planning and Development of Water Resources, EC 1120-2-56, Sept. 25, 1970, § 4g at 2. [Box 5, Item 96].

155. Letter of Maurice D. Arnold, Regional Director, to Col. Rhodes, District Engineer, July 23, 1971. WALLISVILLE EIS, *supra* note 10, at A-23. Similar testimony was received in the Cossatot River case. Environmental Defense Fund, Inc. v. Corps of Engineers of U. S. Army, 325 F.Supp. 749, 760 (E.D.Ark. 1971).

156. 1973 Senate Comm. Hearings § 2, *supra* note 17, at 1463.

157. H.Doc.No.215 § 5 (Wallisville 1961), *supra* note 5, at 50 (Table 50).

158. WALLISVILLE EIS, *supra* note 9, at 26.

water alone, is the "key to making the area attractive to waterfowl." [159]

## 6.

## SUMMARY

As the above discussion points out, each of the local purposes of this claimed multiple-purpose project at Wallisville conceivably may be lacking in substantial support, thus placing additional weight on the navigation and salinity barrier purposes of Wallisville which form the basis of its nexus with the Trinity Project. The situation is simply very much in doubt based on the record before this Court. This being the case, a decision based solely on deference to the claimed multiple purposes of Wallisville and the record of Corps' good faith to date cannot be justified. This is so, even though substantial construction is underway, high costs have been incurred and a delay may well increase them. The law provides that administrative costs, delay and related problems may not undermine NEPA's requirement that federal agencies comply "to the fullest extent possible." [160] That future funding of a project may be imperiled or placed in doubt by a delay is not sufficient reason to alter the rule,[161] nor does it matter that a federal agency has executed contracts with contractors who may lose income through delay,[162] that employees will lose earnings,[163] or even that there exists the likelihood of increased project costs.[164] As one Court properly phrased the resolution of such problems:

> The Court is not suggesting that the status of the work not be considered in determining whether to proceed with the project. It is suggesting that the degree of the completion of the work should not inhibit the objective and thorough evaluation of the environmental impact of the project as required by NEPA. . . . [A]s the Court interprets NEPA, the Congress of the United States is intent upon requiring the agencies of the United States Government, such as the defendants here, to objectively evaluate all of the projects, regardless of how much money has already been spent thereon and regardless of the degree of completion of the work.[165]

From a complete analysis of the record in this case, this Court does not believe that the project in question, the Wallisville Dam and related facilities, has progressed to the point where the costs of altering or abandoning it would certainly outweigh the benefit that might accrue therefrom to the general public.[166]

---

159. Letter from Carey H. Bennett, Acting Regional Director, Region 2, Bureau of Sport Fisheries & Wildlife, U.S. Department of the Interior, to Fort Worth District Engineer August 3, 1962, at 2 [Box FW, Item s, at E–359].

160. *See, e. g.*, Greene County Planning Board v. Federal Power Commission, 455 F.2d 412, 422 (2nd Cir. 1972), cert. denied 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed. 2d 90; Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1118 (1971); Natural Resources Defense Council, Inc. v. Morton, 337 F.Supp. 165, 166–167 (D.D.C.1971), aff'd 148 U.S. App.D.C. 5, 458 F.2d 827 (1972).

161. *See* Named Individual Members of San Antonio Conservation Society v. Texas Highway Department, 446 F.2d 1013, 1028 (5th Cir. 1971), cert. denied, 403 U.S. 932, 91 S.Ct. 2257, 29 L.Ed.2d 711.

162. Morningside-Lenox Park Association v. Volpe, 334 F.Supp. 132, 145–146 (N.D. Ga.1971).

163. Scherr v. Volpe, 336 F.Supp. 886, 888 (W.D.Wis.1971).

164. Committee to Stop Route 7 v. Volpe, 346 F.Supp. 731, 738–739 (D.Conn.1972).

165. Environmental Defense Fund, Inc. v. Corps of Engineers of U. S. Army, 325 F. Supp. 728, 746 (E.D.Ark.1971). *See also*, Morningside-Lenox Park Association v. Volpe, 334 F.Supp. 132, 142 (N.D. Ga.1971).

166. Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323, 1329–1330 (4th Cir. 1972), cert. denied, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261; Thompson v. Fugate, 347 F.Supp. 120, 125 (E.D.Va. 1972).

This Court originally denied the plaintiffs' request for a temporary injunction pending this decision on the merits because it appeared on the face of this massive record that the Wallisville Project probably served primarily a local role and was merely compatible with the Trinity Project. Although Wallisville appeared to function as a significant part of Trinity, this Court, in weighing the equities, did not wish to delay completion of a project satisfying important local needs which originated and developed in concept long before NEPA was ever considered or became effective as a law. Local governmental entities appeared to rely upon Wallisville for water, rather than to develop their own separate facilities. On the basis of a full probing of this record, however, such an equitable resolution is not warranted. There are simply too many issues in this case wherein there is a failure to satisfy the full disclosure requirements of NEPA, including little supported justification in the present environmental impact statement for the claimed local purposes.

Accordingly, an injunction will be granted by this Court to halt any construction on the overall Trinity Project, including further construction on the Wallisville reservoir, until the requirements of NEPA as elaborated upon in the following sections have been complied with. The true purposes and character of Wallisville simply must be ascertained. If and when the Corps can present to this Court additional evidence as to Wallisville's local purposes, and if this Court upon appraising such evidence finds that this project possesses, in reality, substantial local purposes, then it will dissolve the injunction as to Wallisville upon the resubmission of an environmental impact statement which satisfies the requirements of NEPA in all other respects. On the other hand, if such evidence is inadequate under the law and the claimed primarily local purposes are not demonstrated, the Wallisville Project will then be considered by this Court only as the first segment of the Trinity Project. Further construction of Wallisville will then be delayed pending completion, review, and acceptance of the Trinity environmental impact statement as outlined in the following sections of this opinion.

## D.

## THE ROLE OF THE COURTS UNDER NEPA

### 1.

### SCOPE OF JUDICIAL REVIEW

The role of District Courts in reviewing decisions of federal agencies under NEPA has not yet been clearly enunciated, and it appears that differing standards have been used. It has been held that in the ultimate weighing of values, the courts cannot strike the balance but must insist that the appropriate administrative officials use the scales prescribed by Congress with a scrupulous regard for the importance of the choices presented.[167] Another decision has noted that a court cannot seek to impose unreasonable extremes or inject itself into the area of discretion of the agencies as to the choice of the action to be taken.[168] Yet, as one of the major forerunners of environmental litigation noted, the courts must see that important legislative purposes are not lost or misdirected in the vast hallways of the federal bureaucracy.[169]

At least one Circuit has held that the scope of review of an agency decision, which normally must be upheld if supported by "substantial evidence", is not altered by the National Environmental Policy Act.[170] The Supreme Court has

167. Committee to Stop Route 7 v. Volpe, 346 F.Supp. 731, 739 (D.Conn.1972).

168. Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 838 (1972).

169. Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, 146 U.S. App.D.C. 33, 449 F.2d 1109, 1111 (1971).

170. Scenic Hudson Preservation Conference v. Federal Power Commission, 453

peripherally touched upon environmental values in *Overton Park*.[171] The decision was formally based upon sections of two federal highway acts which included clear and specific directives that the Secretary of Transportation "shall not approve any program or project" that requires the use of any public park land "unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park. . . ."[172] The language in NEPA is not as specific. Nevertheless, NEPA was enacted many years after the statutes at issue in *Overton Park* and was intended to cover a multitude of potential environmental harms, rather than one specified item. As the Supreme Court remarked about the highway statutes, the very existence of NEPA indicates that protection of the environment was to be given paramount importance and thus was not to be placed on an equal footing with the usual economic and technical factors.[173]

 The Supreme Court reviewed the standards of the Administrative Procedure Act, 5 U.S.C. § 706 (1964 Ed., Supp. V), and found the "substantial evidence" test authorized only when the agency action is taken pursuant to a rule-making provision of the APA itself, or when the agency action is based on a public adjudicatory hearing. However, the court could not engage in a de novo review in the absence of certain agency procedures which, as here, were not present. The generally applicable standards of § 706 were held to require the reviewing court to engage in a "substantial inquiry."[174] The Secretary's decision, according to the Court, is entitled to a presumption of regularity, although that presumption is not to shield his action from a thorough, probing and in-depth review. The reviewing court must then determine whether the Secretary has acted within the scope of his authority. This would include ascertaining if the actual choice made was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law, if the decision was based on a consideration of the relevant factors and if there had been a clear error of judgment. Despite the fact that the inquiry into the facts is to be searching and careful, the ultimate standard of review is narrow, as the court is not empowered to substitute its judgment for that of the agency.[175]

This Court believes that the *Overton Park* test is a proper one for testing agency decisions under NEPA. Although the Supreme Court has presently foregone the opportunity to speak directly on the applicable test,[176] this Court believes that *Overton Park*, expressly interpreting Congressional legislation in light of Congressional concern over environmental issues,[177] was intended to serve as a guidepost in these presently uncharted waters. The Fifth Circuit Court of Appeals has only recently adopted this same standard. Save Our Ten Acres v. Kreger, 472 F.2d 463 (5th Cir., 1973). Furthermore, this Court

---

F.2d 463, 467 (2nd Cir. 1971), cert. denied, 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972).

171. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

172. 23 U.S.C.A. § 138 (Supp.1972) ; 49 U.S.C.A. § 1653(f) (Supp.1972).

173. *See Overton Park, supra,* 401 U.S. at 411–413, 91 S.Ct. 814.

174. *Id.* at 415, 91 S.Ct. 814.

175. *Id.* at 415–416, 91 S.Ct. 814.

176. *See* note 170, *supra,* 407 U.S. 926, 931, 92 S.Ct. 2453, 2455, 32 L.Ed.2d 813, 815 (Justice Douglas dissenting). "Although value judgments are inevitable and even though the Commission's balancing of environmental costs with other factors may be entitled to some deference, I share Judge Timber's doubts that under § 101 the balance struck by an agency unskilled in environmental matters should be reviewed only through the lens of the 'substantial evidence' test."

177. *See Overton Park, supra,* 401 U.S. 404 n. 1, 91 S.Ct. 814 and accompanying text.

finds the "substantial inquiry" test more compatible with the problems surrounding burden of proof, discussed below, than would be the case with the "substantial evidence" test. Nevertheless, this Court has given close consideration to both tests in the light of the facts and the relevant law in this case, and it would reach the same conclusion, regardless of which test was applied.

## 2.

## BURDEN OF PROOF

Few courts have expressly indicated upon which party the burden of proof should fall, although several have indirectly reached the issue. In a case similar to the one before this Court, a district judge has held that the burden of persuasion rests with the plaintiffs.[178] The Court of Appeals for the Second Circuit, in one of its earlier decisions, pointed out that the burden of proof must not be shifted so as to give, in essence, the plaintiffs a virtual veto power over federal agency decisions.[179] On the other hand, the Court of Appeals for the Fourth Circuit has held that NEPA places a heavy burden upon the federal agencies to enable a court to ascertain whether there has been a genuine and not a perfunctory compliance with the Act, thus requiring the agency to "explicate fully its course of inquiry, its analysis and its reasoning."[180]

The District of Columbia Circuit, in *Calvert Cliffs*, pointed out:

It is . . . unrealistic to assume that there will always be an intervenor with the information, energy and money required to challenge a staff recommendation which ignores environmental costs. NEPA establishes

environmental protection as an integral part of the (agency's) basic mandate. The primary responsibility for fulfilling that mandate lies with the (agency). Its responsibility is not simply to sit back, like an umpire, and resolve adversary contentions at the hearing stage. Rather, it must itself take the initiative of considering environmental values at every distinctive and comprehensive stage of the process beyond the staff's evaluation and recommendation.[181]

The Court of Appeals for the Second Circuit has echoed the language and reasoning of *Calvert Cliffs*, noting that it was, in part, for this reason that Congress compelled the agencies to seek the aid of all available expertise and formulate their own position early in the review process.[182] Although neither of these two cases expressly laid the burden of proof upon one party or the other, both clearly reveal the rationale for placing it upon the federal agency, once a plaintiff has made out a prima facie case of a violation of NEPA. The agencies have created environmental divisions or sections within their structure whose tasks include the survey, evaluation and description of environmental features and impacts. Publicly paid experts spend their full time investigating these features in conjunction with the various projects undertaken by their agencies as well as coordinating with other agencies who are experts in particular fields. Aside from the limited roles served by the Council on Environmental Quality and the Environmental Protection Agency, there is no public environmental "ombudsman" to superintend agency compliance with NEPA. It

178. Environmental Defense Fund, Inc. v. Corps of Engineers of U.S. Army, 348 F.Supp. 916, 933 (N.D.Miss.1972).

179. Scenic Hudson Preservation Conference v. Federal Power Commission, 453 F.2d 463, 480 (2d Cir. 1971), cert. denied, 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972).

180. Ely v. Velde, 451 F.2d 1130, 1138–1139 (4th Cir. 1971).

181. Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, 146 U.S. App.D.C. 33, 449 F.2d 1109, 1118–1119 (1971).

182. Greene County Planning Board v. Federal Power Commission, 455 F.2d 412, 420 (2d Cir. 1972), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90.

would be unrealistic, as pointed out, to expect that the various environmental and conservation groups and individuals would be able to provide an effective check and balance against agency decisions affecting the environment. In most cases, these environmentalists are teachers, laborers, professors, housewives, etc., who must spend the vast majority of the employment time engaged in occupations other than watching the agencies. On the other hand, the agency employees spend their employment time performing tasks related to the very subject matter and activities upon which environmental issues are based.

 Equally important is the nature of the litigation and the judicial role. The record in this case, for the most part relating only to one reservoir, is massive and contains hundreds of documents pertaining to scores of issues. This Court has necessarily spent a truly inordinate amount of time in reading, comparing, analyzing, and indexing these documents so as to be able to comprehend this complex lawsuit. Virtually all of this record is the product of the administrative agency, the Corps of Engineers, with the Wallisville impact statement *constituting a distillation of* what it considered in good faith to be important in such record. Under the circumstances, this Court is compelled to conclude that the very nature of the problem in this legal area is so extensive that if the burden were placed wholly upon citizen plaintiffs, the full disclosure requirements of NEPA would never be implemented satisfactorily and environmental protection as contemplated by Congress would be little more than a fiction. Accordingly, once a prima facie showing has been made that the federal agency has failed to adhere to the requirements of NEPA, the burden must,

as a general rule, be laid upon this same agency which has the labor and public resources to make the proper environmental assessment and support it by a preponderance of the evidence contained in the impact statement.

3.

## JURISDICTION

 Early in the present litigation, the government moved to dismiss on several grounds, including both subject matter and personal jurisdiction. The Court denied the motion to dismiss.[182a] To elaborate here somewhat, this Court finds that jurisdiction is properly based on the federal question statute, 28 U.S.C. § 1331. Harrisburg Coalition Against Ruining the Environment v. Volpe, 330 F.Supp. 918, 921 (M.D.Pa. 1971); Ely v. Velde, 321 F.Supp. 1088, 1094 (E.D.Va.1971); Pennsylvania Environmental Council, Inc. v. Bartlett, 315 F.Supp. 238, 240 n. 1 (M.D.Pa.1970), aff'd, 454 F.2d 613 (3d Cir. 1971). Furthermore, the pleadings adequately establish jurisdiction under the Administrative Procedure Act, 5 U.S.C. § 701 et seq. Environmental Defense Fund, Inc. v. Hardin, 138 U.S.App.D.C. 391, 428 F.2d 1093, 1097–1098 (1970); Citizens Committee for Hudson Valley v. Volpe, 425 F.2d 97, 101–102 (2d Cir. 1970), cert. denied, 400 U.S. 949, 91 S. Ct. 237, 27 L.Ed.2d 256; Upper Pecos Association v. Stans, 328 F.Supp. 332, 333 (D.N.M.1971), aff'd, 452 F.2d 1233 (10th Cir. 1971), vacated, 406 U.S. 944, 92 S.Ct. 2040, 32 L.Ed.2d 330 (remanded to determine mootness); Pennsylvania Environmental Council, *supra*, 315 F. Supp. at 245. Similarly, this Court does not find that the suit is barred by the doctrine of sovereign immunity. Environmental Defense Fund, Inc. v. Corps

182a. In pertinent part the entry provided: Defendant's motion to Dismiss is denied, *see, e. g.,* EDF v. Corps of Engineers, 324 F.Supp. 878 (D.D.C. 1971); Ely v. Velde, 321 F.Supp. 1088 (E.D.Va.1971), aff'd in part, rev'd in part on other grounds, 451 F.2d 1130

(4th Cir. 1971); Izaak Walton League v. Macchia, 2 ERC 1661 (D.N.J.1971); *see also* Named Individual Members of the San Antonio Conservation Society v. Texas Hwy. Dept., 446 F.2d 1013 (5th Cir. 1971).

of Engineers of U.S. Army, 325 F.Supp. 749, 763 (E.D.Ark.1971); Crowther v. Seaborg, 312 F.Supp. 1205, 1219 (D. Colo.1970).

In light of the above disposition, this Court does not reach the jurisdictional allegations advanced by plaintiffs resting on 28 U.S.C. § 1361 relating to mandamus and 28 U.S.C. §§ 2201 and 2202 pertaining to declaratory judgment.

### 4.

### STANDING

■ This Court has studied carefully the Supreme Court's recent pronouncement regarding the standing to sue in an environmental setting. Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). It has also considered numerous other lower court cases wherein the issue of standing was raised in environmental settings. See, e. g., Environmental Defense Fund, Inc. v. Corps of Engineers of United States Army, 348 F.Supp. 916 (N.D.Miss.1972); Citizens for Clean Air v. Corps of Engineers of U.S. Army, 349 F.Supp. 696 (S.D.N.Y.1972); Maddox v. Bradley, 345 F.Supp. 1255 (N.D.Tex.1972); Natural Resources Defense Council v. Grant, 341 F.Supp. 356 (E.D.N.C.1972). This Court is satisfied that the present allegations, asserted prior to Sierra Club v. Morton, are sufficient for standing. Were they to be determined to be insufficient, which this Court does not find, an amendment would only be a minor procedural matter. Environmental Defense Fund v. Corps of Engineers of U.S. Army, 342 F.Supp. 1211, 1216 (E.D.Ark. 1972).

### 5.

### INTERVENTION

To date this Court has received several motions to intervene as of right, Fed. R.Civ.P. 24(a)(2), or, alternatively, permissively under Fed.R.Civ.P. 24(b)(2). Prior to this decision the Trinity River Authority and, joining in one motion, the City of Houston and the Coastal Industrial Water Authority of Texas were granted leave to intervene. Their interests in this matter are amply supported by the facts of this case.

Presently pending are motions to intervene by each of the following Texas cities, moving independently: Dallas, Fort Worth, Irving and Trinity. Another motion is filed collectively on behalf of Houston County (population 18,000), the cities of Crockett (population 7,000), Grapeland (population 1,300), Lovelady (population 400), and the Houston County Water Control and Improvement District No. 1. Finally, another motion is filed collectively on behalf of some 75 cities, 12 counties, 13 soil and water conservation districts and 4 electric cooperatives. This motion shall conveniently be referred to by this Court as the motion of the City of Pantego.

■ The cities of Dallas and Fort Worth, in addition to their joint interests in the navigation features of the Trinity Project, emphasize their concern for the flood control projects and water supply facilities immediately associated with the project and their cities. Inasmuch as these features, plus the location of the northern terminus of the proposed Trinity navigation channel in Fort Worth, are substantially associated with these cities, their motions to intervene are granted as of right. These claims are substantial, and, as a practical matter, can be impaired or impeded by this litigation. As to the status of the other movants, varying circumstances are noted. The City of Irving, for example, is concerned with flood control features of the project, and the City of Trinity seeks to protect a $13,000 investment in a railroad right-of-way which that City regards as being a potentially good site for a barge terminal. The other movants generally are concerned in varying degrees with flood control, water supply, the recreational needs of its citizens, low cost transportation and their local economy and prosperity.

The central issue of this litigation involves NEPA and environmentally related aspects of the projects in question. Although they may be affected, the specific elements such as flood control, recreation, economic prosperity, right-of-ways and transportation are not directly the concern of this Court. These issues are not particularly unique to these movants when contrasted with the hundreds of other cities, water districts and other entities which might desire to intervene on similar grounds. Because of this situation, the Court must focus upon adequacy of representation. The Committee Note of 1966 to Fed.R.Civ.P. 24(a) noted, in applicable part:

> A class member who claims that his "representative" does not adequately represent him, and is able to establish that proposition with sufficient probability, should not be put to the risk of having a judgment entered in the action which by its terms extends to him. . . .

> . . . . . .

> A party to an action may provide practical representation to the absentee seeking intervention although no such formal relationship exists between them, and the adequacy of this practical representation will then have to be weighed. . . .

> An intervention of right under the amended rule may be subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings.

3b J. Moore's Federal Practice ¶ 24.-01[10], at 24–17, 18 (2d Ed. 1969). In-

adequacy of representation under the old intervention rule was shown if there was proof of collusion between the representative and an opposing party, if the representative has or represents some interest adverse to that of the petitioner, if the representative fails because of nonfeasance in the duty of representation, and sometimes if the representative is willing but unable to present the claim of the petitioner. 3b J. Moore's Federal Practice ¶ 24.08[2], at 24–184, 185 (2d Ed. 1969). It would appear that the basic standards have not changed under the new rule. Hobson v. Hansen, 269 F.Supp. 401 (D.D.C.1968); 3b J. Moore's Federal Practice ¶ 24.09–1[4], at 24–314, 315 (2d Ed. 1969). Assuming, but not deciding, that these movants have interests which would be impaired by this litigation, it appears that their interests are adequately represented by one or more of the existing parties, cumulatively considered. Intervention as of right is therefore denied to these remaining movants at this time. Similarly, permissive intervention is denied at this time on the grounds that the mere paperwork and duplication of issues and arguments would delay the proceedings and prejudice the interests of all parties, including their own. See, gen., 3b J. Moore's Federal Practice ¶ 24.10[4], at 24–391 et seq. (2d Ed. 1969).

Holdings of the Fifth Circuit Court of Appeals on intervention questions [183] and the procedures adopted by other courts engaged in environmental litigation [184] do not suggest that another approach is more reasonable.

183. *See, e. g.*, Gabriel v. Standard Fruit and Steamship Co., 448 F.2d 724 (5th Cir. 1971); Diaz v. Southern Drilling Corp., 427 F.2d 1118, 1124 (5th Cir. 1970); Martin v. Kalvar Corp., 411 F.2d 552, 553 (5th Cir. 1969); Atlantis Development Corp. v. United States, 379 F.2d 818, 825 (5th Cir. 1967).

184. *See, e. g.*, Wilderness Society v. Morton, 150 U.S.App.D.C. 170, 463 F.2d 1261 (1972) (per curiam); Greene

County Planning Board v. Federal Power Commission, 455 F.2d 412, 416 (2nd Cir. 1972), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90; Environmental Defense Fund, Inc. v. Corps of Engineers of U.S. Army, 348 F.Supp. 916, 921 n. 3 (N.D.Miss.1972); Natural Resources Defense Council, Inc. v. Tennessee Valley Authority, 340 F.Supp. 400, 408–409 (S.D.N.Y.1971), rev'd on other grounds, 459 F.2d 255 (2nd Cir. 1972).

## E.

## THE NATIONAL ENVIRONMENTAL POLICY ACT

## 1.

### THE SUBSTANTIVE POLICY ELEMENTS

■■■ The basic requirements and obligations of NEPA have been sufficiently outlined by major decisions.[185] NEPA is at the very least "an environmental full disclosure law," [186] an "action-forcing" statute,[187] which is intended to assure "substantial and consistent consideration of environmental factors in decision making," even where it may conflict with other federal objectives.[188] In this manner the "full cost" of a project, including environmental impact, may become known.[189] It is incumbent upon this Court to ensure that the Corps, like all federal agencies, uses "all practicable means, consistent with other essential considerations of national policy," to meet the policies established by Congress.[190] In this respect, there are two matters which are of particular application to this case.

*Requirement of Continual Policy Reevaluation:*

■■■ Section 102 directs all agencies of the federal government, to the "fullest extent possible," to ensure that the "policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter. . . ." [191] This sets a high standard and obligates the agencies continually to review and reappraise existing policies and procedures, not only in light of the developing law, but also in light of the developing agency awareness of environmental factors as issues arise at project sites. Congress sought to ensure that "no agency shall utilize an excessively narrow construction of its existing statutory authorization to avoid compliance." [192] Thus, an agency's review must reflect a "systematic, interdisciplinary approach" and be "integrated" with the natural and social sciences, the environmental design arts, and be developed in consultation with the Council on Environmental Quality.[193] It is a matter of common sense that the field level personnel of the federal agencies, those directly associated with the projects creating environmental impacts, are those most likely to become aware of potential conflicts between existing practices and environmental policies. Effective means of communication must be maintained to apprise them of changing environmental practices as well as to allow them to point up related problems. If these discoveries require new legislation, then it is incumbent upon the agen-

185. *See, e. g.,* Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323 (4th Cir. 1972), cert. denied, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261; Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972); Greene County Planning Board v. Federal Power Commission, 455 F.2d 412 (2d Cir. 1972), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90; Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971).

186. Environmental Defense Fund, Inc. v. Corps of Engineers of U.S. Army, 325 F. Supp. 728, 759 (E.D.Ark.1971).

187. *See* Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1113 (1971).

188. 115 Cong.Rec. (Part 30) 40419 (1969), section-by-section analysis of S. 1075 as reported to the Senate. Noted in Environmental Defense Fund, Inc. v. Corps of Engineers of U.S. Army, 348 F.Supp. 916, 926 (N.D.Miss.1972).

189. *Id.* at 928.

190. *See* 42 U.S.C.A. § 4331(b) (Supp. 1972).

191. 42 U.S.C.A. § 4332(1) (Supp.1972).

192. Conf.Rep. No. 91–765, 91st Cong., 1st Sess., U.S.C.Cong. & Admin.News, pp. 2767, 2770 (1969).

193. *See* 42 U.S.C.A. § 4332(2)(A), (B) (Supp.1972).

cy as a positive duty to bring the issue to the attention of Congress.[194]

*Mitigation—The Substantive Requirement:*

■ NEPA states indirectly, but affirmatively, that under some circumstances federal agencies must mitigate some and possibly all of the environmental impacts arising from a proposed project. This requirement is embodied primarily within Section 101, 42 U.S.C. A. § 4331, with important implementing assistance from Section 102, 42 U.S.C.A. § 4332. This Court will not endeavor to catalogue all permutations of this requirement, but will highlight a few as they apply to the present litigation.

Consistent with other essential considerations of national policy, all federal ,agencies must "use all practicable means" to assure safe surroundings, 42 U.S.C.A. § 4331(a), (b)(2), to attain the widest range of beneficial uses of the environment without unintended consequences, 42 U.S.C.A. § 4331(a), (b)(3), and to preserve important historic, cultural and natural aspects of our national heritage. 42 U.S.C.A. § 4331(a), (b)(4). While tested by a rule of practicability with respect to other essential considerations of national policy, these requirements must be implemented "to the fullest extent possible." 42 U.S.C.A. § 4332.

Although the mitigation requirement has not been examined in the relatively few reported cases to date, its significance is implicit in the guidelines of the CEQ and EPA. For example, the CEQ guidelines since first issued in 1970 have required that:

. . . Federal agencies will . . . assess in detail the potential environmental impact *in order that adverse effects are avoided, and environmental quality is restored or enhanced, to the fullest extent practica-*

*ble.* In particular, alternative actions that will minimize adverse impact should be explored and both the long-short-range implications to man, his physical and social surroundings, and to nature, should be evaluated in order to avoid to the fullest extent practicable undesirable consequences for the environment. (emphasis added)[195]

The more recent EPA guidelines provide that:

Remedial, protective and mitigative measures which will be taken as part of the proposed action shall be identified. These measures to prevent, eliminate, reduce, or compensate for any environmentally detrimental aspects of the proposed action shall include those of the agency and others, e. g., its contractors and grantees.[196]

More significantly are those EPA guidelines directed toward those adverse impacts which cannot be avoided. They require the agencies to:

Describe the kinds and magnitudes of adverse impacts *which cannot be reduced in severity* or which can be reduced to an acceptable level but not eliminated. *For those which cannot be reduced, their implications and the reasons why the action is being proposed, notwithstanding their effect, shall be described in detail.* Where abatement measures can reduce adverse impacts to acceptable levels, the basis for considering these levels adequate and the effectiveness and cost of the abatement measures shall be specified. In particular this analysis shall detail the aesthetically or culturally valuable surroundings, human health, standards of living, or environmental goals set forth in § 101(b) of the National Environmental Policy Act which would be sacrificed.[197] (emphasis added)

This Court is fully aware that many cases have held that NEPA does not cre-

---

194. *See* Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 837 (1972).

195. CEQ Guideline § 2, 36 Fed.Reg. 7724 (1971).

196. Proposed EPA Reg. § 6.45(b)(2), 37 Fed.Reg. 883 (1972).

197. *Id.*, § 6.45(c).

ate "substantive" rights, but rather creates only "procedural" obligations.[198] To the extent that NEPA does not articulate acceptable levels of air, water, heat and noise pollution, this is an accu..ate position. To the extent that NEPA does not give the courts the final decision with respect to which way a highway should go, or which trees should stand and which should fall, this is an accurate position. But to the extent that it would allow the agencies merely to disclose the likely harm without reflecting a substantial effort to prevent or minimize environmental harm, it is not an accurate position of the role of the courts under NEPA.

■ Issues pertaining to mitigation most frequently arise in the context of considering alternatives to the whole or any part of a proposed project's environmental impact. This was noted by the Eighth Circuit Court of Appeals which stated:

> The Corps also argues that it was not necessary to discuss in greater detail the alternative of acquiring land to mitigate the loss of natural resources because this alternative was a separate project requiring separate Congressional authorization. We disagree.

The proposed mitigation plans go to the very heart of the question before the Corps in preparing its environmental impact statement—whether the project should proceed at the present time in view of its environmental consequences. Responsible critics of the project have urged that no project be initiated *until a mitigation plan is actually put into effect* in order to prevent easily avoidable environmental losses. They state that following the commencement of construction, it will become difficult—if not impossible—to acquire suitable land for mitigation because of increased property values and the continued clearing of land for cultivation. Thus, in their view, any mitigation proposal is inextricably linked to the project itself. Such a view is not clearly without merit.[199]

Both the Second and District of Columbia Court of Appeals have suggested that judicial action might be required if there was a significant potential for subversion of the *substantive* policies in NEPA.[200] The courts should not impose unreasonable extremes of compliance or inject themselves into the area of discretion as to what action should be

198. *See, e. g.*, Upper Pecos Association v. Stans, 452 F.2d 1233, 1236 (10th Cir. 1971), vacated, 406 U.S. 944, 92 S.Ct. 2040, 32 L.Ed.2d 330 (remanded to determine mootness) ; Environmental Defense Fund, Inc. v. Corps of Engineers of U.S. Army, 348 F.Supp. 916, 925 (N.D.Miss. 1972) ; Indian Lookout Alliance v. Volpe, 345 F.Supp. 1167, 1172 (S.D.Iowa 1972) ; Environmental Defense Fund, Inc. v. Corps of Engineers of U.S. Army, 342 F.Supp. 1211, 1216–1217 (E.D.Ark. 1972), supporting earlier ruling, 325 F. Supp. 749, 755 (1971) ; Morningside-Lenox Park Association v. Volpe, 334 F. Supp. 132, 139 (N.D.Ga.1971).

199. Environmental Defense Fund, Inc. v. Froehlke, 473 F.2d 346, 351. (8th Cir., 1972).

200. *See* Greene County Planning Board v. Federal Power Commission, 455 F.2d 412, 425 (2nd Cir. 1972), cert. denied,

409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90; Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1112 (1971). *See also* Environmental Defense Fund, Inc. v. U. S. Army Corps of Engineers, 470 F.2d 289 (8th Cir., filed Nov. 28, 1972).
The D.C. Circuit Court of Appeals was recently confronted with what may have been such a case. The Secretary of the Interior was planning to sell offshore leases for oil and gas drilling, notwithstanding an environmental impact statement characterized by the plaintiffs as crying out for a contrary result. An injunction was granted on the ground that the Secretary had not taken a "hard look" at available alternatives which would mitigate the expected environmental impact. Natural Resources Defense Council, Inc. v. Morton, 148 U.S. App.D.C. 5, 458 F.2d 827, 830, 838 (1972).

taken;[201] but they should not hesitate to require further agency consideration when a project appears to call for mitigation and yet none was considered, or only a half-hearted effort was made.

The Wallisville impact statement does not indicate that mitigation was considered or implemented with respect to any environmental impacts noted. Initially, this is not in accordance with the instructions issued by the Chief of Engineers on September 25, 1970. In pertinent part they instruct project planners as follows:

> Identify remedial, protective, and mitigation measures which would be taken in response to adverse effects of environmental impacts. Such measures taken for the minor or short-lived negative aspects of the project will be discussed in this section. The adverse effects which cannot be satisfactorily dealt with will be considered in greater detail along with their abatement and mitigation measures in the following section.[202]

The Wallisville impact statement does indicate generally that control of some future environmentally related problems, such as increased reservoir vegetation, will be subjected to Corps control measures. There is no specific discussion at any one point, however, which would indicate that consideration of mitigation of existing, major impacts was undertaken. For example, the impact statement, dated December 13, 1971, nearly two full years after NEPA, does not reveal any project modifications since Wallisville was planned and designed in 1965. At the least, this does not comply with CEQ guidelines requiring that agencies of ongoing projects reassess the basic course of action, except where impracticable, and shape further action "so as to minimize adverse environmental consequences."[203]

## 2.

## THE ENVIRONMENTAL IMPACT STATEMENT

### a.

### *Detail Required*

The existing guidelines of the CEQ and EPA, as well as those of the Corps, do not yet adequately indicate what amount of detail is required in impact statements. As various courts have pointed out, the statement should gather in one place the discussion of environmental impacts and alternatives[204] so that it serves as comprehensive document upon which responsible agency officials and others might rely in making the required balance between environmental and non-environmental factors.[205] Two district judges, studying impact statements before them, have articulated what appear to be, at first glance, somewhat different tests. One stated that the statement should, at a minimum, contain information as to "all *known* possible environmental consequences."[206] The other limited it to discussing "the *significant* aspects of the *probable* environmental impact."[207] The first judge had been presented with a twelve page impact statement from what appeared to

**201.** Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 838 (1972).

**202.** Engineering Circular No. 1120–2–56, App. B at B–4 [Box 5, Item 96].

**203.** CEQ Guideline § 11, 36 Fed.Reg. 7727 (1971).

**204.** *See, e. g.,* Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App. D.C. 5, 458 F.2d 827, 834 (1972); Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, 146 U.S. App.D.C. 33, 449 F.2d 1109, 1114 (1971).

**205.** Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 833, 835 (1972); Environmental Defense Fund, Inc. v. Corps of Engineers of U. S. Army, 348 F.Supp. 916, 931 (N.D.Miss.1972).

**206.** Environmental Defense Fund, Inc. v. Corps of Engineers of U. S. Army, 325 F.Supp. 749, 759 (E.D.Ark.1971).

**207.** Environmental Defense Fund, Inc. v. Corps of Engineers of U. S. Army, 348 F.Supp. 916, 933 (N.D.Miss.1972).

be a recalcitrant agency. Upon subsequent submission of a more elaborate statement, he dissolved an injunction and stated that it was not necessary to "dot all the I's and cross all the T's" in an impact statement.[208] In light of these facts, the tests espoused do not appear to differ substantially, if at all. A reasonable test would be the same as that adopted by present Corps regulations: an impact statement should contain "all possible significant effects on the environment." [209] The larger the physical size of the environmental amenity at issue, and hence the more readily available for public observation, appreciation, use, or enjoyment, then the greater the likelihood it should be dealt with in the impact statement. This is particularly true if it is endangered or is rapidly diminishing. Likewise, even if the physical size is miniscule or microscopic, the impact statement should deal with it if the environmental impact on it is apt to be significant. In this fashion, the impact statement will be sufficiently detailed so that, if challenged, the courts will not be left to guess as to what is involved and whether the requirements of NEPA have been met.[210]

### b.

#### *Objectivity Required*

■ Objectivity is required of federal agencies, particularly with respect to evaluation of environmental impacts. The Eighth Circuit Court of Appeals has stated that "the test of compliance with § 102, then, is one of good faith objectivity rather than subjective impartiality." [211] A district judge has offered a practical interpretation of objectivity as requiring, at a minimum, a good faith effort to comply with the provisions of NEPA. This would preclude, he stated, consciously slanted or biased impact statements wherein intentional misrepresentation was attempted.[212]

These are sound tests and should be equally applicable to a federal agency with respect to all environmentally related activities, be it selection of consultants, the undertaking of environmental studies, the reliance upon such studies, the creation of environmental assessments, the coordination with reviewing agencies or the preparation of impact statements. There are indications in the record that the Corps of Engineers may have, at one time or another, been less than objective by engaging in rationalizations and super salesmanship.[213]

### c.

#### *Written For The Layman*

■ All features of an impact statement must be "written in language that is understandable to non-technical

**208.** Environmental Defense Fund, Inc. v. Corps of Engineers of U. S. Army, 342 F.Supp. 1211, 1216 (E.D.Ark.1972).

**209.** Corps Reg. § 11b, 37 Fed.Reg. 2528 (1972). This obviously requires a high level of knowledge of all possible effects in order that "significant" ones may be identified by the agency when preparing an impact statement. *See* Corps Reg. § 11a, 37 Fed.Reg. 2528 (1972).

**210.** Ely v. Velde, 451 F.2d 1130, 1138 (4th Cir. 1971); *see also* note 219 *infra* and accompanying text.

**211.** Environmental Defense Fund, Inc. v. U. S. Army Corps of Engineers, 470 F.2d 289, 296 (8th Cir., 1972).

**212.** Environmental Defense Fund, Inc. v. Corps of Engineers of U. S. Army, 342 F.Supp. 1211, 1214 (E.D.Ark.1972).

**213.** *See, e. g.,* note 101 *supra*, and accompanying text; Civil Works Daily Log, Nov. 18, 1963, Headquarters, Department of the Army, Office of Chief of Engineers [Box FW, Item w, at B–48]; American Association of Railroads, Cross Florida Barge Canal Project, Preliminary Analysis of the Restudy Report of the Corps of Engineers, U. S. Army on the Cross Florida Barge Canal Project, Jan. 10, 1958, 14 (Dec. 17, 1958) (quoting from a Congressional Investigating Committee). [Box FW, Item t, at F–33]; Summary of Conference on Proposed Trinity River Waterway, July 26–27, 1960 at 2 [Box FW, Item v, at W–74].

minds and yet contain enough scientific reasoning to alert specialists to particular problems within the field of their expertise."[214] The reason for this standard is that impact statements must assist in rational, thoroughly informed decision making by officials higher up in the agency chain-of-command, including the Congress, the Executive and the general public, some of whom may not possess the technical expertise of those who evaluate the impact and prepare environmental statements. In this regard the present impact statement is deficient.[215] Additionally, when technical procedures are discussed, such as in connection with the benefit-cost analysis issues, the applicable law and methods employed should be adequately explained so that all may understand them.

d.

*Discussion Of Alternatives*

The role that possible alternatives play in the environmental process is particularly critical because it is usually through this medium that mitigation measures may be discovered. By the use of an appropriate alternative, be it to all or a part of a proposed project, a part of the environmental impact may be mitigated. Like mitigation, the consid-

eration of alternatives may not be treated cavalierly by the federal agencies. By the use of the word "alternatives" Congress meant, "[T]he alternative ways of accomplishing the objectives of the proposed actions and the results of not accomplishing the proposed action."[216] Since first issued in April, 1970, the guidelines of the Council on Environmental Quality have required the following standards for the consideration of alternatives:

> A rigorous exploration and objective evaluation of alternative actions that might avoid some or all of the adverse environmental effects is essential. Sufficient analysis of such alternatives and their costs and impact on the environment should accompany the proposed action through the agency review process in order not to foreclose prematurely options which might have less detrimental effects.[217]

The Department of Defense guidelines, issued in August, 1970, are similar. They require:

> A list of carefully developed *alternatives to the proposed action* that may avoid some or all of the adverse environmental effects. Include with these alternatives economic, technical and

214. Environmental Defense Fund, Inc. v. Corps of Engineers of U. S. Army, 348 F.Supp. 916, 933 (N.D.Miss.1972); *see also*, Proposed EPA Reg. § 6.45, 37 Fed. Reg. 883 (1972) ("Statements shall not be drafted in a style which requires extensive scientific or technical expertise to comprehend and evaluate the environmental impact of an Agency action.")

215. This Court has not undertaken the task, which federal agencies must do, to screen the impact statement for all words which might be less than fully understandable to an average individual. Some of the terms appearing in the Wallisville impact statement which this Court believes were unclear are as follows:

> weir notch (Wallisville EIS, *supra* note 9, at 2) ;
> estuarine (*Id.* at 13 and others) ;
> estuarine dependent (*Id.* at 14) ;

alignment improvement and bend easement, siltation, and turbidity (*Id.* at 21a) ;
preclude flotation (*Id.* at 22) ;
eutrophication, (rough fish) (*Id.* at 22) ;
high trapping effect (*Id.* at 25) ;
inundate brackish marsh vegetation (*Id.* at 25) ;
vegetative detrital material (*Id.* at 25, 35) ;
habitat (*Id.* at 26) ;
nektonic inhabitants (later clarified as all fish and "crustaceans") (*Id.* at 31) ;
aquatic ecosystems (*Id.* at 35).

216. *This is the language of the section-by-section analysis presented by Senator Jackson, in charge of the legislation and Chairman of the Senate Interior Committee, in explaining and recommending approval of the bill as agreed in conference. 115 Cong.Rec. 40420 (Dec. 20, 1969).*

217. CEQ Guideline § 6a(iv), 36 Fed.Reg. 7725 (1971).

operational considerations, as well as their environmental impact.[218]

▮▮▮ Of the several courts that have carefully considered the role of alternatives in the environmental spectrum, perhaps the soundest and most succinct statement comes from the District of Columbia Circuit which has stated:

. . . Section 102(2)(D) requires all agencies specifically to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." This requirement, like the "detailed statement" requirement, seeks to ensure that each agency decision maker has before him and takes into proper account all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance. Only in that fashion is it likely that the most intelligent, optimally beneficial decision will ultimately be made. Moreover, by compelling a formal "detailed statement" and a description of alternatives, NEPA provides evidence that the mandated decision making process has in fact taken place, and, most importantly, allows those removed from the initial process to evaluate and balance the factors on their own.[219]

While agencies must consider alternatives to the "fullest extent possible," [220] the search for appropriate alternatives need be neither "exhaustive" [221] nor speculative and remote.[222] Although only those "reasonably available" [223] need be considered, the discussion and consideration cannot be superficial, but must be thoroughly explored.[224] It is not necessary that a particular alternative offer a complete solution to all technical, economic and environmental considerations. If a portion of the original purpose of the project, or its reasonably logical subcomponent, may be accomplished by other means, then a significant portion of the environmental harm attendant to the project as originally conceived may be alleviated.[225] The fact that some reasonably related alternative might require Congressional legislation is not sufficient either to place it beyond the consideration of the agency or beyond inclusion in the impact statement.[226] Likewise, the fact that a particular alternative would require substantial coordination with another federal agency is not sufficient, in and of itself, to place its consideration beyond the requirements of NEPA.[227]

▮▮▮ There are some circumstances, such as are present in this case, in which the duty to consider alternatives takes on an even greater role than would ordinarily appear to be necessary. In those cases in which a proposed proj-

218. DOD Guidelines, *supra* note 85, at § 5c.

219. Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, 146 U.S. App.D.C. 33, 449 F.2d 1109, 1114 (1971).

220. 42 U.S.C.A. § 4332 (Supp.1972). As the Court in *Calvert Cliffs* also noted, these procedural requirements do not tolerate the same degree of agency discretion as substantive duties. Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1114 (1971).

221. Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 836 (1972).

222. *Id.* 458 F.2d at 837–838.

223. *Id.* at 834.

224. *See* Natural Resources Defense Council, Inc. v. Morton, 337 F.Supp. 165, 167 (D.D.C.1971), aff'd, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972) ; Environmental Defense Fund, Inc. v. Corps of Engineers of U. S. Army, 325 F.Supp. 749, 761–762 (E.D.Ark.1971). *See also*, Environmental Defense Fund, Inc. v. Coastside County Water District, 27 Cal.App.3d 695, 104 Cal.Rptr. 197 (1972).

225. Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 836 (1972).

226. *Id.* 458 F.2d at 837.

227. *See Id.* at 835.

ect has a nexus to a more detailed and comprehensive project, it may be necessary that an impact statement not only evaluate the effect of the proposed project, but also assess some or all of the effect of the master plan.[228] As the D.C. Circuit Court of Appeals aptly phrased this duty:

> When the proposed action is an integral part of a coordinated plan to deal with a broad problem, the range of alternatives that must be evaluated is broadened. . . .

> . . . In the absence of assignment of the impact statement function to an agency with broader responsibility the implementation of the environmental review mandated by NEPA fell on the (sponsoring agency) when it took the first step in carrying out the broader . . . program.[229]

Referring to the present suit and assuming that the nexus between Wallisville and the Trinity Project was not sufficient to require an environmental assessment of the larger project, it would still be necessary to evaluate the expected impact that the adjoining Trinity Project would have upon Wallisville. For example, the range of alternatives for Wallisville would also need to take cognizance of potential water pollution traveling downstream and collecting within the borders of the Wallisville reservoir.

A court must use reason and assess the results with an eye to practicality so as not to further tie up the governmental bureaucracy with red tape. However, a court should engage in a "substantial inquiry" to ensure that the agency has rigorously and objective-

ly fulfilled its obligations. In the same fashion that agencies must continually update and reevaluate their policies, they must continue to reevaluate such aspects as mitigation, impact and the scope of a proposed project, even if an acceptable impact statement has been prepared, reviewed and accepted.[230] It may well be difficult as a practical matter for the courts to determine where mere consideration of an alternative is sufficient as contrasted with when actual mitigation is required. As a basic rule, if the agency has properly used its own expertise and that contributed by other expert agencies, all acting fully and reasonably within their own respective jurisdictions, then the final balance should not be disturbed, even if a court would have personally arrived at a different result.

### 3.

### REVIEW OF ENVIRONMENTAL IMPACT STATEMENTS BY OTHER AGENCIES

#### a.

#### In General

NEPA requires sponsoring agencies, prior to the making of an impact statement, to "consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved."[231] The guidelines of the CEQ and EPA expand very little on this point, although the CEQ guidelines do provide lists of agencies arranged by indicated expertise.[232] The legislative

228. The purpose of this is to avoid the likelihood of severely limiting the range of otherwise available alternatives. Committee to Stop Route 7 v. Volpe, 346 F. Supp. 731, 740 (D.Conn.1972).

229. Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 835 (1972).

230. See Id. 458 F.2d at 836; Natural Resources Defense Council, Inc. v. Morton, 337 F.Supp. 170, 172 (D.D.C.1972), aff'd, 148 U.S.App.D.C. 5, 458 F.2d 827; En-

vironmental Defense Fund, Inc. v. Corps of Engineers of U. S. Army, 325 F.Supp. 749, 758–759 (E.D.Ark.1971). See also CEQ Guideline § 11, 36 Fed.Reg. 7727 (1971); Proposed EPA Reg. §§ 6.23(a), 6.27(a)(2), 37 Fed.Reg. 881, 882 (1972).

231. 42 U.S.C.A. § 4332(2)(C) (Supp. 1972).

232. See CEQ Guideline § 7, 36 Fed.Reg. 7725 (1971), and 7727–29; see also Proposed EPA Reg. § 6.27(b)(2)(iv)(c), 37 Fed.Reg. 882 (1972).

history reveals that Congress did not intend to delay unreasonably the processing of federal agency proposals, or that local agencies with only a remote interest in the project without concomitant primary responsibility had to be included. The information obtained, however, was to accompany the proposal through the review process.[233]

 This inter-agency contact must, in fact, be a true "consultation."[234] While one of the purposes behind this requirement was to avoid obvious duplication of efforts, time, and expense,[235] it was also to ensure that the required analysis was undertaken. It could not be presumed that interested citizens or groups would have the financial and technical resources necessary for such undertakings.[236] While 30 to 45 days is usually allowed for reviewing agencies to study and comment upon a proposed project,[237] the "and obtain" requirement of NEPA would prevent too strict an adherence to a time schedule when, for example, the impact statement was particularly large and complex, the reviewing agency was unusually swamped with review requests, or possibly even when on-site investigation or additional study was required before the reviewing agency could render an intelligent opinion.[238] This exception should be reasonably limited to an agency whose expertise appears to be particularly significant with respect to a major aspect of a project.

b.

## Duties Of Other Agencies

 Because NEPA obligates sponsoring agencies to use a systematic, interdisciplinary approach, the basic burden is on these agencies to seek out and contact the appropriate authorities. On the other hand, the other federal agencies may not, because of their own interdisciplinary requirements under NEPA, merely sit by until contacted by a sponsoring agency. By maintaining a check of the Federal Register, they may guard against the possibility that some sponsoring agency has failed to submit an impact statement to them through inadvertence or design when the nature of the project appears to lie within their area of jurisdiction. In short, the use of a systematic, interdisciplinary approach means what it says.

 If in a given situation it reasonably appears that an on-site investigation is required before a reviewing agency may adequately exercise its expertise, then an on-site investigation is required.[239] This is likely to arise more frequently with respect to particularly large projects. Similarly, when an agency's expertise would indicate that it should have comments upon a given proposal, then comments should be made.[240]

233. Conf.Rep.No.91–765, 91st Cong., 1st Sess., U.S.C.Cong. & Admin.News, pp. 2767, 2769 (1969).

234. *See* Environmental Defense Fund, Inc. v. Corps of Engineers of U.S. Army, 325 F.Supp. 728, 741, 745; 325 F.Supp. 749, 758 (E.D.Ark.1971).

235. *See* Environmental Defense Fund Inc. v. Corps of Engineers of U. S. Army, 348 F.Supp. 916, 930 (N.D.Miss.1972).

236. *See* notes 181–182 *supra* and accompanying text.

237. CEQ Guideline § 7, 36 Fed.Reg. 7725 (1971); Proposed EPA Reg. § 6.27(b) (2)(iv)(c), 37 Fed.Reg. 882 (1972); Corps Reg. § 9a, 37 Fed.Reg. 2527 (1972).

238. In November, 1970, the Bureau of Outdoor Recreation was unable to provide substantial comments regarding the Wallisville Project because of a large number of impact assessment requests. The Bureau finally was able to respond in July, 1971. WALLISVILLE EIS, *supra* note 9, at A–22, 23.

239. The Bureau of Mines and Bureau of Outdoor Recreation reported that their comments regarding Wallisville were made without benefit of on-sight examination. *Id.* at A–20, 23. The Court expresses no opinion as to whether such investigation was required by either agency as to this project.

240. The Bureau of Reclamation reported that it had no comments to make regarding the Wallisville Project. *Id.* at A–27. The Court has no opinion as to whether such comments were required. In this

More importantly, the range of its comments should focus upon the impact the project will have upon the environment, a determination which may require the reviewing agency's expertise, not just whether the project will affect some other ongoing project being conducted by the reviewing agency.[241] Application of this expertise may require a myriad of activities, such as file checks, reviews of past studies, literature searches or map investigations. The reason underlying this approach is to ensure that some significant impact does not go undiscovered until too late, merely because the sponsoring agency was unaware of potential problems which the reviewing agency might suspect.

c.

### Deference To Agency Expertise

The record reflects that in the course of planning Wallisville reservoir, sharp differences of opinion arose between the Corps of Engineers and other agencies which rendered opinions that, at least, arguably fell under their jurisdiction and area of expertise. For example, according to the record the Department of the Interior claims that the Wallisville Project would cause a significant reduc-

tion in the amount of fresh water discharged into Trinity Bay, a development likely to have a significant adverse effect on the saltwater commercial fishing industry.[242] The impact statement reflects that it will not be significantly reduced for the first 25 years,[243] although a Corps official, writing four weeks after the impact statement was published, approximated the reduction as being 17 to 20 percent within only a few years after the project's completion.[244] In another matter, the Corps claims substantial recreation benefits,[245] although the Bureau of Outdoor Recreation disagrees and indicates that it would be better if the area were left undeveloped for natural recreation.[246] While the Corps has developed procedures for measuring recreation demand and benefits,[247] the record does not reflect whether they are acceptable to agencies with recreational expertise or whether they accurately measure recreational "need." [248] For example, in 1962 the Bureau of Sport Fisheries and Wildlife computed fish and wildlife benefits for Tennessee Colony Reservoir to be $1,236,000. The Corps claimed $6,300,000, an amount criticized by the Bureau as being unsupported.[249] With respect to the

regard it appears that it would be worthwhile for sponsoring agencies, at the time of preparing impact statements, to precede agency comments (or letters noting lack of comment) with a brief description of the reviewing agency's expertise and area of responsibility, such as might be found in the United States Government Organization Manual. This would enable readers to determine whether the reviewing agency was meeting its obligations as well as to judge more intelligently the value of the comments supplied.

241. The Soil Conservation Service reported "the Project (Wallisville) will not adversely affect or benefit any existing or proposed projects of the Soil Conservation Service." *Id.* at A–13.

242. *See* note 69 *supra* and accompanying text.

243. WALLISVILLE EIS, *supra* note 9, at 24.

244. Letter of D. T. Graham, Chief, Engineering Division to Dr. Gordon Gunter, Jan. 21, 1972. [Box 6, Item 128].

245. *See* note 148 *supra* and accompanying text.

246. *See* note 155 *supra* and accompanying text.

247. WALLISVILLE DESIGN MEMO NO. 2A (Recreation 1965), *supra* note 7, at 6–9.

248. *See, e. g.,* note 153 *supra* and accompanying text.

249. The system of estimating fish and wildlife benefits appearing in your report makes no allowance for project-caused losses. Moreover, it is not a biologically sound approach since it gives no real consideration to the many interrelated biological factors which bear upon populations of fish and wildlife at any given site. In the final analysis, it is the populations of fish and wildlife that ultimately determine the extent of hunting and fishing.

The estimated net annual benefit to fish and wildlife of $1,236,000 shown in our report was arrived at through the cooperative efforts of our Bureau,

Trinity Project, in apparently that same year the District Engineer estimated hunting and fishing would increase by 4,900,000 man-days annually if the project were constructed, while the Fish and Wildlife Service estimated an increase of only 937,000 man-days. The District Engineer also estimated the general recreation increase to be 9,100,000 man-days annually, an amount approximately three times that estimated by the National Park Service. These differences led the Board of Engineers for Rivers and Harbors to comment:

> Considering that the Park Service and Fish and Wildlife Service are experts in their fields, it is believed that these wide differences should be reconciled to a greater degree, or more support furnished for the estimates used.[250]

Another area of disagreement appears to have arisen in the context of the benefit value to be attributed to water supply, the Department of Health, Education, and Welfare evidently setting one value while the Corps utilized a higher one.[251]

Possibly one of the more critical areas pertains to the claimed damages to the saltwater commercial fishing industry if the Wallisville Project is completed as designed.[252] As the 1965 Corps' study reported, an inclusion of these damages in the benefit-cost ratio computation might well result in a lack of economic justification for the project:

> In the undefined "estuarine waters", the Corps makes no estimate of effects, whereas the bureau estimates

major losses in both commercial and sport fishing. As stated above, the bureau estimated these effects in pounds of catch and visitor days, respectively, but made no monetary estimate. Using Corps estimates of 30 cents per pound for commercial fish catch and $1.00 per visitor day for sport fishing, the bureau's estimate of effects would result in a net annual loss of over $1.5 million for the independent operation and over $1.8 million for the system operations. Since the remaining benefits for all other purposes total $991,000 for the independent operation and $842,000 for the system operation, acceptance of the bureau's estimate would result in an unfavorable project from an economic standpoint.[253]

The Corps subsequently recomputed the claimed loss on agreed-upon rates and reduced the estimated loss from $1.5 million to $562,000.[254] Nevertheless, not even this amount was reported in the impact statement, nor was it apparently computed in the benefit-cost ratio.[255]

This Court is not attempting to decide whether one position is more reasonable than another. In light of the disposition of this case, it is not necessary to do so. This Court is only concerned that the law as passed by the Congress is followed. This warrants some discussion of what NEPA requires.

 Congress did not intend that a federal agency consult with another agency "which has jurisdiction by law

the Bureau of Commercial Fisheries and the Texas Game and Fish Commission. Our experience and judgment indicates this figure to be quite realistic.
Letter from Carey H. Bennett, Acting Regional Director, Southwest Region 2, Bureau of Sport Fisheries and Wildlife, U. S. Department of the Interior, Aug. 3, 1962, to Ft. Worth District Engineer, at 3 [Box FW, Item s, at E–360].

250. Letter from Col. Edmund H. Lang, Resident Member, BERH, to Southwestern Division Engineer, Feb. 5, 1963, at 6–7 [Box FW, Item w, at B–134].

251. Letter of Jerome H. Svore, Regional Program Director, Water Supply and Pol-

lution Control, Public Health Service, U. S. Department of HEW, Nov. 8, 1965, to Galveston District Engineer. 1 WALLISVILLE GEN. DESIGN MEMO NO. 1 App. C (1965), *supra* note 6, at Exh. 4.

252. *See* notes 27, 65, 69–81, 96–101, *supra*, and accompanying text.

253. 1 WALLISVILLE GEN. DESIGN MEMO NO. 1 App. C (1965), *supra* note 6, at 25.

254. *See* note 74 *supra* and accompanying text.

255. Defendant Corps of Engineers' Answer to Interrogatory 40(n).

or special expertise with respect to any environmental impact involved" and then have its comments accompany the impact statement through the review process, only to have them ignored. This would not satisfy the requirement that agencies "utilize a systematic, interdisciplinary approach." With all due respect to the experts acquired by the Corps of Engineers to work in the environmental sections added at both District and Division levels, their duties cannot include their substitution for the expertise of other federal agencies charged with primary duties relating to the environment. Rather, these Corps experts must serve the Corps as environmental managers to ensure that unintended impacts do not go unnoticed by engineers until it is too late in a project's development. These officials presumably are alerted to whatever studies or inquiries need to be made, and they may evaluate comments of reviewing agencies for purposes of completeness and ensure that obvious errors in analysis are not made by such agencies. When a conflict arises between the Corps and an agency which is making an evaluation in its particular field of expertise, and when the Corps' evaluation is based upon factors of which the reviewing agency may take cognizance, then NEPA obligates the Corps in most instances to defer to that evaluation. Only upon the presentation of clear and convincing evidence that the reviewing agency was incorrect in its assessment should the Corps adopt another evaluation; even so, this refusal to defer should not occur until after the reviewing agency has had the opportunity to review the Corps' claimed evidence, and possibly reverse or modify its original evaluation.

The Court in *Calvert Cliffs* criticized an agency seeking to defer to water quality standards devised and administered by state agencies and approved by the federal government under the Federal Water Pollution Control Act. There

the Court stated that NEPA required full consultation, but "most certainly did not authorize a total abdication to those agencies. Nor did it grant a license to disregard the main body of NEPA obligations." [256] This case does not compel a different result here, because in *Calvert Cliffs* the sponsoring agency was not seeking to defer to the considered judgment of a reviewing agency which was evaluating an environmental impact in the context of the proposed project. Rather, the sponsoring agency was seeking to defer to water permit standards based upon an entirely different set of values, namely maximum levels of acceptable pollution (as a single impact), rather than a measurement of actual total project impact.

By requiring this deference to the agency best equipped to render an expert opinion, it appears that Congress intended to provide a form of environmental "check and balance" with which federal agencies might complement one another and thereby keep the ship of state, as unwieldy as it often is, on a more steady course as "trustee of the environment for succeeding generations." [257]

### F.

### THE WALLISVILLE ENVIRONMENTAL IMPACT STATEMENT

### 1.

### THE DISCLOSURE

#### a.

#### *In General*

Because of both procedural and substantive deficiencies, it will be necessary that the Corps of Engineers prepare a new environmental impact statement, either as to Wallisville alone or for the entire Trinity Project. This will depend, as noted earlier, upon the Corps' presentation of satisfactory proof to this Court that the project has substantial lo-

256. Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, 146 U.S. App.D.C. 33, 449 F.2d 1109, 1123 (1971).

257. *See* 42 U.S.C.A. § 4331(b)(1) (Supp. 1972).

cal purposes which would favor its equitable segregation from the Trinity Project for NEPA purposes. Some of the more significant deficiencies of the present impact statement appear in the following areas:

b.

### Archeological Sites

 As advised by the National Park Service, the impact statement notes there are 175 identified archeological sites in the project area, 17 of which contain material of historic association and 5 of which are listed in the National Registry of Historic Places. Three of these 5 sites "will not be inundated at normal pool levels," while the other 2 "will be inundated in the lake and may be subject to accelerated erosion by wave action." [258]

The Texas State Historical Survey Committee urges that steps be taken to preserve and protect "one of the most important historic site complexes in Southeast Texas." [259]

Aside from failing to consider the total impact at one location,[260] and apparently failing to contact the Advisory Council on Historic Preservation as required by CEQ guidelines,[261] the impact statement is unclear as far as weighing the importance of the sites, the degree to which the affected areas may contain still undiscovered important sites, or the actual, anticipated "impact" likely to result from inundation. The question is —does it or does it not mean destruction? There is no evaluation of the ef-

fect of floods which the Corps reports will occur from one to three times per year, nor any assessment of the effect of hurricanes on a large body of water which reportedly hit the Texas Coast on an average of every 1.7 years with occasional fifteen foot tides.[262]

Although there is no "cost" assigned to the loss of these archeological sites for benefit-cost purposes,[263] there is no indication that protection of the sites is anticipated, even though some means are reported as being available.[264] The subject merits a full and fair inquiry, particularly since it does appear that there is concern for approximately 300 acres of oil fields which are to be protected with a ring levee.[265]

c.

### Water Quality

The impact statement generally reports that water quality is expected to be good for the purposes intended, noting that upstream sewage and other polluted discharges are controlled by state permits and future discharges will be controlled by the Corps of Engineers with approval of the Environmental Protection Agency. Aside from critical communications received regarding the above procedures,[266] this report is in apparent disregard of the caveat in *Calvert Cliffs* concerning the abdication of responsibility for evaluating total pollution impact.[267] The statement is not sufficient under NEPA, particularly when it apparently indicates no change in pollution control policy from that con-

258. WALLISVILLE EIS, *supra*, note 9, at 27.

259. *Id.* at A–39, 40.

260. The Archeological impact is considered at three locations in the Wallisville impact statement with some overlap. *Id.* at 16–17, 26–27a, 36.

261. CEQ Guidelines, Appendix I, 36 Fed. Reg. 7727 (1971).

262. *See* note 39 *supra*.

263. Defendant Corps of Engineers' Answer to Interrogatory 40(1).

264. WALLISVILLE EIS, *supra* note 9, at 27–27a.

265. 1 WALLISVILLE GEN. DESIGN MEMO 1 § 2 (1965), *supra* note 6.

266. 3 Envir.L.Rep. 184–5 (June 16, 1972); 3 Envir.L.Rep. 271 (June 30, 1972).

267. *See* note 257 *supra* and accompanying text. *See also* CEQ Guideline § 6(a) (iii), 36 Fed.Reg. 7725 (1971); Proposed EPA Reg. § 6.21(d), 37 Fed.Reg. 881 (1972).

templated in 1941 in connection with the Trinity Project.[268] There is some discussion of water quality couched in terms of parts per million, but it fails to provide the non-technical reader with a scale of reference as to what is acceptable and what is not.

Most significant is the failure of the statement to assess the likely pollution level, assuming full navigation operations on the Trinity River in accordance with projected water commerce estimates. The Wallisville Project lies at the mouth of the Trinity River and is a likely collection point for upstream barge and tug discharges, leaks, spills, etc. The record reflects the potential presence of other factors which may affect water quality including saltwater intrusion (from storms), damage to the locks (used as a control device), chemical treatment for vegetation and exceedingly low water levels. These factors should be discussed in sufficient detail, as should the water quality "cost" of pollution through elimination of the Trinity as a free flowing river and the effect of the Federal Water Pollution Control Act Amendment of 1972 upon Corps procedures.

d.

*Population and Industrial Expansion*

Although there is reason to believe that there will be development, growth and industrial expansion as a result of the Wallisville Project's providing of a dependable water supply,[269] there is no impact evaluation of such expansions,

nor has its environmental "cost" been considered. Not only has Congress determined that this type of growth leads to increased pollution,[270] but also guidelines of the CEQ and EPA point out that consideration to such hazards must be given.[271]

e.

*Damage to Wildlife, Waterfowl and Fish*

The impact statement reflects that 85 acres of partially wooded land inhabited by numerous species of wildlife will be removed and that some 12,500 acres of high marsh and cypress swamp will be submerged by the completion of this project. The statement points out that some rare and endangered species will be affected, and that competition for the remaining habitat may impair survival prospects of "some species." Noting that most animals exhibit a degree of mobility and adaptability, the statement concludes by declaring that "the degree of such impairment and the identity of such species as might be so affected, are indeterminate." [272]

At the very least, the impact statement should indicate whether any already endangered species may be among those whose survival may be impaired, and qualified experts on the subject should be identified. NEPA requires federal agencies to "preserve . . . natural aspects of our natural heritage . . . wherever possible." [273] Efforts should also be made to identify which species may be significantly impaired [274] so that a judgment decision,

---

268. *See* H.Doc. No. 403 § 4 (1941), *supra* note 2, at 88–90.

269. WALLISVILLE EIS, *supra*, note 9, at 21, 24; *see also*, H.Doc. No. 215 (Wallisville 1961), *supra* note 5, § 4 at 12, § 5 at 37; 1 WALLISVILLE GEN. DESIGN MEMO NO. 1 § 1 (1965), *supra* note 6, at 47.

270. 42 U.S.C.A. § 4371(a)(3) (Supp. 1972).

271. CEQ Guideline § 6(a)(ii), (iii), 36 Fed.Reg. 7725 (1971); Proposed EPA Reg. § 6.45(b)(1), 37 Fed.Reg. 883 (1972). *See also*, 42 U.S.C.A. § 4331

(b)(5) (Supp.1972); Environmental Defense Fund, Inc. v. Corps of Engineers of the U.S. Army, 325 F.Supp. 728, 748 (E.D.Ark.1971).

272. WALLISVILLE EIS, *supra* note 9, at 35.

273. 42 U.S.C.A. § 4331(b)(4) (Supp. 1972); *see also* notes 194–195 *supra* and accompanying text.

274. This may require more than the Corps' admitted "cursory inspection" made at Tennessee Colony Lake. *Tenn. Colony Lake Memo, supra* note 26, at III–3.

made in conjunction with the appropriate agencies, can determine the degree of mitigation required for non-endangered species on a national or regional basis, if any. In 1961 it was reported that there was a "critical need for a refuge and feeding area in this section of Texas."[275] Because of local opposition to federal purchase of private property for this purpose, the concept was rejected.[276] This Court expresses no opinion regarding the propriety of a wildlife refuge, but the concept may need to be reconsidered in light of the project's impact on the area.

f.

*Estuarine Damage*

The key defect of the impact statement with respect to the estuarine areas and the claimed resultant damage to the commercial saltwater fishing industry is the basis upon which the Corps' decision is made. The Corps' rejection of the critical opinions of other agencies is not fully explained, so that a layman reader cannot determine for himself which viewpoint accurately depicts the true situation. For example, substantial reliance appears to be placed upon a paper entitled "Estuarine Nekton" by Dr. J. L. McHugh, but the study is not attached to the impact statement, his qualifications are not indicated, and the methods employed to arrive at his conclusions are not revealed. In light of the controversy over the methodology underlying the Gunter report, this explanation would appear to be critical.

 The statement also reflects that the Corps undertook independently to evaluate the problem with its own staff marine biologist. The statement reports that "[m]arine biologists use various methods of evaluating estuarine habitat and estimating its contributions to the commercial fishery resources."

One method uses energy-balance principles based upon the assumption that, all other environmental factors remaining constant, the ecology of a given area will support life forms at an equilibrium level in consonance with the available food and nutrient supply. It is unlikely that the assumptions and input data required for computations of this nature ever are sufficiently complete and valid to ensure complete reliability of results. Nevertheless, the method is used to estimate unit productivity of estuarine areas *and does offer some means of comparing quality in different areas.* Another, and perhaps more commonly used, method of evaluating the unit productivity of estuarine areas is proportionately relating the total area of available estuarine habitat to the total landings of commercial fish in the areas of concern. Data pertaining to the total landings are readily available and comparatively accurate. However, the assumptions and judgment factors that must, of necessity, enter into computations of this nature cause the final results to be questionable.[277] (emphasis added)

The impact statement undertakes no application of either method to determine if any indication of possible harm results. The matter is simply dismissed. Assuming without further information that both methods contain the represented deficiencies, the fact remains that no other test or standard is advanced by the Corps to assist in solving what is admittedly a very knotty problem. On the other hand, if both methods were applied as scientifically as possible, and both indicated a substantial likelihood of harm, then this result would tend to support the opinion of the Bureau of Fish and Wildlife Service. Under such circumstances, failure to attribute any environmental "cost" as a consequence

275. Letter of Director, Bureau of Sports Fisheries and Wildlife, U.S. Department of Interior, to Chief of Engineers, Feb. 3, 1961. H.Doc. No. 215 § 2a (Wallisville 1961), *supra* note 5, at xvii.

276. *See* notes 66–67 *supra* and accompanying text. *See also* note 53 *supra*.

277. WALLISVILLE EIS, *supra* note 9, at 33.

of impaired commercial fishing would be a violation of NEPA's policy. In short, a recognized indicator regarding environmental amenities, even with admitted shortcomings, appears to be a better analysis procedure than no indicator at all.

The impact statement declares that the Wallisville Project will only eliminate about 2.4 percent of the acres of water and intertidal marsh capable of sustaining estuarine animals in the Galveston Bay system. This declaration was not subjected to scrutiny, comment and appraisal by other federal agencies. The impact statement then goes on to cite numerous percentages. It indicates that much of the "emergent marsh" in the Galveston Bay system, which is located in the Trinity River Delta, comprises about 19 percent of the entire system, that Trinity Bay encompasses about 25 percent of the water area of Galveston Bay system, that about 82 percent of the state's oyster harvest, 50 percent of the blue crab harvest, 46 percent of the estuarine shrimp harvest and 10 percent of the fin fish harvest come from the Galveston estuary. These statistics obviously relate to sizable amounts of water area and commercial commodities. Yet, there is no assessment of the Wallisville Project's impact on any or all of these various harvests.

The impact statement touches only summarily on the issue of mitigation. One method suggested to minimize the estuarine loss involves the erection of artificial holes and water courses; this possible solution was discounted as being in an experimental stage with costs unknown based upon the present state of knowledge in the field. Another method involving artificial propagation of commercial species was dismissed by stating that the ability to propagate large numbers of animals is not in prospect in the near future. The layman reader simply has insufficient information to make any independent assessment, and the Corps gives no indication in the state-

ment that it plans to consider the problem further.

### 2.

### THE CONSIDERATION OF ALTERNATIVES

#### a.

#### *Background*

The record is unclear as to why the particular site for the Wallisville Project was selected, as early studies focused on "site limitations at river mile 3.9" (the present location) and another location at river mile 8.6.[278] The present location and design were selected as being the most beneficial, considering the factors deemed important in the early 1960's. Following the decision to make an environmental impact statement in 1970, the Corps formulated six alternatives as being "reasonably broad and practical," in addition to the alternative of abandonment. The basis of each was salvage of current navigation construction with secondary consideration being given to the other purposes. All of the plans reportedly would involve additional expense and, as the Corps states, the only method of assuring preservation of recovered estuarine habitat for present purposes would be to have the federal government purchase the lands at an additional cost of about $2,300,000. Inasmuch as all of the alternatives would have a benefit-cost ratio of less than one, all were rejected.

#### b.

#### *Proper Methodological Approach*

The proper method for approaching a consideration of alternatives under NEPA is to consider first the primary purposes or functions that the project is to serve. Alternatives to each of these projects must then be weighed, because it is not appropriate to disregard alternatives merely because they do not offer, individually, a complete solution to the problem.[279] Furthermore,

278. *See* note 54 *supra* and accompanying text.

279. *See* note 225 *supra* and accompanying text.

each of the primary environmentally adverse effects must be considered, and alternative approaches to the project should be considered with an eye to mitigating each or all of these. The purpose of "breaking" down a project into its beneficial and detrimental "components" is to determine whether some significant portion of the environmental harm may be alleviated. The record reflects that this was done in 1966, although lacking the details that would be required for environmental decisions.[280] The Court is aware of a 1965 finding by the Corps that "development of single purpose plans for water supply, recreation and fish and wildlife on tributary streams is not feasible due to the lack of suitable tributaries near the project area."[281] It is possible that reevaluation on an individual basis in light of NEPA and the current emphasis upon environmental protection might produce different conclusions from those reached in 1965. In truth, the requirement of "breaking" down a project is nothing more than a bona fide exercise in common sense to place in proper perspective what is bad and what is good about a project in terms of the environmental consequences. This Court cannot hope to identify every conceivable alternative here that should be properly considered. However, in light of what this Court regards as inadequate treatment of reasonable alternatives in the present impact statement, these observations are advanced in a constructive effort to point up the NEPA standards to be met.

c.

### Water Conservation and Supply

The record sheds some light on the thinking of certain experts in this area. One alternative might be a deep, compact surface reservoir instead of the present one which is shallow and spreads out to cover thousands of acres. As recently as April of 1971, this suggestion was brought to the attention of the Corps in a public hearing considering a site selection for Aubrey Lake Reservoir, another project associated with the Trinity Project. Dr. J. K. G. Silvy, representing the Water Research Laboratories of North Texas State University and the Utility Board of the City of Denton at a recent Corps public meeting, offered this suggestion based upon what he stated was approximately forty years' study of Texas reservoirs. As his footnoted statement indicates, he estimated that the useful volume of a shallow reservoir might be cut by fifty percent within 25 years.[282]

Additionally, alternative sources for meeting the water needs of users might be considered, such as expanding the existing fresh water reservoir supplies used by rice farmers for preventing damage due to saltwater intrusion.[283] Expansion of other existing water reservoir areas in the vicinity, even though possibly more expensive as far as pumping costs may be concerned,[284] might offer substantially more environmental reward which, if evaluated in economic terms, might well outweigh the increased cost of pumping.

280. 1 WALLISVILLE GEN. DESIGN MEMO NO. 1 App. C, (1965), *supra* note 6, at 37–42.

281. *Id.,* § 1 at 49.

282. *See* note 125 *supra.*

283. *See* note 131 *supra* and accompanying text.

284. The impact statement notes that the alternative to the natural river concept, a system of overland canals, pumping stations, highway crossings and appurtenant equipment from Livingston and its water users would be particularly expensive. WALLISVILLE EIS, *supra* note 9, at 40. This fails to consider the overall environmental "costs" as well as the known fact that system operations, which would save these costs, would result in a loss of $219,000 of annual recreational benefits in order to obtain $38,000 in water benefits. *See* note 134 *supra* and accompanying text.

#### d.
### Saltwater Barrier

This Court does not purport to understand the complexities of the saltwater intrusion problem to the degree that the Corps must. However, from a reading of the record it is apparent that other methods of mitigation have been tried in the past with varying degrees of success. For example, the record reflects that during a period of particularly high intrusion, local interests constructed a temporary dam across the river itself.[285] It is also known that local interests have substantial off-river storage reservoirs containing fresh water which are used, apparently, for irrigating rice fields when intrusion precludes the use of water from the Trinity River directly.[286] The record also indicates that eight foot levies with wide drainage ditches are planned, or are in the process of being built, to protect families in the Wallisville area from the river.[287] The record also indicates that approximately one-half of the saltwater barrier effect is attributed to the release of fresh water from the Livingston Reservoir which flushes out the saltwater and prevents crop damage.[288]

In discussing alternatives in the statement, perhaps attention should be paid to the possibility of increased use of one or more of these above procedures, or other reasonable methods, either singly or in conjunction with others, so as to alleviate a majority of the damage caused by saltwater intrusion. The impact statement simply does not indicate any interest in alternatives on the part of the Corps in this area.

#### e.
### Abandonment

This section of the impact statement focused on the money presently invested, the need for joint operation of Wallisville with Livingston Reservoir and the increased cost of obtaining municipal water from Livingston. The conclusion was reached that abandonment is not feasible. While this, in fact, may be accurate, in light of the present deficiencies in the statement regarding consideration of alternatives, a lack of elaboration in the area of the benefit-cost analysis discussed hereafter, and inadequate treatment of mitigation, this alternative will require reconsideration as well.

#### f.
### Navigation (As Applicable To Trinity Project)

Undoubtedly one of the major areas for consideration of alternatives is that of navigation. As has been previously noted, the origin of the Wallisville Project sprang from a need for a saltwater barrier to cope with the increased penetration of saltwater following navigation on the lower Trinity. Inasmuch as the Wallisville reservoir is a significant first step in the Trinity Project, the purpose of which rests primarily upon navigation, consideration of alternatives to navigation necessarily will have to appear as well in the Trinity impact statement. As at least one other court has noted, the federal agency cannot fulfill the demanding standard of "careful and informed decisionmaking" by disregarding impending plans for future project development.[289]

Most prominent is the giving of serious consideration to the use of existing railroads, truck or other surface facilities. An environmental report prepared by Stephen F. Austin State University for the Corps in connection with the proposed Tennessee Colony Reservoir, another link in the overall Trinity Project, recommended serious consideration

---

285. *See* note 38 *supra* and accompanying text.

286. *See* note 131 *supra* and accompanying text.

287. 1 WALLISVILLE GEN. DESIGN MEMO NO. 1 § 2 (1965), *supra* note 6 at 8.

288. *See* note 49, *supra.*

289. Greene County Planning Board v. Federal Power Commission, 455 F.2d 412, 424 (2nd Cir. 1972), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90.

of existing or new railway facilities.[290] Another factor to which obvious attention will need to be drawn is whether the use of one mode of transportation produces greater pollution than another, be it air pollution, water pollution or noise pollution. It is but another requisite in satisfying NEPA that all probable approaches to a particular project are receiving full consideration. Some inquiry might be directed to the Department of Transportation to determine what, if anything, might constitute other reasonable alternatives. The merits of water transportation versus other forms of transportation between the Gulf area and North Texas are obviously matters beyond the expertise of this Court. Yet common sense dictates that any consideration of alternatives under NEPA would require an overall assessment of existing transportation facilities in the area of the proposed project.

## G.

## THE ENVIRONMENTAL IMPACT STATEMENT REVIEW PROCESS

### 1.

### THE AGENCY REVIEW PROCESS

#### a.

#### NEPA And The CEQ Guidelines

While NEPA does not detail the precise procedures which federal agencies must follow in conducting their review process, it does require that the agencies must consider the environment "to the fullest extent possible," 42 U.S. C.A. § 4332, and use "all practicable means" in implementing their observations and the Congressional policies. 42 U.S.C.A. § 4331(b). Section 102 requires the agencies to utilize a systematic, interdisciplinary approach integrating the natural and social sciences and the environmental design arts in "decisionmaking" where the project is expected to have an impact upon the environment.[291] The Act also requires the agencies to identify and develop methods and procedures of decision making which will ensure giving presently unquantified environmental amenities and values "appropriate consideration" along with economic and technical considerations.[292] NEPA additionally requires that the impact statement, along with the comments and views of the various agencies, accompany the project proposal through the existing agency review process.[293] The Guidelines of the Council on Environmental Quality have constantly emphasized that the agency decision-making process, in considering the impact statement and alternatives, must look at both the short-term and long-term effects of a given project and "assess the action for cumulative and long-term effects from the perspective that each generation is trustee of the environment for succeeding generations."[294] This role of trustee impressed upon the federal agencies whose actions will affect the existing environment imposes a high standard of performance which carries with it exacting and sometimes onerous requirements.

By compelling the preparation of a detailed impact statement and description of alternatives discussed earlier,

NEPA provides evidence that the mandated decision making process has in fact taken place and, most importantly, allows those removed from the initial process to evaluate and balance the factors on their own.[295]

---

290. Stephen F. Austin State University, Environmental and Cultural Impact, Proposed Tennessee Colony Reservoir, Vol. I, at 21 (Jan. 1972) [Box FW, Item mm]; But see 1973 Sen.Comm. Hearings § 6, supra note 17, at 1996.

291. 42 U.S.C.A. § 4332(2)(A) (Supp.1972).

292. Id. at § 4332(2)(B) (Supp.1972).

293. Id. at § 4332(2)(C) (Supp.1972).

294. CEQ Guideline § 6(a)(v), 36 Fed.Reg. 7725 (1971).

295. Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, 146 U.S. App.D.C. 33, 449 F.2d 1109, 1114 (1971).

This allows, as the CEQ Guidelines suggest, the opportunity for proposal changes or mitigation of damage by higher levels in the reviewing process.[296] The review must not only be objective,[297] it must be a "truly independent review" so as to provide "a crucial check on the staff's recommendations."[298] The need for this type of review led to the creation of the Council on Environmental Quality. As NEPA's legislative history noted:

> An independent review of the interrelated problems associated with environmental quality is of critical importance if we are to reverse what seems to be a clear and intensifying trend toward environmental degradation. The Federal Government has spent vasts sums of money on aspects of the problem and will certainly increase its efforts in the future—and yet there is still no independent source of review of the total environmental situation, nor is there in existence any agency to provide the President and the Congress with an estimation of the priorities which should be assigned to different aspects of the problem.[299]

The federal agencies are not free to ignore the impact statement, as such statement and its contents must be considered at each step in the agency review process.[300] The review it receives must be "rigorous."[301] The review alternatives are not limited to just minimizing damage, or of going ahead while revealing any irreparable harm which might be caused. NEPA requires an agency decision, informed of all pertinent environmental factors, as to whether or not the project should even be built.[302]

These obligations are strict, and, indeed, they must be if environmental considerations are to be regarded in the concept of a trusteeship mandated by NEPA. Hasty and ill-considered decisions are impermissible. Similarly, the courts have been swift to point out that the duty of review is a primary, non-delegable function residing in the federal agencies.[303] Even if a particular project is uncontested, the reviewing levels of an agency must examine the impact statement carefully to determine that the initial environmental assessment was adequate. Furthermore, the reviewers must still independently consider the final balance that was struck among conflicting factors.[304] In all cases the agency reviewers must take the "hard look" at environmental consequences mandated by Congress[305] by giving individualized consideration and balancing of environmental factors, conducted fully and in good faith.[306]

296. CEQ Guideline § 6(a)(iv), 36 Fed. Reg. 7725 (1971). According to the testimony of a Corps official before Congress, projects are, in fact, being modified as a consequence of the consideration given to impact statements. 1973 Senate Comm. Hearings § 2, *supra* note 17, at 1373.

297. See notes 211 to 213 *supra* and accompanying text for a discussion of the requirement of objectivity.

298. Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, 146 U.S. App.D.C. 33, 449 F.2d 1109, 1118 (1971).

299. H.Rep.No.91-378, 91st Cong., 1st Sess., U.S.C.Cong. & Admin.News, pp. 2751, 2753 (1969).

300. *See* Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1117-1118 (1971).

301. Environmental Defense Fund, Inc. v. Corps of Engineers of U.S. Army, 348 F. Supp. 916, 931 (N.D.Miss.1972). *See also,* CEQ Guideline § 6(a)(iv), 36 Fed.Reg. 7725 (1971).

302. Committee to Stop Route 7 v. Volpe, 346 F.Supp. 731, 738 (D.Conn.1972).

303. Greene County Planning Board v. Federal Power Commission, 455 F.2d 412, 420 (2nd Cir. 1972), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90.

304. Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, 146 U.S. App.D.C. 33, 449 F.2d 1109, 1118 (1971).

305. Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 838 (1972).

306. Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, 146 U.S. App.D.C. 33, 449 F.2d 1109, 1115 (1971).

 The reviewing courts assume a heavy burden as well. They must ensure that the final agency decision was not arbitrary and that it clearly gave sufficient weight to environmental values.[307] Obviously perfection cannot be required,[308] nor should the courts, in interpreting the intent of Congress, seek to impose unreasonable extremes upon the agencies.[309] Nevertheless, the procedural duties of Section 102 must be complied with by the agencies to the fullest extent, and these standards must be rigorously enforced by the Courts.[310] As a practical matter, the courts should demand greater compliance during the early stages of project planning at which point the project is still being comprehended and evaluated environmentally. Irrevocable decisions have not yet been made at this point. If the impact statement is complete, detailed and objective, then there should be no information gaps, and the review process can be much more easily performed by the agencies. On the other hand, if all of these various steps have not been conducted in accordance with these standards, then it is the responsibility of the courts to require further agency deliberation.[311] It is this Court's considered opinion that, within the scope of its obligation to enforce the provisions of NEPA, it is appropriate to insist that these standards are equally applicable to ongoing projects authorized prior to NEPA in which substantial work remains to be done and in which the project has not yet reached that point where the cost of altering or abandoning it clearly outweighs the benefits that

might accrue therefrom to the general public.

b.

### The Corps' Impact Statement Review Process

As this memorandum and opinion has noted previously,[312] there is limited indication of the actual review given to the Wallisville impact statement, and there is no indication, so far as this Court has been able to determine from this massive record, that either the Secretary of the Army or Congress has passed upon the propriety of the final balance indicated in the impact statement. Inasmuch as further review is required, an examination of the Corps' decision-making process is appropriate.[313]

As applicable to the present litigation, there appear to be four separate procedures utilized by the Corps in preparing and reviewing impact statements involving the public and in communicating with other federal agencies for comments. Why they have been selected cannot be determined from the face of the regulations or the record. They are not based upon project cost, geographical dimensions or even the magnitude of the anticipated environmental impact. Such factors arguably might justify different degrees of attention and review by the various levels in the chain-of-command. However, it would appear that the particular Corps procedure utilized depends upon the method or status of the project authorization. For example, "new" projects being studied, but which have not received formal authori-

307. *Id.*

308. *See* Environmental Defense Fund v. Corps of Engineers of U.S. Army, 348 F. Supp. 916, 927 (N.D.Miss.1972).

309. Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 838 (1972).

310. *See* Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1114 (1971) ; Environmental Defense Fund v.

Corps of Engineers of U.S. Army, 348 F. Supp. 916, 927 (N.D.Miss.1972).

311. Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1115 (1971).

312. *See* notes 82–103 *supra* and accompanying text.

313. Inasmuch as the review process generally follow the Corps' chain-of-command, attention is directed to the chart indicated in footnote 18 *supra*.

zation, are subjected to what appears to be the most rigorous review process.[314] Projects classified under the heading "special projects and continuing authorities," which do not receive individualized annual appropriations by Congress, are subjected to a second procedure.[315] And projects already considered "authorized" are subject to still different procedures, depending upon whether construction has begun[316] or not.[317] Presumably the Wallisville and Trinity Projects, respectively, would be examples of the latter two procedures for "authorized" projects, both being continually identified as authorized in the record.[318] In the absence of any explanation for the differing procedures, the Court can only presume that the procedures to be applied to "authorized" as well as to "new" projects were intended to be applied so as to fully comply with NEPA. Admittedly, this Court is concerned about the wisdom of such separation in the context of this case, the main concern being that both the Secretary of the Army and the Congress have knowledge of and fully approve of all current Corps proposals as to both the Trinity and the Wallisville Projects. For example, the Trinity Project, although "authorized" at least in part, is apparently still sometime away from the point at which construction on projects other than Wallisville will begin. As a practical matter, this would appear to be no different from a "new" project of this magnitude on which environmental and engineering

studies were still being considered. Furthermore, it hardly appears justifiable that a project of this unusual size costing over $1 billion would be subjected to a less rigorous review procedure than, for example, a single "new" reservoir project costing a few million dollars.[319] As for Wallisville, the current status has already been pointed up. It does not appear from the record that the Secretary of the Army or the Congress have passed upon the final balance struck in the impact statement.

A few of the key differences will be noted in Corps review procedures. It should first be pointed out that impact statements apparently go through a series of versions or stages, depending upon which procedure is used. For example, "new" projects receive an environmental "assessment," a "preliminary" draft impact statement, a "draft" impact statement, and then a "final" impact statement. The procedure for "authorized" projects involves only the latter two stages—the draft and then the final statements. Furthermore, for all procedures except those pertaining to "new" projects, it is the District Engineer who is charged with the duty of preparing draft and final statements; on "new" projects he prepares only the assessment and preliminary versions, while the Office of the Chief Engineer (OCE) prepares the draft and final versions.

"New" projects involve more opportunity for review and comment by other

314. *Sec gen.*, Corps Reg. § 14a, 37 Fed.Reg. 2528–29 (1972).

315. *See gen.*, Corps Reg. § 14b, 37 Fed. Reg. 2529 (1972). These projects include minor flood control and navigation improvement works. Because of annual fiscal limitations on this category of projects, specific appropriation requests are not required.

316. *See gen.*, Corps Reg. § 14d, 37 Fed.Reg. 2530 (1972).

317. *See gen.*, Corps Reg. § 14c, 37 Fed. Reg. 2529–30 (1972).

318. The Wallisville Project was authorized by Congress in 1962. *See* note 53 *supra.*

The Trinity Project was authorized by Congress in 1965 although restricting any expenditures on navigational features. *See* note 68 *supra* and accompanying text.

319. Aside from the fact that Congress has not passed upon the 1968 reevaluation study of the navigation aspects of the Trinity Project, it does not appear that the various levels of the Corps of Engineers' chain-of-command has subjected that study to the same degree of independent review and analysis as is required of an environmental impact statement. *Compare* notes 59–64 *supra* and accompanying text *with* notes 297–306 *supra* and accompanying text.

federal agencies, inasmuch as there are two formal coordination efforts and sometimes a third but more informal opportunity.[320] "Authorized" projects receive only one opportunity for coordination, a formal one occurring after the draft version is prepared. Equally significant is the difference in the procedures utilized by the Board of Engineers for Rivers and Harbors (BERH). "New" projects receive a special BERH staff presentation on environmental issues and impacts, with "controversial issues receiving special consideration." This occurs after the preliminary statement is prepared and before the OCE prepares the draft version. Projects under "special and continuing authorities" also receive the presentation, but not until after the final statement is prepared. "Authorized" projects on which construction has begun (Wallisville) do not receive the presentation, while those on which construction has not yet begun (Trinity) receive one "where applicable." The regulations are silent as to when it is "applicable." It appears to this Court that the earlier the focus upon en-

vironmental issues, assuming the full impact is known, the greater the flexibility and opportunity for striking a reasonable balance with regard to all factors.

▆▆ In light of the above, and the fact that Congressional approval will be required before the Secretary of the Army makes expenditures for navigation construction, this Court presently views the Trinity Project as one which should be processed as though it were not yet authorized, thereby eliminating any question as to its complete exposure to scrutiny of the decision makers on environmental issues.

There are several additional apparent deficiencies noted in the regulations. For example, they do not clearly indicate how, if at all, Corps officials charged with project implementation may recommend project alteration in order to mitigate unnecessary, or perhaps previously unknown, environmental harm.[321] Similarly, the regulations give little firm guidance with respect to when public meetings should be held,[322] a situation

320. At the time of preparing the initial environmental assessment the District Engineer is instructed by the regulations to coordinate with the appropriate federal, state and local agencies. The two formal reviews noted occur after the preliminary draft statement is prepared by the District Engineer and, subsequently, after the draft statement is prepared by the OCE.

321. In the general prologue of the regulations, District and Division Engineers are required to ensure that the project or proposal in question is "fully consistent with the policies enunciated" in NEPA and Corps directives. Corps Reg. § 4c(2), 37 Fed.Reg. 2525 (1972). If, "after taking all measures within [their] authority," they cannot satisfy that requirement, they are to request authority or guidance. *Id.* at § 4d. In light of the guideline requirements of periodic project reevaluation, CEQ Guideline § 11, 36 Fed.Reg. 7727 (1971), Proposed EPA Reg. §§ 6.23(a), 6.27(a)(2), 37 Fed.Reg. 881–82 (1972), it would appear that Corps regulations should be more explicit in advising officials that comments or recommendations were encouraged as well as providing them with a means of communication. Implicit

in the CEQ guidelines is the need for a procedure for altering or abandoning projects, even after authorization, should unforeseen environmental consequences be discovered.

322. The Corps' regulations, notes 315–318 *supra*, require a minimum of one public meeting prior to preparing final statements, with as many as three or more meetings for new projects. Congress has not clearly specified the role of public meetings in the environmental process. *See* 42 U.S.C.A. § 4331(a); H.Rep.No. 91–378, 91st Cong., 1st Sess., U.S.C.Cong. & Admin.News 2760, 2768 (1969). Present guidelines are little more explicit. *See* CEQ Guidelines §§ 10(b), (c), (e), 36 Fed.Reg. 7726 (1971); Proposed EPA Reg. § 6.61, 37 Fed.Reg. 883–84 (1972); Corps Reg. § 12, 37 Fed.Reg. 2528 (1972). With respect to the Trinity Project, at least one public meeting at each component project site should be held prior to preparing preliminary draft statements for *both* component statements and the cumulative impact statements. Comments made at these meetings should be considered.

compounded by the recent issuance of proposed Corps Regulations on public meetings which appear not to take cognizance of existing practices.[323] With respect to public access and review of draft and final impact statements the Corps' Regulations are more definite, although a relatively minor discrepancy would appear to exist. EPA guidelines provide that draft and ·final impact statements "shall be" distributed to public organizations for comments, while merely being made available to private individuals.[324] While Corps regulations appear to be in accord with respect to final statements, they appear to be in error insofar as they require a prior "request" from the public without regard to organizational or individual status.[325]

▮ The most serious defect of the present regulations is that they do not appear to require circulation of impact statements to Congress except on "new" projects.[326] It is clear that each appropriation request since January 1, 1970, is required to be accompanied by all required detailed impact statements. Environmental Defense Fund v. Tennessee Valley Authority, 339 F.Supp. 806, 811 (E.D.Tenn.1972). *See also,* Environmental Defense Fund, Inc. v. Froehlke, 473 F.2d 346, 352 (8th Cir., 1972). Conservation Council of North Carolina v.

Froehlke, 340 F.Supp. 222, 226 (M.D. N.C.1972).[327] The obligation with respect to the Secretary is less clear. NEPA does not require that the Secretary file formal findings regarding proposed projects and their impact, regardless of the size of the project or magnitude of its impact. Nevertheless, as head of the federal agency, the Secretary is responsible for ensuring that agency action complies with NEPA.[328] As the Supreme Court in *Overton Park* pointed out, formal findings would be of much assistance to the courts, particularly where large projects are involved. They might also avoid subsequent delays and the possible need to examine the Secretary more directly. *See* Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 417–421, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), on remand, 335 F.Supp. 873 (W.D.Tenn.1972). A possible procedure for avoiding this problem might be to precede the main body of impact statements, in the same fashion the Corps presently uses for project reports to Congress, with the report of each level of review.[329]

▮ A last problem involves the handling by the Corps of other agency review and comment, the modification of the impact statement, and the determination of who gets the "last word" with regard to critical environmental assess-

---

323. Proposed Corps Regs., 37 Fed.Reg. 21818–20 (1972).

324. Proposed EPA Reg. §§ 6.65(a), (b), 37 Fed.Reg. 884 (1972).

325. *See* Corps Reg. §§ 10a, 14a(8), 14b(5), 14c(2), 37 Fed.Reg. 2527–29 (1972).

326. *See* Corps Reg. §§ 8, 14a(10), 14b(9), 14c(6), 37 Fed.Reg. 2527–30 (1972). This Court is aware that specific appropriation requests from Congress are not generally required for projects within the category of special projects and continuing authorities. Nevertheless, where the impact is of such significance that an impact statement is required, these statements should be made available to the Congress so that they may take specific action regarding the impact, if they so choose. The Court has not directed its attention

to the application of this standard to the civil duties of the Corps as they pertain to regulation of permit applications or disposal of land for port and industrial uses.

327. This requirement also appears to be implicit in the various applicable guidelines. *See, e.g.,* CEQ Guidelines §§ 5(a) (i), 10(c), 36 Fed.Reg. 7724–26 (1971); Proposed EPA §§ 6.23(a), (d), 37 Fed. Reg. 881 (1972); DOD Guidelines, *supra,* note 85, at § 8.

328. The Corps regulations do indicate that impact statements are transmitted to the CEQ by the office of the Secretary of the Army. *See* note 326 *supra.* There is no indication that any review is had.

329. See notes 2–5 *supra.*

ments. For example, a draft version of the Wallisville impact statement prepared in October, 1970, was submitted to the various reviewing federal agencies, and in January, 1971, was submitted to the CEQ.[330] Afterwards, one of the more critical sections of the statement was expanded with new material that substantially justified the Corps' position with respect to the claimed estuarine area damage and its effect upon commercial fishing.[331] No other agency had received the opportunity to review this new evidence and comment upon it. At least two other courts have been confronted with similar situations. One merely noted the problem without comment.[332] In the other case an addendum had been prepared to an impact statement previously found judicially insufficient under NEPA. The court held the addendum to be "essentially a draft statement" which was required to be circulated to the appropriate agencies under NEPA.[333] This is an area of great concern to a court which is called upon to comprehend complex environmental problems and evaluate the efficacy of impact statements filled with incomplete or conflicting assessments. The problem merits attention and because of its complexity, suggested procedures for minimizing this dilemma are advanced at a later point in this opinion.[333a]

## H.

## THE BENEFIT-COST ANALYSIS AREA

### 1.

### IN GENERAL

A study of the record in this case, and particularly the Congressional hearings since fiscal year 1966 as they apply to projects contained within the ambit of the Trinity Project, points up the importance of benefit-cost ratios in the appropriation and decision making process for public works projects funded by the United States Government. The benefit-cost ratio is basically a comparison of the anticipated "benefits" derived from a particular public works project with the anticipated "costs" over the estimated life span of the project. Both benefits and costs must be stated in monetary terms. Furthermore, since benefits and costs will be accruing over each of the many years of the project's life span, it is necessary to discount them so that their present values may be determined and compared. As one writer described this discounting procedure:

Discounting involves the reduction of future dollar values by the application of a discount or interest rate to them. For example, if the appropriate discount rate is 5 percent, $1.05 one year from now is only worth one dollar to-

---

330. *See* notes 88–91 *supra* and accompanying text.

331. *See, gen.,* WALLISVILLE EIS, *supra* note 9, at 27a–34. The justification is extensively reworked over earlier drafts. *See Corps Environmental History, supra* note 82, Incl. 5 at 5–6, Incl. 10 at 6–8. Of particular interest is the following statement in the impact statement:

Based on the best available information, there are over 300,000 acres of water and intertidal marsh in Galveston Bay estuarine system capable of sustaining estuarine animals, and this project will eliminate about 2.4 percent of this acreage.

WALLISVILLE EIS, *supra*, at 32. The suggestion is that the project would affect commercial fishing by only about 2.4 per-

cent. This particular comment is not found in the Corps' Environmental History, thus was apparently prepared sometime after September 23, 1971. *See Corps Environmental History, supra,* at 11.

332. Environmental Defense Fund, Inc. v. Corps of Engineers of U.S. Army, 325 F. Supp. 749, 760 (E.D.Ark.1971) ("Note: The defendants did not send to Mr. Wood's office, [Bureau of Outdoor Recreation] prior to the hearing on the merits, a copy of their second impact statement.")

333. Natural Resources Defense Council, Inc. v. Morton, 337 F.Supp. 170, 172 (D. D.C.1972) ; *see also* note 230 *supra* and accompanying text.

333a. See page 1382 infra.

day. Otherwise stated, $1.05 one year in the future discounted to today is equal to one dollar. There is no other way to account of costs and benefits which do not accrue in the present. All future figures must be discounted to today if a proper calculation of net benefits is to be obtained.[334]

Once this has been done, if a comparison indicates that the projected benefits will reasonably exceed the costs, then, all other things being equal, the project is typically regarded as being "justified". If, for example, it was expected that for every one dollar of federal investment in a given project the benefits would be equal to two dollars, then the benefit-to-cost ratio would be 2.0 to 1 or 2.0:1. If the benefits equal the costs, the ratio is 1:1 or unity, as the term is used.

There is little Congressional guidance regarding benefit-cost procedures. The only applicable statute provides, in pertinent part:

> . . . it is the sense of Congress . . . that the Federal Government should improve or participate in the improvement of navigable waters or their tributaries, including watersheds thereof, for flood-control purposes if the benefits to whomsoever they may accrue are in excess of the estimated costs. . . .[335]

As a general rule the courts in the past have avoided inquiring into benefit-cost procedures and conclusions, being of the view that Congress should resolve related disputes, and occasionally holding that courts have no jurisdiction into such matters.[336] This Court must conclude that, on the basis of the present record and the intended thrust of NEPA, it cannot bypass an examination of the benefit-cost analysis, at least insofar as it is relevant to environmental considerations within the Trinity and Wallisville Projects. As a close scrutiny will reveal, the present procedures tend to intertwine environmental and non-environmental factors in such a way that certain claimed environmental "benefits" have been quantified in economic terms and included in the benefit-cost analysis; yet, at the same time, certain of the environmental "costs" have not been quantified or considered at all. The result is that the meaning of the benefit-cost ratio, which is represented to the Congress, this Court and the public as being an objective evaluation of all quantifiable factors involved in these various projects, is open to considerable question. Congress evidently contemplated that benefit-cost procedures might be adaptable to include environmental considerations. In discussing the duties and functions of the CEQ, NEPA's legislative history recited how environmental amenities might be given suitable consideration:

> One way in which this might be done would be to develop a sophisticated cost and benefit analysis—in which the total (and often not strictly economic) consequences of Federal activities may be assessed. The environmental auditing function of the

---

334. Joskow, Cost-Benefit Analysis for Environmental *Impact Statement*, 91 Pub. Util.Fort. 21, 22 (1973). *See also* defendant Corps of Engineers' Answers to Interrogatories 40(a)–(e).

335. 33 U.S.C.A. § 701a. *See* Environmental Defense Fund, Inc. v. Corps of Engineers of U.S. Army, 348 F.Supp. 916, 923 n. 7 (N.D.Miss.1972). This provision originated as Act of June 22, 1936, 49 Stat. 1570. *See also* Box 7, Item 143, "List of Statutes, Documents or Guidelines Bearing on Cost-Benefit Analysis Civil Works Projects."

336. *See, e. g.,* Environmental Defense Fund, Inc. v. Corps of Engineers of the U.S. Army, 348 F.Supp. 916, 924–925 (N.D. Miss.1972); Conservation Council of North Carolina v. Froehlke, 340 F.Supp. 222, 226 (M.D.N.C.1972); Environmental Defense Fund, Inc. v. Corps of Engineers of U.S. Army, 325 F.Supp. 728, 754–755 (E.D.Ark.1970).

Council falls squarely within the functions specified in this subsection.[337] While the CEQ has not presently proposed such an analysis procedure, it is the Corps which is charged by Congress with preparing benefit-cost analyses. Congress is evidently relying upon these as presently being an indicator of all costs and benefits, economic and non-economic. For example, the following remarks were made in a recent House Report concerning a Mississippi public works project:

> The Committee notes that the proposed plan provides a significant reduction in flood control damages in addition to providing municipal and industrial water supply, recreation and area redevelopment benefits. Alternative projects would have more adverse effects on the environment, or would be economically infeasible. The very favorable benefit cost ratio indicates the investment in the project is sound.[338]

 The District of Columbia Circuit Court has properly identified the role of a court under these circumstances:

> We conclude, then, that Section 102 of NEPA mandates a particular sort of careful and informed decision-making process and creates judicially enforceable duties. The reviewing courts probably cannot reverse a substantive decision on its merits, under Section 101, unless it be shown that the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental values. But if the decision was reached procedurally without individualized consideration and balancing of environmental factors—con-

ducted fully and in good faith—it is the responsibility of the courts to reverse. As one District Court has said of Section 102 requirements: "It is hard to imagine a clearer or stronger mandate to the Courts." [339]

Because of non-compliance with the requirements of NEPA, as has been outlined in previous sections of this opinion, it is not necessary to rely upon deficiencies in benefit-cost computations to reach a decision in this case. However, because the Wallisville impact statement and the record which relates to both projects indicate that the balance struck was "arbitrary" and "clearly gave insufficient weight to environmental values", under *Calvert Cliffs'*, *supra*, substantial in-depth revision by the Corps in this area will be required prior to the acceptance of either the Wallisville or the Trinity Project impact statement.

### 2.

### THE BENEFIT-COST RATIOS INVOLVED

The benefit-cost ratio claimed by the Corps of Engineers in 1961 for the Wallisville Project was 2.5 to 1. Congress authorized the project the following year. This was eight years prior to the passage of NEPA, and environmental factors, on the whole, were not then given the consideration that the law requires today. The Wallisville Project ratio of benefits to costs has diminished over the years, and since fiscal year 1970 the claimed ratio has stood at 1.11 to 1.[340] Virtually the sole reference to the ratio in the Wallisville environmental impact statement is as follows:

> When the project was authorized in 1962, the benefit-to-cost ratio was es-

337. H.Rep.No.91–378, 91st Cong., 1st Sess., U.S.Cong. & Admin.News, pp. 2751, 2760 (1969).

338. H.Rep.No.92–1475, 92d Cong., 2d Sess., 27–28 (1972) [Box 10, Item 182b].

339. Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, 146 U.S. App.D.C. 33, 449 F.2d 1109, 1115 (1971). *See also* note 219 *supra* and accompanying text.

340. *Corps' B/C Tabulations*, *supra* note 114.

timated at 2.5, based on an amortization period of 50 years and an interest rate of 2.5 percent. Based on 1970 price data and an interest rate of 3.-125 percent, the benefit-to-cost ratio of the project is estimated at 1.11.[341]

In 1968 the Corps' reevaluation of the navigational features of the overall Trinity Project resulted in a claimed benefit-to-cost ratio as 1.5 to 1, based upon the average annual benefits and costs over the 50 year life span of the project.[342] This claimed ratio remains the same today.[343]

### 3.

## VARIABLE JUDICIAL INQUIRY

This Court cannot be primarily concerned with a specific, final mathematical ratio of benefits to costs, although it is interesting to note that the Secretary of the Army, in another case in which there existed a claimed ratio of 1.24 to 1, stated that the project was "only marginally justified." [344] Furthermore, a document in the record recites that in 1961 the national benefit-cost ratio of our nation's waterways was 3.17 to 1, whereas that for the Intracoastal Canal, a canal system extending, in part, along the Gulf of Mexico from the west coast of Florida to the Mexican border, was reported as being 14.8 to 1 in 1955.[345] Nevertheless, under the law the final decision to build or not to build any given public works project is to be left to Congress, and it may accept or reject any ratio that it chooses. However, when the claimed ratio is composed, in part, of environmental amenities which Congress has required under current law to be given careful attention and consideration, then the courts have an obligation to act, where necessary. The standard of judicial review is the same as for other features of environmental law, being one of "substantial inquiry." [346]

### 4.

## LEGAL JUSTIFICATION FOR JUDICIAL INQUIRY

NEPA obligates all agencies of the Federal Government to

identify and develop methods and procedures, in consultation with the Council on Environmental Quality . . . which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decision-making along with economic and technical considerations.

42 U.S.C.A. § 4332(2)(B). As we enter the third year following the passage of NEPA, this has still not been done. The response of the Corps of Engineers to this deficiency is as follows:

While the present state of the art does not afford a basis for quantifying environmental amenities and project benefits in the same economic terms, the courts, the Congress and the Council on Environmental Quality have all expressed interest in, and Federal agencies are working toward the establishment of, a systematic balancing analysis which will assure that

---

341. WALLISVILLE EIS, *supra* note 9, at 1.

342. H.Doc.No.364 § 3, *supra* note 4, at 4–5.

343. *See, e. g.*, 1973 Sen. Comm. Hearings § 2, *supra* note 17, at 1407.

344. Environmental Defense Fund, Inc. v. Corps of Engineers of U.S. Army, 348 F. Supp. 916, 924 n. 10 (N.D.Miss.1972).

345. Letter from Dale Miller, Executive Vice President, Intracoastal Canal Association of Louisiana and Texas, to Col. R. G. West, Fort Worth District Engineer, Army Corps of Engineers, Dec. 18, 1961, at 2 [Box FW, Item q, at U–40].

346. The standard of judicial review is discussed at notes 167–177 *supra* and accompanying text.

environmental amenities are considered along with economic and technical factors in the light of the overall public interest.[347]

The legislative history of NEPA clearly reveals that Congress intended the "development of adequate methodology for evaluating the full environmental impacts and the full costs—social, economic, and environmental—of federal actions.[348]

■■■■■ In September, 1970, at about the same time that the Wallisville impact statement was being initiated, the Office of the Chief of Engineers issued instructions for the preparation of environmental statements. In relevant part they provided:

Discuss both the beneficial and detrimental aspects of the environmental changes or conversions placing some relative value on the impacts described. A distinction should be observed here, whereby the *impacts* (changes) were initially detailed without making value judgments while at this point are discussed in terms of their effects (who or what is affected by the changes). Identify the recipient (environmental element, interest group, industry, agency) of these effects and the nature and extent of the impacts on them. Discuss these effects not only with reference to the project area, but in relation to any applicable region, basin, watershed or ecosystem. In the example given, the loss of wetland might have relevance to different areas depending on the uniqueness of the filled area, the developmental plans and state of adja-

cent and regional wetlands, and the extent of the secondary effects of the filling (alteration of estuarine salinity wedge, sedimentation effects on adjacent shellfish, the modification of the surficial and groundwater hydrology of contiguous marsh and upland areas, etc).[349]

The Wallisville impact statement does not comply with this directive. Instead, it contains numerous conclusory statements that the benefit-cost ratio is justified and that the alternative possibilities would not be justified. There is no semblance of the "finely tuned and 'systematic' balancing analysis" mandated by NEPA. Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1113 (1971). More particularly, the impact statement does not discuss the benefit-cost analysis of the project or its possible alternatives in sufficient detail and non-technical language so as to permit the non-expert reader to evaluate intelligently the agency's conclusions. *See* Environmental Defense Fund v. Tennessee Valley Authority, 339 F.Supp. 806, 809 (E.D.Tenn.1972). As noted previously, the reason for the methodology required by Section 102(2)(B) of NEPA is to ensure that the "full cost" of the action will be known, including the environmental factors. Environmental Defense Fund, Inc. v. Corps of Engineers of U.S. Army, 348 F.Supp. 916, 928 (N.D.Miss.1972). The full cost as contained in this vast record is not shown in the impact statement.

The developing law as well as the Corps' own guidelines should have resulted, at least, in the presentation of

347. WALLISVILLE EIS, *supra* note 9, at 94.

348. *See* 115 Cong.Rec. (Part 30) 40420 (1969) (support of § 102(2)(B), section-by-section analysis of S. 1075 as reported to the Senate), *quoted in* Environmental Defense Fund, Inc. v. Corps of Engineers of U.S. Army, 348 F.Supp. 916, 928 n. 18 (N.D.Miss.1972).

349. Department of the Army Circular No. 1120–2–56 App. B, at B–3 (Sept. 25, 1970) ("Investigation, Planning and Development of Water Resources, Preparation and Coordination of Environmental Statement"). [Box 5, Item 96].

the highlights of the benefit-cost analysis in the Wallisville impact statement. They were omitted. It is now clear that even more than highlights are required. The proposed guidelines issued by the Environmental Protection Agency in January, 1972, since adopted, should make it clear to all federal agencies that this is the case. They provide:

(d) *Alternatives to the proposed action.* Develop, describe, and objectively weigh alternatives to any proposed action which involves significant trade-offs among the uses of available environmental resources. *The analysis shall be structured in a manner which allows comparisons of: (1) Environmental and financial cost differences among equally effective alternatives, or (2) differences in effectiveness among equally costly alternatives. Where practicable, benefits and costs should be quantified or else described qualitatively in a way which will aid in a more objective judgment of their value.* Where such an analysis is prepared, it shall be appended to the statement. The analysis of different courses of action shall include alternatives capable of substantially reducing or eliminating any adverse impacts, even at the expense of reduced project objectives. The specific alternative of taking no action always must be evaluated. *This analysis shall evaluate alternatives in such a manner that reviewers independently can judge their relative desirability.* In addition, the reasons why the proposed action is believed by the Agency to be the best course of action shall be explained.

(e) *Relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity.* Describe the cumulative and long-term effects of the proposed action which either significantly reduce or enhance the state of the environment for future generations. In particular, the desirability of Agency actions shall be weighed to guard against short-sighted foreclosure of future options or needs. Special attention shall be given to effects which narrow the range of beneficial uses of the environment or pose long-term risks to health or safety. *Who is paying the "environmental cost" versus who is gaining the "benefits" over time shall be identified.* In addition, the reasons the proposed action is believed by the Agency to be justified now, rather than reserving a long-term option for other alternatives, including no use, shall be explained. (emphasis added)

Section 6.45(d), (e), 37 Fed.Reg. 883 (1972). In February, 1972, the Corps' regulations were issued with the following provision:

Contain objective analyses. Normally, the use of detailed project cost figures should be avoided but general cost comparisons may be used to illustrate the environmental, economic, or social trade-offs necessary to achieve objectives.

Section 7e, 37 Fed.Reg. 2526 (1972). While detail is not required to the extent indicated in the general design memoranda, which are the multiple-volume studies focusing on virtually every cost involved in the project, substantial detail as to broad totals would appear to be necessary in order to explain intelligently to the layman reader the basis behind the benefit-cost conclusions.

### 5.

### QUANTIFYING SELECTED ENVIRONMENTAL AMENITIES

The basic problem underlying the benefit-cost procedures in environmental cases is one of inclusion of such "benefits" and "costs." Selected environmentally-related "benefits" have been identified by the Corps and "quantified." That is, they have been given a dollar-and-cents value and included as

justification for building some of the projects in the Trinity master plan including Wallisville. Yet, similarly situated environmentally related features which would appear to be "costs" in that they would be irreparably lost by construction of a given project, have not been included or quantified at all. In some cases these losses are identified, but in this context mere disclosure is insufficient. Last of all, some of the quantified factors characterized as "benefits" would seem to be open to considerable question.

The 1965 economic analysis of the Wallisville Project, which is the only comprehensive study in the record, contains what appear to be typical engineering "costs", including lands, structures, construction costs, and the like. In order to obtain a realistic total cost figure, the analysis projected future costs of construction and operation. To avoid the possibility of error and to compensate for rising prices affecting the total figure, the Corps increased the total estimates of virtually every cost item by 12 to 15 percent as a buffer.[350] Yet, upon close study of the Wallisville impact statement and a review of the record, this Court is unable to locate any

costs which can be designated as environmental "costs." The closest item appears to be the inclusion of the market values of trees which is included in real estate costs.[351] Nevertheless, when "benefits" are considered, a different standard is employed. In addition to including the economic benefits attributable to navigation, water supply and salinity control,[352] the Wallisville benefit-cost analysis also includes "benefits" which are basically environmental. These include fish and wildlife benefits,[353] hunting and fishing benefits,[354] and a recreational benefit incorporating all other forms of recreation besides hunting and fishing.[355]

For commercial fishing, which appears to be both economic and environmental in nature, the Wallisville analysis includes a $29,000 per year benefit for fresh-water commercial fishing,[356] but, as noted previously, it has not included estimated salt-water commercial fishing losses calculated at over $500,000 annually.[357] While the Wallisville analysis includes $8,500 annual benefits attributable to small boat usage,[358] no evaluation has been made of boating benefits existing in the absence of the project.[359] Substantial benefits have

350. *See, gen.,* 1 WALLISVILLE GEN. DESIGN MEMO NO. 1, App. C (1965), *supra* note 6, at 3–15. The 1965 Trinity Project study used contingency margins of 25 percent. *See, e. g.,* H.DOC.NO. 276, App. VI (1965), *supra* note 3, at 5, 97–102, 122–136, 147–149, 153–155, 158–162. The 1968 reevaluation study used 20 percent margins. H.DOC.NO.364, App. I (1968), *supra* note 4, at 74.

351. Army Corps of Engineers' Answer to Interrogatory No. 40(j). This appears to be little change in practice since 1941 when trees were considered in terms of being a paper mill resource. H.DOC.NO. 403 § 4 (1941), *supra* note 2, at 104.

352. 1 WALLISVILLE GEN. DESIGN MEMO NO. 1, App. C (1965), *supra* note 6, at 20–21, 26, 27.

353. *Id.* at 21.

354. *Id.* at 22–23.

355. *Id.* at 27–28.

356. *Id.* at 21.

357. *See* note 74 *supra* and accompanying text.

358. Corps' Memo from Brigadier General C. H. Dunn, Southwest Division Engineer, to Board of Engineers for Rivers & Harbors, March 6, 1963, at 4 [Box FW, Item w at B–122].

359. The Corps refers to a study by the Texas Parks & Wildlife Department, not in the present record, which reportedly rates canoe type activities by annual users as 23rd on a scale of 24. *Corps' Response to Donald Smith, supra* note 31, at 10. The Corps also reported that recreational surveys for the project at the time of the investigation found no major identifiable use of the river for the type of activities described. The Court has been unable to locate any references to such surveys in the record.

been attributed to hunting,[360] although the statement does not contain information as to how a shallow reservoir is likely to benefit it. Substantial benefits are also attributed to fishing.[361] While it is conceivable that many persons might be attracted to fishing at a reservoir, obviously more convenient and more easily reached than seeking out various streams, the statement does not indicate any reasonable basis for excluding data on those who would continue to fish in free-flowing streams or rivers such as the Trinity, even if the reservoir was never constructed. In connection with another project component of the Trinity Project, although apparently not used in conjunction with Wallisville, the Corps has included substantial benefits for "nature students."[362] This benefit is difficult to comprehend. If, in fact, the individuals counted are true students of nature, it scarcely seems to follow that such students were attracted and thus became measurable benefits solely because of the project.

There are additional problems in evaluating environmental benefits, more particularly, the establishment by the Corps of a "need" for a project without adequate support in the record, and the reliance upon local interest evaluations of such a "need" when it is in the interest of such persons or entities to be somewhat less than objective. NEPA directs that the full story be told about a given project including its negative as well as its positive factors. The present methods of analysis and comparison appear to be looking in large part at only one-half of the picture.

## 6.
## UNSTABILIZED COST PROJECTIONS

The tables which follow this section summarize the various yearly estimated total federal appropriation costs for the Trinity Project and its components, some of which like Wallisville are funded separately. As the tables indicate, the total projections have generally continued to increase substantially year after year. Such increases have occurred despite the apparent practice of allowing a 12 to 25 percent margin for error in costs at the time of originally estimating total costs.[363] In certain instances substantial project changes have been made, such as relocating the project site, adding a new highway loop or some other reasonably justifiable cause. In other cases the increases appear to be less meritorious. While some of such increases may be attributable to a rise in the cost of living, the majority cannot be. During approximately the last four years, the national annual consumer price index increase varied between 4.2 percent and 6.0 percent, whereas the reported index variation in the Dallas metropolitan area varied between 3.0 and 6.5 percent annually.[364] Such cost of living increases do not generally comport with the percentage increases in estimated costs of the projects reflected in the tables.

In spite of the large annual increases in costs, the benefit-cost ratio of each of the projects in question generally has not changed. The apparent reason for this situation is that claimed benefits have been escalated by the Corps at the

---

360. 1 WALLISVILLE GEN. DESIGN MEMO NO. 1, App. C (1965), *supra* note 6, at 22 (Table 1), 23.

361. *Id.*

362. 1971 House Subcomm. Hearings § 5, *supra* note 15, at 1640 (Lakeview Reservoir).

363. *See* note 350, *supra* and accompanying text.

364. Telephone conference with Gloria Conway, U.S. Bureau of Labor Statistics, Dallas, Texas, January 19, 1973. National statistics based on fiscal years 1968 through 1971. Statistics for Dallas area based on calendar years 1968 through 1971. Figures for 1972 were not yet available.

same rate as the costs. The following testimony before the House Subcommittee of the Committee on Appropriations obtained by John M. Slack, Representative from West Virginia (who was apparently chairing the Subcommittee that day), from Maj. Gen. Harold R. Parfitt, Southwest Division Engineer, indicates what occurred:

> Mr. Slack. On page 25, $3 million is budgeted to continue planning of the Trinity River project in Texas. Please outline the current status of planning on the project.
>
> General Parfitt. Sir, we have really just begun planning on the Trinity River project. We are in its early phase. We are emphasizing in this phase an analysis of the environmental situation in the Trinity River system.
>
> Mr. Slack. It is noted that the cost of the project is now estimated at $1.4 billion, an increase of $169.4 million since last year. Yet the benefit-to-cost ratio remains the same at 1.5 to 1. What benefits have been increased to offset the added cost?
>
> General Parfitt. Sir, almost all of the benefits have been escalated in about the same ratio as the charges. These are navigation, flood control, water supply and water quality, and redevelopment benefits.[365]

While it might be reasonable to escalate claimed benefits at the same rate as the general area cost-of-living increase, such escalation to offset those price increases due solely to the cost-of-living changes, there is no indicated basis in the record for escalating them at a higher rate. Obviously, the increases in claimed benefits in this instance are almost precisely the same as the increased costs, thereby preserving the project's benefit-to-cost ratio at 1.5 to 1.

■ The reason for this Court's concern in this area is that a valid favorable benefit-cost ratio combining all facets of a project must represent the final synthesis of technical, economic and environmental factors. Any major changes on either the cost or benefit side of any of these factors can alter substantially the premise upon which a final decision by the agency and Congress was based approving a given project. Accordingly, if there were an increase in economic "benefits", unless there was a proportional increase in environmental benefits, the possibility exists that economic benefit increases alone could be used to override increased environmental costs in a manner contrary to the intent of Congress.[366] What must not be overlooked is the priority assigned by Congress to environmental factors under NEPA. As this Court understands this body of law, protection of the environment is now viewed as paramount, and it is not to be placed on an equal footing with the usual economic and technical factors. *See* Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

---

365. 1973 House Subcomm. Hearings § 5, *supra* note 17, at 1618.

366. The method of Congressional appropriation has clearly begun involving environmental considerations. *See, e. g.,* S.Rep. No.92–1199, 92d Cong., 2d Sess., 35 (1972) [Box 10, Item 182d]. The public works appropriation bill to which this section referred was vetoed by the President on October 27, 1972, because Congress was exceeding the President's recommended ceiling on spending.

COMPARISON OF PROJECTED TOTAL APPROPRIATION COSTS
INDICATING ANNUAL COST PERCENTAGE CHANGES

| Completion Date: | Trinity River Project [a] 1988 | Wallisville Project [a, c] 1973 (Sept.) | High-Level Bridges [c] 1974 (June) |
|---|---|---|---|
| **Fiscal Year (July 1–June 30)** | | | |
| 1962–63 | --- | $ 9,498,000 [373] (b) | --- |
| 1963–64 | --- | [$ 9,638,666] [e] (ann. chge= +1.5%) | --- |
| 1964–65 | --- | [$ 9,779,332] [e] (ann. chge= +1.5%) | --- |
| 1965–66 | $ 737,607,000 [367] (b) | $ 9,920,000 [374] (ann. chge= +1.4%) | --- |
| 1966–67 | [$ 755,535,000] [e] (ann. chge= +2.4%) | $14,400,000 [375] (ann. chge= +45.2%) | $10,180,000 [383] |
| 1967–68 | [$ 773,463,000] [e] (ann. chge= +2.4%) | $16,200,000 [376] (ann. chge= +12.5%) | $12,300,000 [384] (ann. chge= +20.8%) |
| 1968–69 | $ 791,391,000 [368] (ann. chge= +2.3%) | $17,200,000 [377] (ann. chge= +6.2%) | $12,800,000 [385] (ann. chge= +4.1%) |
| 1969–70 | $1,019,100,100 [369] (ann. chge= +28.7%) | $19,400,000 [378] (ann. chge= +12.8%) | $11,400,000 [386] (ann. chge= +10.9%) |
| 1970–71 | $1,109,800,000 [370] (ann. chge= +8.9%) | $21,500,000 [379] (ann. chge= +10.8%) | $10,700,000 [387] (ann. chge= −6.1%) |
| 1971–72 | $1,187,600,000 [371] (ann. chge= +7.0%) | $24,400,000 [380] (ann. chge=+13.5%) | $ 7,600,000 [388] (ann. chge= −29.0%) |
| 1972–73 | $1,357,000,000 [372] (ann. chge= +14.3%) | $27,000,000 [381] (ann. chge= +10.7%) | $10,400,000 [389] (ann. chge= +36.8%) |
| Dec. 31, 1972 | --- | $28,800,000 [382] (± 6 mos.= +6.7%) | --- |

*Total Increase*

| | | | |
|---|---|---|---|
| Period | 1965–72 | 1962–72 (Dec.) | 1966–72 |
| Cost to Date | $619,393,000 | $19,302,000 | $220,000 |
| Total % to Date | 84% Overall | 203.2% Overall | 2.2% Overall |
| Average % | 12% Yearly | 19.4% Yearly | 0.36% Yearly |

a. Total Federal Cost (Corps of Engineers), subject to partial reimbursement by State of Texas or others.

b. Total projected cost estimate at time of requesting Cong. approval.

c. Component of Trinity River Basin Development Project, separately funded.

d. Component of Basin Development Project, originally included in total.

e. Figure not supplied in record. Amount interpolated by averaging total change between supplied figures indicated over period of time for which figures are missing. Accompanying percentages based upon the interpolated figure.

367. H.DOC.NO.276 § 1, *supra* note 3, at ix.

368. 1970 Sen. Subcomm. Hearings § 2, *supra* note 14, at 520.

| Completion Date: | Elm Fork Floodway [d] (Unknown) | Duck Creek Channel [d] 1975 (Oct.) | Lakeview Reservoir [d] (Unknown) |
|---|---|---|---|
| **Fiscal Year (July 1–June 30)** | | | |
| 1966–67 | - - - | - - - | $31,180,000 [400] |
| 1967–68 | - - - | - - - | $36,100,000 [401] (ann. chge= +15.8%) |
| 1968–69 | $11,191,000 [390] | $4,540,000 [395] | $35,300,000 [402] (ann. chge= –2.2%) |
| 1969–70 | $13,700,000 [391] (ann. chge= +22.4%) | $4,870,000 [396] (ann. chge= +7.33%) | $38,900,000 [403] (ann. chge= +10.2%) |
| 1970–71 | $16,000,000 [392] (ann. chge= +16.8%) | $5,430,000 [397] (ann. chge= +11.5%) | $73,100,000 [404] (ann. chge= +87.9%) |
| 1971–72 | $17,500,000 [393] (ann. chge= +9.4%) | $6,702,000 [898] (ann. chge= +23.4%) | [$84,250,000] [e] (ann. chge= +15.3%) |
| 1972–73 | $20,100,000 [394] (ann. chge= +14.9%) | $7,800,000 [399] (ann. chge= +16.4%) | $95,400,000 [405] (ann. chge= +13.2%) |
| **Total Increase** | | | |
| Period | 1968–72 | 1968–72 | 1966–72 |
| Cost to Date | $ 8,909,000 | $ 3,260,000 | $ 64,220,000 |
| Total % to Date | 79.6% Overall | 71.8% Overall | 206.0% Overall |
| Average % | 19.9% Yearly | 17.9% Yearly | 34.3% Yearly |

a. Total Federal Cost (Corps of Engineers), subject to partial reimbursement by State of Texas or others.

b. Total projected cost estimate at time of requesting Cong. approval.

c. Component of Trinity River Basin Development Project, separately funded.

d. Component of Basin Development Project, originally included in total.

e. Figure not supplied in record. Amount interpolated by averaging total change between supplied figures indicated over period of time for which figures are missing. Accompanying percentages based upon the interpolated figure.

369. *Id.*

370. 1971 Sen. Subcomm. Hearings § 3, *supra* note 15, at 1485.

371. 1972 Sen. Subcomm. Hearings § 1, *supra* note 16, at 1608.

372. 1973 Sen. Subcomm. Hearings § 2, *supra* note 17, at 1408.

373. H.DOC.NO.215 § 3, *supra* note 5, at 5.

374. 1966 Sen. Subcomm. Hearings § 1, *supra* note 10, at 165.

375. 1967 Sen. Subcomm. Hearings § 1, *supra* note 11, at 460.

376. 1968 Sen. Subcomm. Hearings § 1, *supra* note 12, at 608.

377. 1969 Sen. Subcomm. Hearings § 1, *supra* note 15, at 118.

378. 1970 Sen. Subcomm. Hearings § 2, *supra* note 14, at 588.

379. 1971 Sen. Subcomm. Hearings § 3, *supra* note 15, at 1552.

380. 1972 Sen. Subcomm. Hearings § 1, *supra* note 16, at 1665.

381. 1973 Sen. Comm. Hearings § 2, *supra* note 17, at 1464.

| | Aubrey Reservoir [a, d] | Lavon Reservoir Modification [a, d] |
|---|---|---|
| Completion Date: | (Unknown) | 1975 (June) |
| **Fiscal Year** (July 1 to June 30) | | |
| 1966–67 | - - - | $27,300,000 [410] |
| 1967–68 | - - - | $40,300,000 [411] (ann. chge= +47.6%) |
| 1968–69 | - - - | [$45,050,000] [e] (ann. chge= +11.8%) |
| 1969–70 | $41,200,000 [406] | [$49,800,000] [e] (ann. chge= +10.5%) |
| 1970–71 | $46,300,000 [407] (ann. chge= +12.4%) | [$54,550,000] [e] (ann. chge= +9.5%) |
| 1971–72 | $50,500,000 [408] (ann. chge= +9.1%) | $59,300,000 [412] (ann. chge= +8.7%) |
| 1972–73 | $60,400,000 [409] (ann. chge= +19.6%) | $63,400,000 [413] (ann. chge= +6.9%) |
| *Total Increase* | | |
| Period | 1969–71 | 1966–71 |
| Cost to Date | $19,200,000 | $36,100,000 |
| Total % to Date | 46.6% Overall | 132.2% Overall |
| Average % | 15.5% Yearly | 22.0% Yearly |

a. Total Federal Cost (Corps of Engineers), subject to partial reimbursement by State of Texas or others.

b. Total projected cost estimate at time of requesting Cong. approval.

c. Component of Trinity River Basin Development Project, separately funded.

d. Component of Basin Development Projetc, originally included in total.

e. Figure not supplied in record. Amount interpolated by averaging total change between supplied figures indicated over period of time for which figures are missing. Accompanying percentages based upon the interpolated figure.

382. Corps' Status Report to Dec. 31, 1972 [Box 7, Item 145–1].

383. 1968 Sen. Subcomm. Hearings § 1, *supra* note 12, at 605.

384. *Id.*

385. 1969 Sen. Subcomm. Hearings § 1, *supra* note 13, at 116.

386. 1970 Sen. Subcomm. Hearings § 2, *supra* note 14, at 583.

387. 1971 Sen. Subcomm. Hearings § 3, *supra* note 16, at 1548.

388. 1972 Sen. Subcomm. Hearings § 1, *supra* note 16, at 1662.

389. 1973 Sen. Comm. Hearings § 2, *supra* note 17, at 1460.

390. 1970 House Subcomm. Hearings § 6, *supra* note 14, at 494.

391. *Id.*

392. 1971 Sen. Subcomm. Hearings § 3, *supra* note 15, at 1508.

393. 1972 Sen. Subcomm. Hearings § 1, *supra* note 16, at 1632.

394. 1973 Sen. Comm. Hearings § 2, *supra* note 17, at 1436.

395. 1970 House Subcomm. Hearings § 6, *supra* note 14, at 505.

396. *Id.*

397. 1971 Sen. Subcomm. Hearings § 3, *supra* note 15, at 1506.

398. 1973 Sen. Comm. Hearings § 2, *supra* note 17, at 1528.

399. *Id.*

400. 1968 Sen. Subcomm. Hearings § 1, *supra* note 12, at 582.

401. *Id.*

### 7.

### BENEFIT ANALYSIS PROCEDURES —IN GENERAL

 The record indicates several aspects of the procedures utilized in the benefit-cost analysis which merit comment. One of the more critical, it would appear, is the period of analysis, the "life span" of the project over which the benefits and costs are computed. As a general rule, the longer the period of time over which benefits can be claimed, the higher and more favorable the benefit-cost ratio. The greatest costs occur at the time the project is constructed when maintenance costs are comparably small. However, the longer the projected life span, the greater the initial cost will be in order to ensure that the project will last for the contemplated period of time. Care must be taken to select a realistic "life span" of a project. Claiming a life span which is substantially longer than a given project can actually sustain will reflect an abnormally favorable benefit-cost ratio, as the initial cost will be comparatively lower, the projected benefits will be received for a longer period of time, and, as a consequence, the project may well appear to be fully justified. Once built, however, the project can become a liability if, in fact, it cannot last as long as claimed.

The reason for noting this area is that the Wallisville Project's benefit-cost ratio was originally calculated on a fifty year life span, was subsequently lengthened to 100 years, and then re-turned to its present fifty year period.[414] The Trinity Project's benefit-cost ratio in 1965 was calculated originally on a 100 year basis. Only after the Bureau of the Budget noted that the Corps usually used a 50 year basis was the projected life span lowered. Thereupon, benefit-cost ratio dropped from 1.4 to 1 down to 0.74 to 1; the Secretary of the Army then recommended deferring construction of the navigation features until it became economically justified at some time in the future.[415] A study of the record indicates no changes in engineering design or technical aspects of either the Wallisville or Trinity Projects during the changes from one life span to the other. It should be axiomatic that an artificially long projected life span for a project involving combined environmental economic "benefits and costs" would be unacceptable under NEPA; the resulting ratio would be artificially high, thus suggesting a false "balancing" between technical, economic, and environmental factors.

 A related and more complex computation involves the area within which specified benefits are measured. For example, the record reflects that the Corps' 1968 economic reevaluation of the Trinity Project focused on the two major market areas in physical proximity to the navigation channel—the Dallas-Fort Worth and the Houston-Galveston markets. Economic interests opposed to the barge channel argue that benefits should be measured within the bounda-

402. 1970 House Subcomm. Hearings § 6, *supra* note 14, at 507.

403. *Id.*

404. 1971 Sen. Subcomm. Hearings § 3, *supra* note 15, at 1511.

405. 1973 Sen. Subcomm. Hearings § 3a, *supra* note 17, at 232.

406. 1971 Sen. Subcomm. Hearings § 3, *supra* note 15, at 1501.

407. *Id.*

408. 1973 Sen. Comm. Hearings § 2, *supra* note 17, at 1428.

409. *Id.*

410. 1968 Sen. Subcomm. Hearings § 1, *supra* note 12, at 664.

411. *Id.*

412. 1973 Sen. Comm. Hearings § 2, *supra* note 17, at 1544.

413. *Id.*

414. *Corps' B/C Tabulations, supra* note 114.

415. H.Doc.No.276, *supra* note 3, § 2 at xv, § 1 at x. *See also* notes 56–57 *supra* and accompanying text.

ries of the entire state.[416] The record suggests that the larger the area within which benefits are measured, and the farther away from the dense marketing areas they are obtained, the lower the benefits become. The economic savings from using barges, for example, are greatest to those in close proximity to the waterway who can readily transport commodities on it instead of utilizing more expensive transportation alternatives; businesses located farther away would need to first transport their goods by some method to the canal, a cost which might exceed their shipping directly to their customers. This Court's concern at this time is to determine if such a problem exists with reference to areas within which environmental benefits are computed. If the area of environmental analysis parallels that for economic analysis, the resulting claimed benefits could be more easily analysed in a benefit-cost computation. Problems would seem to arise when the respective economic and environmental areas differ, particularly if the procedures for determining an economic area were too elastic. By altering the area of economic measurement, an unrealistically high benefit can conceivably appear, thus upsetting any fine balance arrived at with environmental benefits. The record in this case offers insufficient data for this Court to suggest or apply a proper rule for measuring such areas, either for economic or environmental analysis. What is important is that the problem

be identified and fully examined in the impact statement.

The record indicates some controversy over the fact that the Corps, in its 1968 economic justification reevaluation of the navigation features of the Trinity Project, added an additional flat ten percent to computed transportation savings on some or all of the commerce items surveyed.[417] The Corps reported to Congress that this was done to take into account an estimated amount of general commerce which would utilize the waterway that was undisclosed by a field traffic canvass conducted by the Corps. The entire record relating to this economic resurvey is not before the Court; thus a more thorough inquiry at this point cannot be made. However, the Court notes that this procedure might be proper if balanced statistical sampling techniques were utilized.

The record also reflects substantial controversy over the interest rate used to discount benefits and costs;[418] the purpose is generally to approximate investments in private business.[419] Both the Wallisville and Trinity Projects' benefit-costs analyses are based on an interest rate of 3.125 percent.[420] The current rate of interest required for federal projects is apparently 5⅝ percent.[421] Although construction has not begun on the Trinity Project, the lower rate prevails because it was the approved rate when the basic project was

---

416. Testimony of General Koisch. 1970 Sen. Subcomm. Hearings, § 5, *supra* note 14, at 6981. *See also id.* at 5530.

417. H.Doc.No.364 (1968), *supra* note 4, § 3 at 3, § 4 at 15, 27, 28; *see also,* 1972 Sen. Subcomm. Hearings, *supra* note 16, § 2 at 1449, 1451; § 4 at 257.

418. Discounting is discussed briefly at note 334 *supra* and accompanying text.

419. Authority is derived from 18 C.F.R. § 704.39. For a review of the controversy *see*: 1972 Sen. Subcomm. Hearings § 2, *supra* note 16, at 1447, 1450–51; 1971 Sen. Subcomm. Hearings § 1, *supra* note 15, at 432, 461; Corps' Response to Donald Smith, *supra* note 31, at 6. This same

matter has been raised in at least one other case. Environmental Defense Fund, Inc. v. Corps of Engineers of U. S. Army, 325 F.Supp. 749, 761 (E.D.Ark.1971). The record reflects that different interest rates are used for federal costs than are used for non-federal costs. H.Doc.No.276, App. VI (1965), *supra* note 3, at 1, 6, 157, 163.

420. WALLISVILLE EIS, *supra* note 9, at 1; 1972 Sen. Subcomm. Hearings § 4, supra note 16, at 257–58. *See also* defendant Corps of Engineers' Answer to Interrogatory No. 40(e).

421. 1973 Sen. Subcomm. Hearings § 4, *supra* note 17, at 43.

authorized in 1968.[422] If the higher interest rate were applied, the benefit-cost ratio would drop substantially below unity. This problem has recently been reconsidered by at least one House and two Senate subcommittees, and in each case the present procedures were retained. The Senate Committee on Public Works reported:

> Of particular concern is the proposal by the Water Resources Council that the standards include a discount rate of interest based on the private money market. The Committee believes that the adoption of this interest rate would adversely affect the continuation of an orderly program of water resources development, since economic justification would be difficult to establish on such an artificial basis.

> The Committee further believes that it is incompatible with the purpose of water resource programs to make these government activities dependent upon fluctuations in the private money market. Water resource projects must be considered on the basis of their value to local communities, regions and the Nation as a whole.[423]

It appears, however, that one reason for not changing the present procedures was to "assure that Congress will have sufficient time to review water resources standards now being considered by the Water Resource Council." [424] From the brief comments contained in the noted reports, it appears that no consideration was given to the effect of the interest rate upon environmental decisions bound up in the benefit-cost ratio. Inasmuch

as a final decision does not appear to have been made, and since the Council on Environmental Quality has apparently not addressed itself to this issue, this Court can do no more than allude to the controversy in the record.

8.

## PROCEDURES FOR ANALYZING RECREATION BENEFITS

 One of the most frequently claimed benefits arising out of public works projects is that of outdoor recreation. Because of the nature of the benefit, it is obviously closely associated with environmental decisions. This Court's greatest concern here is twofold; that the record raises a question as to the procedures used to claim these benefits and that the claimed "need" for this type of recreation is not adequately supported statistically or otherwise. The Court has already noted that the Wallisville Project claims substantial recreation benefits, despite the existence of similar facilities nearby and criticism from the Bureau of Outdoor Recreation.[425] The late Senator Allen J. Ellender of Louisiana has suggested, and the record seems to support it, that some public works projects would not have been economically "justified" except for the fact that the benefit-cost ratio was increased by adding a great deal more recreation benefits than could be justified on the basis of reasonable need.[426] In order to understand this area, there are several aspects to which attention should be directed.

422. 1972 Sen. Subcomm. Hearings § 4, *supra* note 16, at 257–58. *See also* note 79 *supra*.

423. S.Rep.No.92–1199, 92d Cong., 2d Sess., 3 (1972) [Box 10, Item 182d]. *See also* S.Rep.No.92–923, 92d Cong., 2d Sess., 2–3 (1972) (Senate Committee on Appropriations) [Box 8, Item 158] ; H.Rep. No.92–1151, 92d Cong., 2d Sess., 5–6 (1972) (House Committee on Appropriations) [Box 8, Item 158b].

424. H.Rep.No.92–1582, 92d Cong., 2d Sess., 46 (1972) (Explanatory Comment to § 72 of the Flood Control Act of 1972, subsequently vetoed by the President, which provided for no change in the current interest rate formula.) [Box 10, Item 182a].

425. *See* notes 146–155 *supra* and accompanying text.

426. 1968 Sen. Subcomm. Hearings § 1, *supra* note 12, at 581. *See also* note 447 *infra* and accompanying text.

### a.

### *Evaluating Recreational Benefits*

According to the record recreational benefits are based upon a schedule of visitation values adopted in 1960 by the Interagency Committee on Water Resources.[427] Calculated on the basis of the number of recreation users per day, rates of $0.50 per person for general visitors, $1.00 for nature students, $1.00 to $2.00 for sport fishing and hunting, and $3.00 for waterfowl hunting have been used by the Corps in determining the recreational benefits to be attributed to various projects.[428]

Reportedly, an analysis is made by the Corps of an area in its "unimproved" condition and then compared to the projected usage of the area if the project were built.[429] A judgment estimate is made by the Corps as to projected usage, depending upon such factors as proximity to metropolitan areas, an evaluation of the overall vicinity, the quality of the facilities provided, and the degree to which opportunities to engage in a number of activities are provided.[430] For example, prospective recreation visitation at the Wallisville Project was analysed by the Corps as follows:

> An estimate of the average annual attendance for recreational purposes recognizes the various factors of population and potential increase of population within the zone of influence, the quality of recreational opportunities inherent in the project, access, trends of interest in outdoor recreation, availability of similar recreational opportunities, and other elements that must be considered in obtaining a judgment estimate of visitation. Consideration was given to the records of annual visitation to the Dam B reservoir located on the Neches River, about 80 miles from the Wallisville Reservoir site. Considering all of these factors, it is estimated that Wallisville Reservoir will attract about 785,000 visitors during the third year after completion and a total of about 969,000 by the year 1975. It is believed that the estimated attendance

427. H.Doc.No.276, App. V (1965), *supra* note 3, at 21. This document was apparently printed as Sen.Doc.No.97, Supp. 1, and prescribed values ranging from $0.50 to $1.50 for general recreation. 1971 House Subcomm. Hearings § 5, *supra* note 15, at 1639.

428. For example, benefits for Lakeview Reservoir in 1970 were calculated on the basis of $.50 for general visitors and $1 for sports fishermen and hunters. In 1971, when the total cost increased, benefits were recalculated at the rate of $1 for general visitors, sport fishermen and nature students, $2 for sports hunters and $3 for waterfowl hunters. *Id.* at 1640. The basic forms of "recreation" to which values are apparently attached includes sports fishing, hunting, picnicking, water sports and other outdoor activities. *See, e. g.,* H.Doc.No.215 § 5 (Wallisville 1961), *supra* note 5, at 49. Reportedly recreation benefits do not attempt to include "intangible" benefits, *i. e.,* economic gains due to pre-visitation expenditures, such as purchase of boats, water sports equipment, hunting equipment and the like. Nor are benefits accruing to the general well being, health and mental conditioning resulting from recreation at a particular project included. *Id.,* § 6 at 75. Wallisville rates are noted at note 431, *infra.*

429. *Id.* at 49; defendant Corps of Engineers' Answer to Interrogatory No. 40(f). 1 WALLISVILLE GEN. DESIGN MEMO NO. 1, App. C (1965), *supra* note 6, at 23–25. *See also* 1968 Sen. Subcomm. Hearings § 1, *supra* note 12 at 580; 1971 H. Subcomm. Hearings § 5, *supra* note 15, at 1633, 1639. The Corps determined that the demand for outdoor recreation in the Trinity Project was increasing due largely to six factors: (1) increased urbanization, (2) increasing numbers of older persons with time for outdoor recreation, (3) larger than average increases in young persons not yet in the labor force, (4) steady growth in per capita income, (5) improved travel facilities, and (6) increases in leisure time. H.DOC. NO. 276, App. V (1965), *supra* note 3 at 4–6.

430. *See* 1968 Sen. Subcomm. Hearings § 1, *supra* note 12, at 580; 1971 House Subcomm. Hearings § 5, *supra* note 15, at 1633, 1639; 1 WALLISVILLE GEN. DESIGN MEMO NO. 1, App. C (1965), *supra* note 6, at 23.

in 1975 will approach the optimum recreational capacity for this reservoir.[431]

There is little more in the record that indicates the procedures utilized by the Corps in arriving at these estimates.[432]

In ascertaining projected estimates for both the Trinity and Wallisville Projects, the record reflects that the Corps communicated with some federal and state agencies whose expertise lies in the area of recreation.[433] The key documents used to justify these projects do not indicate what the nature of the communications was, nor the degree of coordination undertaken by the Corps with the other agencies. It appears that the Corps places substantially greater reliance upon visitation statistics at other Corps public works projects than upon other factors.[434] A question may be raised as to whether standardized procedures for measuring recreational demand are being utilized. For exam-ple, visitation estimates at Wallisville were limited generally to a fifty mile radius of the project.[435] The record is unclear as to the scope of the Trinity Project. While it appears that recreational measurement may have paralleled the scope of the survey of economic benefits, there is no indication that a fifty mile radius limitation was imposed.[436]

The Court raises a question as to the procedures utilized for projecting future "usage" of these recreation areas, as they would appear to be unsupported by the record. For example, there appears to be little or no basis for the method employed to obtain estimates of site visitation at an area in its "unimproved" state. Whereas the Corps apparently keeps accurate visitation records of users of existing Corps facilities, it is not inappropriate to inquire—who records the treks of individuals into the wilderness? ' Conclusions arrived at based upon a procedure weighted in fa-

431. WALLISVILLE DESIGN MEMO NO. 2A (Recreation 1965), *supra* note 7, at 5. The procedure used by the Corps for establishing the visitation benefits appears to be as follows:

> According to procedures contained in "Proposed Supplement No. 1, Evaluation Standards for Primary Outdoor Recreation," the designation of a unit value per recreation day is based on three major factors, as follows: (1) the class of recreation, (2) the quality of recreation, and (3) the degree to which opportunities to engage in recreation activities are available. The class of recreation which will be available will be of a general nature, such as warm water fishing and small game and waterfowl hunting. The fish and wildlife habitat of the Wallisville area indicates that success in hunting and fishing should range from average to good. Access to the reservoirs considered to be convenient to most people residing within the 50 mile zone of influence. The service facilities planned for construction at the reservoir are considered to be adequate for the proposed hunting and fishing demand. Based on the above considerations, the unit value per visitor day is established at $1 per visit for hunters and fishermen.

1 WALLISVILLE GEN. DESIGN MEMO NO. 1, App. C (1965), *supra* note 6, at 23.

432. *See, gen.*, 1 WALLISVILLE GEN. DESIGN MEMO NO. 1, App. C (1965), *supra* note 6; WALLISVILLE DESIGN MEMO NO. 2A (Recreation 1965), *supra* note 7.

433. *See, e. g.*, II.Doc.No.276, App. V (1965), *supra* note 3, at 5–15; WALLISVILLE DESIGN MEMO NO. 2A (Recreation 1965), *supra* note 7, at 12–13.

434. *See, e. g.*, II.Doc.No.276, App. V (1965), *supra* note 3, at 3–4, 6, 8 (Figure 2), 9–12, 14.

435. II.Doc.No.215 § 5 (Wallisville 1961), *supra* note 5, at 75; *see also* note 431 *supra*.

436. *See, e. g.*, II.Doc.No.276, App. V (1965), *supra* note 3, at 4–5, 16–19. Corps reservoirs to be built in conjunction with the Lakeview, Aubrey, Garza-Little Elm, and Grapevine components of the Trinity Project, collectively estimated at attacting 15 million visitors annually, are all approximately within 50 miles of one another and the triangle of cities of Dallas-Fort Worth-Denton. On the other hand, the Tennessee Colony Reservoir Project, estimated to attract 6 million visitors annually, is located in an area with a combined urban and rural population of approximately 550,000. *Id.* at 11.

vor of developmental type recreation facilities does not take into account the desires of those who may prefer natural recreation. Unless measurement procedures accurately calculate both types of usages, the former can be emphasized at the expense of the latter. Similarly, the methods used for projecting estimated visitation must be objective and realistic. This opinion has already noted that in connection with the Trinity Project the District Engineer computed estimated increases of 9,100,000 man days of general recreation and 4,900,000 man days of hunting and fishing, whereas the Fish and Wildlife Service and the National Park Service made estimates of approximately 3,000,000 and 937,000 respectively.[437] The U.S. Department of the Interior, and particularly such components as the Fish and Wildlife Service, the National Park Service and the Bureau of Outdoor Recreation, who are charged with duties and legal responsibilities relating both directly and indirectly to the determination of recreational needs,[438] would in all likelihood be better qualified to evaluate such estimates as are here involved.

justified through use of recreation benefits, when the main purpose of the project is non-recreational, and the costs of building the recreational facilities are minimal compared to the main purpose costs. For example, the cost of constructing recreational facilities at Lakeview Reservoir is only about 12 percent of the total project cost,[439] whereas about 70 percent of the total claimed benefits justifying the project are attributed to recreation; the primary purpose for building the reservoir is flood control and water supply.[440] The latest figures available in the record for the Wallisville Project indicate that the costs of recreational facilities equal only about 3.5 percent of the total costs [441] while claimed benefits account for 18.4 percent of the total.[442] Similarly, although approximately 64.5 percent of the benefits claimed by Aubrey reservoir are attributed to recreation, the primary role of the project is water conservation;[443] yet, the cost of recreational facilities is approximately 18 percent of total first cost.[444]

### b.

#### Recreation Benefits Versus Costs

Somewhat akin to the foregoing discussion is the fact that certain of the projects in the Trinity Project are being

### c.

#### Elasticity of Claimed Recreational Benefits

The record suggests that recreation analysis procedures are inexact and occasionally are subject to use in connection with non-recreational purposes.

437. *See* note 250 *supra* and accompanying text.

438. *See, e. g.*, United States Government Organization Manual 1972/73 250, 256–58, 263–64.

439. 1972 House Subcomm. Hearings § 5, *supra* note 16, at 571 (Percentage computed from testimony). In 1965 recreation construction costs as reported to Congress only totaled 3.8 percent of the total first costs. H.Doc.No.276, App. VI (1965), *supra* note 3, at 101, 102.

440. *See* 1968 House Subcomm. Hearings § 1, *supra* note 12, at 582; 1972 House Subcomm. Hearings § 5, *supra* note 16, at 571.

441. 1 WALLISVILLE GEN. DESIGN MEMO NO. 1, App. C (1965), *supra* note 6, at 1.

442. Corps B/C Tabulations, *supra* note 114. When Congressional approval was sought in 1961, the estimated total federal costs invested in construction and operation of recreational facilities at Wallisville equaled 24 percent of the total expenditures, while the annual benefits attributed to recreation were 38 percent. H.Doc.No.215 § 4 (Wallisville 1961), supra note 5, at 13–14.

443. H.Doc.No.276, App. VI (1965), *supra* note 3, at 105 n. 1.

444. *Id.* at 108.

For example, the Corps reportedly made no claim for recreational benefits in the benefit-cost analysis of the Gilham Dam project on the Cossatot River in Arkansas, although emphasizing such benefits in the impact statement.[445] On the other hand, when the total estimated costs of the Lakeview Reservoir doubled between 1969 and 1970 due to a relocation of the proposed site, the benefit-cost ratio increased from 2.7:1 up to 3.3:1, primarily because of a 262.7 percent increase in claimed recreation benefits.[446] The record does not indicate that there was a 262.7 percent greater need for recreation at the new site.

## 9.

## CONCLUSION

The foregoing is an effort to point out what appear to be deficiencies in the Corps' benefit-cost analysis procedures, primarily as they impinge upon environmental factors in such a way as might dilute the emphasis to be given to these amenities. The present procedures do not appear to comply with Congressional policies as declared in NEPA or as reported above. Probably the area embodying the greatest deficiencies is that associated with recreational benefit claims. These have also been the cause of Congressional concern, although for non-environmental reasons. For example, the late Senator Allen J. Ellender of Louisiana, at a Senate Subcommittee Hearing in 1971, made the following observations to a Corps of Engineers official reflecting his concern over the use of recreational benefits to justify projects:

You can swell those benefits by increasing the visitations by maybe tri-

ple what it will actually be, if you want.

. . . . . . .

. . . But here lately, in order to justify many projects in the program, you have added large recreation benefits. Except for the addition of those recreation benefits, you could not justify the project. You could not obtain a 1 to 1 ratio . . . except by adding . . . large recreation benefits. . . .

. . . . . . .

. . . it strikes me that any program that is advocated by the Engineers should stand on its own on the basis of navigation and flood control. If you have to add recreation benefits to jackup your benefits in order to make it feasible—that is to obtain a benefit-to-cost ratio over 1.1 to 1—I just think that is wrong. I have been trying to keep the justification for these projects within the primary responsibility of the Corps, and that is for navigation and flood control. Because you could easily justify almost any program if you start adding water pollution now to what you do for recreation.

You could have, maybe, your navigation and your flood control 0.5 to 1 and then add enough recreation and other benefits to make the ratio 2 to 1. This could be recreation or some other type of benefit that has not even been considered in the past in order to justify a project on the basis of a good benefit-cost ratio.[447]

The magnitude of the total Trinity River Basin development project and the fact that the nation is entering its third

---

445. Although the impact statements refer to the creation of outdoor recreational opportunities, the defendants do not "formally" claim recreational benefits as part of the benefit-to-cost ratio. Environmental Defense Fund, Inc. v. Corps of Engineers of U. S. Army, 325 F. Supp. 749, 759 (E.D.Ark.1971).

446. Claimed recreation benefits rose from $2,025,000 annually to $7,345,000. 1971

House Subcomm. Hearings § 5, *supra* note 15, at 1632–33. *See also* 1971 Sen. Subcomm. Hearings § 3, *supra* note 15, at 1509–14.

447. 1971 Sen. Subcomm. Hearings § 3, *supra* note 16, at 1504–05; *see also*, 1972 House Subcomm. Hearings § 5, *supra* note 17, at 571; 1968 Sen. Subcomm. Hearings § 1, *supra* note 13, at 580–81.

year following the enactment of NEPA without tangible strides being made towards development of measureable environmental economic analysis procedures compel substantial scrutiny of existing procedures and claimed benefits. Fortunately a time crisis is not at hand as to the Trinity Project with studies, technical and environmental, apparently far from completion and the initiation of construction even more distant. Even if the studies were complete, the long term benefits likely to accrue from a delay while a re-analysis of techniques was undertaken might well outweigh any resulting increased costs.

If such sophisticated techniques are not presently available for use, then interim alternative methods should be explored by Congress to ensure that we do not necessarily jeopardize the intent of NEPA between now and the time that agencies and ultimately the courts are supplied with appropriate standards for evaluating the comparative degrees of benefits and costs. For example, as one witness suggested in testimony before Congress, it may be desirable for the present to require "a benefit cost ratio very much in excess of unity in order to justify the project." [448] If the Congress were to decide upon some arbitrary benefit-cost ratio below which a project would not be considered, only the more meritorious and more urgently needed public works projects would survive close examination and be authorized until such time as a more all-encompassing and refined set of benefit-cost tools becomes available. In this fashion, the formidable task assigned to the courts could be more adequately and intelligently undertaken, and hopefully the decisions rendered would comport more fully with the intent of Congress.

## I.

## THE DIRECTIONS OF THE COURT: STRUCTURE OF SUBSEQUENT ENVIRONMENTAL IMPACT STATEMENTS

In this new and largely uncharted area of the law, this Court has encountered many problems, both mechanical as well as theoretical. One such mechanical problem is that of fully assimilating the contents of the Wallisville impact statement and related record as submitted in this case so as to comprehend in some logical manner what information is contained therein. Lengthy impact statements appear to be the rule, rather than the exception, in environmental cases, but a Court simply does not possess the time or the capacity in environmental cases to wade through such a mass of records as are submitted here in order to determine if the Corps has satisfied the requirements of NEPA. What becomes particularly distressing is the fact that Wallisville is but the initial segment of the overall Trinity Project in which the impact statement and record will necessarily be of immense size. Because of the sheer magnitude of this project and the absolute necessity that an impact statement be prepared by the Corps which can be meaningfully reviewed, it is apparent that much greater care must be taken in the system, organization and presentation of material for the benefit of a Court and a layman.

The courts to date have apparently not dealt with impact statement structure to any depth. The District of Columbia Circuit Court of Appeals stated, in passing, that the statement "must set forth the material contemplated by Congress in form suitable for the enlightenment of the others concerned." [449] Another court found an impact statement to be sufficiently detailed when

448. Testimony of Donald Smith, Assistant Professor of Economics at Southern Methodist University. 1972 Sen. Subcomm. Hearings, § 2, *supra* note 16, at 1451–52.

449. Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 836 (1972).

"perused in its entirety, including the independent and often opposing views of the other public agencies. . . ."[450] This latter impact statement, it should be noted, was 55 pages in length, exclusive of exhibits and letters.[451] This Court believes that this latter standard will not be sufficient for an impact statement of the magnitude likely to result in the overall Trinity Project. Yet, it would be unreasonable to expect even the most diligent administrator, congressman or court to read hundreds or thousands of pages of text, exhibits, enclosures and appendices in the effort to gain an overall grasp of the environmental impact. For this reason, the Court advances the following guidelines for use in preparing the impact statements associated with the overall Trinity Project, including the resubmission of a Wallisville statement. They are not to be read as being in lieu of guidelines promulgated by the CEQ and EPA, or those of the Corps otherwise not inconsistent; rather, they should be applied to supplement such guidelines so as to present the clearest possible picture of the project in question.

1. The primary intention of this Court is to ensure that:

(a) The revised Wallisville impact statement, assuming it satisfies the Court's stated objections and assuming it properly and fully reflects the precise scope of the project as of 1973, not some prior date, is submitted to the Congress, the CEQ and other appropriate agencies for full review and authorization. The obtaining of such authorization is not clear from the present impact statement and record.

(b) The Trinity impact statement which is presently being prepared will be fully processed and reviewed by the Corps as a "new" project and thereafter submitted to the Congress, the CEQ and other appropriate agencies for full review and authorization.

2. With respect to mechanical organization of the impact statement, maximum efforts shall be expended by the Corps to ensure clarity, thoroughness and objectivity of presentation so that all factors including environmental amenities are fairly portrayed. With reference to the Trinity Project, a substatement will be prepared, processed and reviewed with respect to *each* of its major components so that a fact finder and a court can discern that component's relevance and justification when related to the overall Trinity Project. This will include, but is not necessarily limited to, each major dam, reservoir, lock or combination thereof and each flood control project. Thereafter, a "master" impact statement will be prepared focusing upon the cumulative effect of all of the components for the benefit of the fact finder and a court so that full compliance with NEPA can be ascertained. Consideration should be given to the use of environmental matrix analysis which, this Court has noted, was included as an integral part of the Cossatot River impact statement.

3. In order to ensure full coordination with the reviewing agencies in preparation of impact statements, the following are advanced:

(a) If modifications or changes take place in a project or in an impact statement after reviewing agencies have reviewed and expressed opinions, then further coordination and review of such modifications or changes by these agencies are required. The Corps and all agencies must express opinions based on the same information.

(b) The impact statement will contain the written opinion of all appropriate reviewing agencies as well as those of the Corps, the primary purpose being to present a complete and objective appraisal of the good and the bad of a proposed project including the balance struck between envi-

450. Environmental Defense Fund, Inc. v. Corps of Engineers of U. S. Army, 348 F. Supp. 916, 933 (N.D.Miss.1972).

451. *Id.* at 940.

ronmental, technical and economic factors. The textual discussion of the impact statement must draw the attention of readers to any views opposing those espoused by the Corps with respect to any amenity, be it technical economic or environmental. They may be discussed in the text, if desired, providing a reference notation is made to where the original comments or letters may be found in the enclosed appendices. If the opposing view is not textually discussed, a footnote reference shall be inserted in the text at the Corps' challenged comment. At the bottom of that same page, some signal notation should be inserted to apprise the reader of the controversy (*e. g.*, "contra"), the source identified (*e. g.*, Bur. Sport Fish.), and a reference to where in the record the original comments or letter may be found.

4. Because this Court is convinced that under the present state of the law construing NEPA, any benefit-cost analysis must include a full consideration of environmental factors as well as the traditional economic and technical valuations, it has no hesitancy to examine this area concerning the Wallisville and Trinity Projects by reviewing the information appearing in the record of this case. What is of deep concern is the absence of definitive guidelines, procedures and common denominator terms to be used in quantifying and comparing environmental values with other values. Such expertise should be found most readily in the Congress, the CEQ and the agencies administering these programs.

In order that this Court may have the benefit of the latest guidelines and procedures in the field to apply to the Wallisville and Trinity Projects, the Corps is directed to seek out such information from all appropriate sources and supply to this Court definitive policy guidelines, regulations or standards with respect to the following:

a. The basic procedure, standard or measure for comparing and evaluating environmental amenities with economic and technical factors—jointly or separately without overlapping features.

b. The methods to be used for quantifying environmental amenities, both as to benefits and as to costs. Procedures need to be established for determining which agency or entity will be primarily charged with the duty for evaluating the "values" to be applied to natural conditions and the "benefits" to be attributed to uses such as recreation.

c. The procedures to be used for controlling project cost increases, the statistical soundness of the add-on benefit procedure, the relationship of project life to projected benefits, environmental or otherwise, the role of interest levels to environmentally-related analyses, and the comparative areas to be used for economic benefit studies versus environmental benefit studies.

d. Guidelines to be used for determining the "need" for recreation in a given area and which agency or entity is to determine such "need."

### J.

### SUMMARY AND HOLDING OF THIS COURT

The history of planned navigational development in the Trinity River Basin extends over the past century. The present plans relate back at least to the early 1940s, and they have regularly been considered in the light of existing navigation on the Trinity River which extends from Trinity Bay to Liberty, Texas. As a result of navigational improvements made over the years, saltwater from Trinity Bay penetrated upstream following the navigation channel, particularly when the flow of the Trinity River was low. As a consequence, there were protests of rice farmers located in the vicinity of the mouth of the Trinity who demanded that a protective saltwater barrier dam be built. This

was the genesis of the Wallisville Dam and Reservoir. Soon thereafter, local governments and interests sought expansion of the project to include areas for water preservation and supply, and this purpose was thereafter incorporated as well. At the present time, two additional purposes and benefits are claimed for the Wallisville Project, recreation as well as fish and wildlife enhancement.

The National Environmental Protection Act (NEPA) under which the present suit has been brought became effective on January 1, 1970. At that time the development planning of Wallisville had already progressed substantially. The Corps of Engineers recognized after a period of understandable indecision that the Act required the Corps to consider the environmental impact of the entire Trinity Basin project as well as the impact of its initial segment at Wallisville. Recognizing the extensive history of Wallisville and noting its claimed important and predominantly local purposes, this Court did not wish to delay the completion of the project which originated in concept long before the advent of NEPA. Accordingly, a temporary injunction was denied pending a decision on the merits. Following an exhaustive examination of the Wallisville impact statement and the massive record submitted in this case, this Court has concluded that such an equitable resolution is not warranted. The claimed local purposes are not adequately documented and supported in the Wallisville environmental impact statement at this time, and it will be necessary to determine through further evidence the true character and purposes of the Wallisville Project.

Additionally, the existing Wallisville environmental impact statement is insufficient under NEPA, since it lacks the requisite detail and fails to satisfy the full disclosure requirements of the Act. Alternatives to the present project are inadequately considered, and there is no indication that genuine ef-forts have been made to mitigate any of the major impacts on the environment resulting from the construction of the project. There is little support in the record for the Corps' failure to defer to the expert judgment of other federal agencies which have expressed opinions with respect to significant environmental impacts. Inasmuch as this Court finds that the plaintiffs have made out a prima facie case of defendants' non-compliance with NEPA, the burden of proof is on the defendants to demonstrate that they have fully complied with its provisions.

Of particular significance to the Trinity Project as well as to the Wallisville Project is the Court's finding that the Corps' benefit-cost analysis procedures are deficient under NEPA because they consider and evaluate selected environment related "benefits" without also considering and evaluating environmentally related "costs". Before an impact statement for the Wallisville or Trinity Projects may be completed and adequately reviewed, there is a need to bring certain procedures to the attention of Congress, the appropriate federal agencies, and the Council on Environmental Quality in order that appropriate policy decisions may be made to assist the Corps and the Court in assessing the completeness of environmental impact statements. These will include the determination of proper methods for quantifying and evaluating environmental amenities.

In view of the uncertainty surrounding the character and purposes of the Wallisville Project at this time, all as set forth earlier in this opinion, both the Wallisville and Trinity Projects will necessarily be enjoined. Inasmuch as Wallisville is a segment of the master plan for the Trinity Project, directions as to the preparation of impact statements will apply to both projects in order to assist this Court in enforcing the letter and spirit of NEPA. It will be necessary that the Corps of Engineers prepare impact statements for each ma-

jor component of the Trinity River Basin development program including Wallisville as well as a subsequent one assessing the cumulative environmental impact. Apart from the mechanical organization of such impact statements in order to ensure maximum clarity and completeness, each impact statement will be given the same general agency and congressional review that new projects currently receive under the Corps of Engineers' regulations. It is the intent of this Court, in view of the circumstances in this case, that Congress, the appropriate federal agencies and the Council on Environmental Quality pass upon and render decisions on the Wallisville and Trinity Projects as well as other components in the light of NEPA as passed by Congress.

Accordingly, an injunction will be granted by this Court to halt any construction on the overall Trinity Project, including further construction on the Wallisville Project, until the requirements of NEPA have been complied with. The Court has been apprised of the fact that modification on several highway bridges spanning the Trinity is underway so as to accommodate the navigation channel, if built. Federal funds are being used to cover the increased costs of building these high level bridges. Because these bridges and connecting roads are not directly related to the Trinity Project, and because the mere increase in height appears to this Court at this time to be a very tenuous nexus to the Trinity Project, this injunction shall not apply to such bridge construction.

Among other matters, the satisfying of the requirements of NEPA will necessitate the ascertaining of the true purposes and character of the Wallisville Project. If and when the Corps can present to this Court additional evidence as to Wallisville's local purposes, and if this Court upon appraising such evidence finds that this project possesses, in reality, substantial local purposes, then it will dissolve the injunction as to Wallisville upon the resubmission of an environmental impact statement which satisfies the requirements of NEPA as outlined in this opinion. On the other hand, if such evidence is inadequate under the law and the claimed primarily local purposes are not demonstrated, the Wallisville Project will then be viewed by this Court only as the first segment of the Trinity Project. In that event, further construction of Wallisville will be delayed to await completion of the Trinity environmental impact statement assessing the cumulative impact of the overall Trinity Project, including Wallisville, in a manner satisfactory to the requirements of NEPA to be followed by such statement's complete review and acceptance by the Congress, the relevant federal agencies and the Council on Environmental Quality.

Plaintiffs' motion for summary judgment is hereby granted, and an injunction will issue forthwith as to both the Wallisville and Trinity Projects. The defendant Corps of Engineers' motion for summary judgment is denied. An appropriate order will be prepared terminating construction on both projects with the exception of the modification of the high level bridges spanning Trinity River noted previously, and such order will be submitted to this Court for entry within seven (7) days. It is further ordered that plaintiffs file an appropriate bond for payment of costs and other matters in the amount of $100 in line with current reported decisions.[452] Clerk will notify counsel.

452. *See, e. g.,* Natural Resources Defense Council, Inc. v. Morton, 337 F.Supp. 167, 169 (D.D.C.1971), aff'd 148 U.S.App.D.C. 5, 458 F.2d 827 (1972); Environmental Defense Fund, Inc. v. Corps of Engineers of U. S. Army, 331 F.Supp. 925, 927 (D.D.C.1971); Environmental Defense Fund, Inc. v. Corps of Engineers of U. S. Army, 324 F.Supp. 878, 883 (D.D.C. 1971).

## SUMMARY JUDGMENT

CAME on for hearing the Motion for Summary Judgment filed by Plaintiffs; and the Court being of the opinion that Plaintiffs' said Motion should be granted, accordingly, by its Memorandum and Order issued and filed herein by the Court on the 16th day of February, 1973, Plaintiffs' Motion for Summary Judgment is Granted; and pursuant thereto, it is hereby

Ordered, Adjudged and Decreed that Defendants, Robert F. Froehlke, Secretary of the Army, Lt. General Frederick J. Clarke, Chief of Engineers of the United States Army, and Colonel Nolan C. Rhodes, District Engineer of the Corps of Engineers of the United States Army, their successors in office, their agents, representatives and employees, and all other persons acting in concert or cooperation with said Defendants, or at their direction or under their control, shall be and are hereby permanently enjoined from constructing, or causing the construction of, directly or indirectly, the Trinity River Project or the Wallisville Project, or of any parts or components thereof, unless said Defendants fully comply with the law, including all requirements of the National Environmental Policy Act and this Court's Memorandum and Order of February 16, 1973; and until further Order of this Court; provided, however:

(1) there is excluded from this Order those certain six (6) highway bridges designed to cross the Trinity River on State of Texas Highway No. 105; United States Highway No. 190; State of Texas Highway No. 31; International Highway No. 635; International Highway No. 45; and State Highway Loop 12; and

(2) in terminating construction of the Wallisville Project, Defendants are hereby authorized to perform only the following acts on or before April 15, 1973: (i) install and adjust gate seals on navigation lock, (ii) remove gates and apply protective coating thereto; (iii) paint armor and steel sheet piles; (iv) remove lower well point system and flood chamber; (v) remove upper well point system; (vi) protect ends of concrete overflow dam with sandbags; and (vii) clean up, move out and secure equipment and supplies; in the performance of such acts during said period of time, Defendants are hereby Ordered to file with the Court and with copies thereof to be furnished to each counsel of record, each two weeks of such period a report setting out the status as of such time of the work done pursuant hereto, the nature of such work so done and an estimate of time required for completion thereof; and it is further,

Ordered that Plaintiffs tender security for the payment of costs and damages as may be suffered by any party determined to have been wrongfully or unlawfully enjoined herein in the amount of, or equivalent to, One Hundred Dollars ($100.00).

APPENDIX A

TRINITY RIVER AND TRIBUTARIES, TEXAS
TRINITY RIVER

COMPREHENSIVE PLAN
OF DEVELOPMENT

U.S. ARMY ENGINEER DISTRICTS,
FORT WORTH AND GALVESTON

PLATE I

APPENDIX B
Wallisville Project

PROJECT PLAN MAP

SCALE OF FEET

2000 0 4000 8000

PROJECT
LOCATION

TRINITY RIVER AND TRIBUTARIES, TEXAS
WALLISVILLE LAKE

LOCATION AND PROJECT PLAN
MAPS

SCALE AS SHOWN

U S ARMY ENGINEER DISTRICT, GALVESTON, TEXAS

TO ACCOMPANY ENVIRONMENTAL STATEMENT
DATED NOVEMBER 1971

LOCATION MAP

SCALE OF MILES

PLATE 1